1  Alan Gura (Calif. Bar No. 178221)
   Gura & Possessky, PLLC
2  101 N. Columbus St., Suite 405
   Alexandria, VA 22314
3  703.835.9085/Fax 703.997.7665

4  Donald E.J. Kilmer, Jr. (Calif. Bar No. 179986)
   Law Offices of Donald Kilmer, A.P.C.
5  1645 Willow Street, Suite 150
   San Jose, CA 95125
6  408.264.8489/Fax 408.264.8487

7
               IN THE UNITED STATES DISTRICT COURT
8
             FOR THE EASTERN DISTRICT OF CALIFORNIA
9

10   Deanna Sykes, et al.,                )    Case No. 2:09-cv-01235-MCE-KJM
                                          )
11              Plaintiffs,               )    MEMORANDUM OF POINTS
                                          )    AND AUTHORITIES IN SUPPORT
12              v.                         )    OF PLAINTIFFS' MOTION FOR
                                          )    SUMMARY JUDGMENT
13   John McGinness, et al.,              )
                                          )
14              Defendants.               )
     _____)
15
           MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
16                PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

17          COME NOW the Plaintiffs, Deanna Sykes, Andrew Witham, Adam Richards, Second

18   Amendment Foundation, Inc., and The Calguns Foundation, Inc., by and through undersigned

19   counsel, and submit their Memorandum of Points and Authorities in Support of their Motion for

20   Summary Judgment.

21          Dated: August 6, 2009                    Respectfully submitted,

22   Donald E.J. Kilmer, Jr. (Calif. Bar No. 179986)   Alan Gura (Calif. Bar No. 178221)
     Law Offices of Donald Kilmer, A.P.C.              Gura & Possessky, PLLC
23   1645 Willow Street, Suite 150                     101 N. Columbus St., Suite 405
     San Jose, CA 95125                                Alexandria, VA 22314
24   408.264.8489/Fax 408.264.8487                     703.835.9085/Fax 703.997.7665
     E-Mail: Don@DKLawOffice.com
25
       By:  /s/Donald E.J. Kilmer, Jr./        By:   /s/Alan Gura/
26          Donald E.J. Kilmer, Jr.                  Alan Gura

27                                                   Attorneys for Plaintiffs

28

TABLE OF CONTENTS

Table of Authorities......................................................... ii

Preliminary Statement........................................................ 1

Statement of Facts........................................................... 1

    The Regulatory Background........................................... 1

    Defendants' Customs, Practices, and Policies......................... 2

    Plaintiffs' Experiences With Defendants' Challenged Policies......... 3

Summary of Argument......................................................... 7

Argument.................................................................... 8

    I.    The Second Amendment Protects The Right To Carry Handguns
          For Self-Defense.................................................. 8

    II.   The Second Amendment Is Incorporated As Against Defendants
          By Operation Of The Fourteenth Amendment.......................... 9

         A.    The Privileges Or Immunities Clause Incorporates
               The Second Amendment...................................... 9

         B.    The Due Process Clause Incorporates The Second Amendment...... 10

              1.    The Right to Arms in Our Legal Tradition.............. 11

              2.    The States' Treatment of the Right to Arms............ 11

              3.    The Interest Secured by the Right to Arms............. 12

    III.  California Has Selected Concealed Carrying As The Permissible Mode of
          Exercising The Right To Arms...................................... 14

    IV.  Defendants' Challenged Policies Are Unconstitutional.............. 18

         A.    Defendants' Policies Rejecting Self-Defense As A Basis For
               Issuing Handgun Carry Permits Are Unconstitutional......... 19

         B.    Defendants' Challenged Policies Violate The Right To
               Equal Protection.......................................... 19

         C.    Defendants' Challenged Policies Violate The Right To Travel........ 22

    V.   Plaintiffs Have Been And Continue To Be Injured By Defendants'
          Unconstitutional Policies......................................... 23

Conclusion................................................................. 28

1                            TABLE OF AUTHORITIES

2   Cases

3   *Andrews* v. *State*, 50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15, 16

4   *Apethaker* v. *Secretary of State*, 378 U.S. 500 (1964). . . . . . . . . . . . . . . . . . . . . . . . . 23

5   *Aymette* v. *State*, 21 Tenn. 154 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

6   *Bach* v. *Pataki*, 408 F.3d 75 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

7   *Benton* v. *Maryland*, 395 U.S. 794 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

8   *City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432 (1985). . . . . . . . . . . . . . . . . 20

9   *City of Las Vegas* v. *Moberg*, 485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . . . . . . . . 9

10  *Cruzan* v. *Dir., Mo. Dept. of Health*, 497 U.S. 261 (1990). . . . . . . . . . . . . . . . . . . . . . 12

11  *District of Columbia* v. *Heller*, 128 S. Ct. 2783 (2008). . . . . . . . . . . . . . . . . . . . . passim

12  *Duncan* v. *Louisiana*, 391 U.S. 145 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

13  *Dunn* v. *Blumstein*, 405 U.S. 330 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

14  *Eisenstadt* v. *Baird*, 405 U.S. 438 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

15  *Erdelyi* v. *O'Brien*, 680 F.2d 61 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

16  *Gannett Co.* v. *DePasquale*, 443 U.S. 368 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . 14

17  *Gideon* v. *Wainright*, 372 U.S. 335 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18  *Greenlaw* v. *United States*, 128 S. Ct. 2559 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . 25

19  *Griswold* v. *Connecticut*, 381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

20  *Guillory* v. *County of Orange*, 731 F.2d 1379 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . 20

21  *Harper* v. *Virginia Board of Elections*, 383 U.S. 663 (1966). . . . . . . . . . . . . . . . . . . . 20

22  *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . 24

23  *Houghton* v. *Shafer*, 392 U.S. 639 (1968) (per curiam). . . . . . . . . . . . . . . . . . . . . . . 26

24  *Hussey* v. *City of Portland*, 64 F.3d 1260 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 20

25  *In re Application of McIntyre*, 552 A.2d 500 (Del. Super. 1988). . . . . . . . . . . . . . . . . . 16

26  *In re Brickey*, 70 P. 609 (Idaho 1902). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

27  *Int'l Brotherhood of Teamsters* v. *United States*, 431 U.S. 324 (1977). . . . . . . . . . . . . . 26

28  *Kellogg* v. *City of Gary*, 562 N.E.2d 685 (Ind. 1990). . . . . . . . . . . . . . . . . . . . . . . 9, 28

1  *Kent* v. *Dulles*, 357 U.S. 116 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2  *Lawrence* v. *Texas*, 539 U.S. 558 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

3  *Madsen* v. *Boise State University*, 976 F.2d 1219 (9th Cir. 1992) (per curiam). . . . . . . . . . 26, 27

4  *Mallock* v. *Eastly*, 87 Eng. Rep. 1370, 7 Mod. Rep. 482 (C.P. 1744). . . . . . . . . . . . . . . . . 11

5  *Maloney* v. *Cuomo*, 554 F.3d 56 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

6  *Miller* v. *Texas*, 153 U.S. 535 (1894). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

7  *Mills* v. *District of Columbia*, ___ F.3d ___,
   2009 U.S. App. LEXIS 15324 (D.C. Cir. July 10, 2009). . . . . . . . . . . . . . . . . . . . . . . 23

8  *Muscarello* v. *United States*, 524 U.S. 125 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9  *National Rifle Ass'n* v. *City of Chicago*, 567 F.3d 856 (7th Cir. 2009). . . . . . . . . . . . . . . . . 13

10 *Nunez by Nunez* v. *City of San Diego*, 114 F.3d 935 (9th Cir. 1997). . . . . . . . . . . . . . . . 22, 23

11 *Nunn* v. *State*, 1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15, 19

12 *Papachristou* v. *City of Jacksonville*, 405 U.S. 156 (1972). . . . . . . . . . . . . . . . . . . . . . . . . 22

13 *Perkins* v. *Endicott Johnson Corp.*, 128 F.2d 208 (2nd Cir. 1942). . . . . . . . . . . . . . . . . . . . 14

14 *Planned Parenthood* v. *Casey*, 505 U.S. 833 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

15 *Poe* v. *Ullman*, 367 U.S. 497 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

16 *Price* v. *Georgia*, 398 U.S. 323 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

17 *Robertson* v. *Baldwin*, 165 U.S. 275 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 *Rochin* v. *California*, 342 U.S. 165 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

19 *Saenz* v. *Roe*, 526 U.S. 489 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 22, 23

20 *Salute* v. *Pitchess*, 61 Cal. App. 3d 557 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 21

21 *Shapiro* v. *Thompson*, 394 U.S. 618 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

22 *Shuttlesworth* v. *City of Birmingham*, 394 U.S. 147 (1969). . . . . . . . . . . . . . . . . . . . . . . . 26

23 *State ex rel. City of Princeton* v. *Buckner*, 377 S.E.2d 139 (W. Va. 1988). . . . . . . . . . . . . 9, 28

24 *State* v. *Chandler*, 5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 19

25 *State* v. *Delgado*, 692 P.2d 210 (Or. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

26 *State* v. *Kerner*, 107 S.E. 222 (N.C. 1921). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

27 *State* v. *Reid*, 1 Ala. 612 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*State* v. *Rosenthal*, 55 A. 610 (Vt. 1903). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*The Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873). . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Town of Castle Rock* v. *Gonzales*, 545 U.S. 748 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United Food & Commercial Workers Union Local 751* v. *Brown Group, Inc.*,
　　517 U.S. 544 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States ex rel. Bennett* v. *Rundle*, 419 F.2d 599 (3rd Cir. 1969) (en banc). . . . . . . . . . . 14

*United States ex rel. Hetenyi* v. *Wilkins*, 348 F.2d 844 (2d Cir. 1965). . . . . . . . . . . . . . . . . . 14

*United States ex rel. Latmore* v. *Sielaff*,
　　561 F.2d 691 (7th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States* v. *Baugh*, 187 F.3d 1037 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States* v. *Carolene Products Co.*, 304 U.S. 144 (1938). . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Cruikshank*, 92 U.S. 542 (1875). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Emerson*, 270 F.3d 203 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Everist*, 368 F.3d 517 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Weinberger* v. *Salfi*, 422 U.S. 749 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Williams* v. *State of California*, 34 Cal. 3d 18 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Youngberg* v. *Romeo*, 457 U.S. 307 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Zobel* v. *Williams*, 457 U.S. 55 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


Constitutional Provisions

U.S. Const., amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const. amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S. Const. amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S. Const. amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim


Statutes

Cal. Elections Code § 9005. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cal. Gov't Code § 815.2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cal. Gov't Code § 818.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1  Cal. Gov't Code § 820.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2  Cal. Gov't Code § 821.6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

3  Cal. Penal Code § 12050. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

4  Tex. Gov't Code § 411.177(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5  Tex. Penal Code § 46.035(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

7  Other Authorities

8  Akhil Reed Amar, *Substance and Method in the Year 2000*,
       28 Pepp. L. Rev. 601 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   Black's Law Dictionary (6th Ed. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   Br. of Amici States Texas, et al., Supreme Court No. 07-290. . . . . . . . . . . . . . . . . . . . . 11

   Br. of Amici States Texas, et al., Supreme Court Nos. 08-1497, 08-1521 . . . . . . . . . . . . . 11

   Br. of Amicus State of California,
       Supreme Court Nos. 08-1497, 08-1521 (July 6, 2009). . . . . . . . . . . . . . . . . . . . 9, 11

   Cal. Joint Budget Committee Analysis,
       SA 1999-RF0053, Dec. 22, 1999. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   Cal. Joint Budget Committee Analysis,
       SA 2001-RF0041, Dec. 13, 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   Eugene Volokh, *Implementing the Right to Keep
       and Bear Arms for Self-Defense: An Analytic
       Framework and a Research Agenda*,
       56 UCLA L. Rev. 1443 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   Eugene Volokh, *State Constitutional Rights to Keep
       and Bear Arms*, 11 Tex. Rev. L. & Pol. 191 (2006). . . . . . . . . . . . . . . . . . . . . . . . . 11

   Richard L. Aynes, *Constricting the Law of Freedom: Justice Miller,
       the Fourteenth Amendment, and the Slaughter-House Cases*,
       70 Chi.-Kent L. Rev. 627 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   The American Students' Blackstone (G. Chase ed. 1884). . . . . . . . . . . . . . . . . . . . . . . . 16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PRELIMINARY STATEMENT

Defendants' policies with respect to the issuance of gun carry permits are clearly established. The only question is whether these policies are constitutional. They are not.

Defendant Sheriffs and their respective counties maintain near-complete bans on the carrying of handguns for self-defense by ordinary, law-abiding individuals. These bans are not compelled by California law, which provides Defendants authority to license the carrying of handguns. Nor are these bans consistent with Plaintiffs' rights under the Second and Fourteenth Amendments. The law is clear: law-abiding individuals in our country are generally entitled to carry handguns for self-defense.

Plaintiffs do not challenge the concept that Defendants have an interest in regulating firearms in the interest of public safety, just as Defendants have an interest in regulating the time, place, or manner of speech or public assemblies. Nor do Plaintiffs challenge the idea that the state may maintain a system of licensing the carrying of firearms, just as the state might license parades or demonstrations. But the regulatory interest here is not absolute. It is curtailed by the right to keep and bear arms, rooted in the inherent and natural human right of self-defense.

To be sure – Plaintiffs do not claim that there is a constitutional right to carry *concealed* weapons any more than there is a constitutional right to carry weapons openly. Whatever an individual's preference, precedent confirms that the right is simply to carry weapons, and that legislatures may choose to specify the manner of doing so. California chooses to ban the open carrying of functional handguns and permit their concealed carry. Accordingly, permits to carry arms may not be denied to ordinary, law-abiding citizens such as Plaintiffs who can demonstrate basic competence with a firearm and who wish to carry a handgun for self-defense.

STATEMENT OF FACTS

*The Regulatory Background*

California law generally bars the open carrying of functional firearms, allowing the practice only in unincorporated areas or, with a special license, in select sparsely populated

1  counties. SUF 1. California law also prohibits the concealed carrying of functional firearms

2  without a license. SUF 2. Accordingly, for most people and throughout most of the state, a

3  license to carry a concealed weapon provides the only legal option available to those who wish to

4  carry firearms for self-defense. SUF 3.

5        Applicants seeking a license to carry a handgun must pass a criminal background check,

6  SUF 4, and successfully complete a course of training in the proper use of handguns. SUF 5.

7  Applications for a permit to carry a handgun are made to the Sheriff of the county in which the

8  applicant either resides or spends a substantial period of time in owing to the applicant's principal

9  place of employment or business being located in that county. SUF 6. Alternatively, application

10  may be made to the chief or other head of a municipal police department of any city or city and

11  county in which the applicant resides. SUF 7.

12        In addition to the successful completion of a background check and training, the issuance

13  of a permit to carry a handgun is left to the discretion of the issuing authority, based upon that

14  authority's determination that an applicant "is of good moral character, [and] that good cause

15  exists for the issuance" of the permit. SUF 8. Issuing authorities must publish policies regarding

16  the issuance of handgun carry permits. SUF 9.

17  *Defendants' Customs, Practices, and Policies*

18        In practice, the issuance of permits to carry handguns varies widely among California

19  jurisdictions. Some issuing authorities almost never issue handgun carry permits, others issue

20  permits only occasionally, and yet others liberally issue permits to most if not all law-abiding

21  applicants. Defendants are sued because they fall in the first category.

22        Defendants John McGinness and Ed Prieto are the Sheriffs of Sacramento and Yolo

23  Counties, respectively. SUF 10, 11. Under California law, McGinness and Prieto are issuing

24  authorities for a permit to carry a concealed handgun. SUF 12, 13. On a public website

25  maintained by Defendant Sacramento County, Defendant McGinness lays out his policy for

26  determining applications to carry handguns. Defendant McGinness explains that "[t]he mere fear

27  of victimization, or desire to carry a firearm, shall be insufficient" "good cause" to issue a gun

28  carry permit. SUF 14. Defendant McGinness also explains that "[w]hat may be good cause in one

area of the county may not be in another area." SUF 15. Defendant McGinness further requires "one year minimum residency in Sacramento County." SUF 16.

Recently, Defendant McGinness advised that owing to budget cuts, he would be forced to lay off many deputies and curtail his department's ability to respond to crime. Defendant McGinness offered that to offset such cuts in his police force, he might adopt a more permissive policy toward issuing permits to carry handguns. SUF 17. Stated McGinness, "If we wind up with six patrol cars patrolling the entire county of Sacramento, I have no choice but to make some changes in terms of the issuance of concealed weapons permits." SUF 18. McGinness added, "In this scenario where we can not begin to assure people any element of safety, I think I have to make a change and would frankly probably collapse that committee [that screens handgun carry permit applications] and take on myself to issue those permits based on a person's need to protect themselves." SUF 19.

Defendants Prieto and Yolo County likewise maintain a restrictive policy with respect to the issuance of gun carry permits, rejecting self-defense, without more, as a reason to even apply for a permit. Defendant Prieto's written policy regarding the issuance of gun carry permits includes among "examples of invalid reasons to request a permit" "self-protection and protection of family (without credible threats of violence)." SUF 20.

*Plaintiffs' Experiences With Defendants' Challenged Policies*

Plaintiffs Deanna Sykes and Andrew Witham are law-abiding residents of Sacramento County. SUF 21, 22. Plaintiff Adam Richards is a law-abiding resident of Yolo County. SUF 23. All three individual plaintiffs are fully qualified under federal and California law to purchase and possess firearms. SUF 24.

Plaintiff Sykes seeks to exercise her Second Amendment right to carry a handgun for personal protection. SUF 25. Plaintiff Sykes fears victimization, and desires to carry a firearm, but has not been specifically threatened nor has she been previously been victimized by violent crime. SUF 26. Plaintiff Sykes applied for a handgun carry permit from Defendant McGinness's predecessor in Sacramento County but her request was denied. SUF 27. Plaintiff Sykes has read the written policy of Defendant McGinness that "[t]he mere fear of victimization, or desire to

1   carry a firearm, shall be insufficient" "good cause" to issue a gun carry permit and thus

2   understands that she lacks "good cause" to obtain a permit as that term is defined and

3   implemented by Defendants McGinness and Sacramento County. SUF 28. Plaintiff Sykes fears

4   arrest, prosecution, fine and imprisonment if she were to carry a handgun without a handgun carry

5   permit. But for the lack of a handgun carry permit and her fear of prosecution, Plaintiff Sykes

6   would carry a handgun in public for self-defense. SUF 29.

7       On December 10, 2006, Plaintiff Andrew Witham completed the basic course required to

8   obtain a handgun carry permit in Shasta County, as well as the course of training required to

9   obtain a permit to carry an exposed firearm from the California Bureau of Security and

10  Investigative Services. SUF 30. Since then, Witham has re-qualified four times for the exposed

11  handgun permit, which he currently possesses, along with a Private Investigator license. SUF 31.

12  Witham's Private Investigator license, in conjunction with his Exposed Firearm Permit, allows

13  him to carry an exposed, loaded handgun in California but only while he is engaged in the course

14  and scope of his work as a private investigator. SUF 32.

15      In January, 2007, the Sheriff of Shasta County, where Witham lived and worked, issued

16  Witham a two-year permit to carry a concealed handgun. SUF 33. On or about July, 2007,

17  Witham relocated from Shasta to the City of Fairfield, in Solano County. As required by law,

18  Witham notified the Sheriff of Shasta County of this move. SUF 34. On or about July, 2008,

19  Witham relocated from Solano County to Sacramento County, and again notified the Sheriff of

20  Shasta County of this move. Within days, his permit to carry a handgun was revoked. SUF 35.

21      Witham contacted Defendant McGinness's office to inquire about the revocation of his

22  permit to carry a handgun, and was advised that a permit would have to be issued by Defendant

23  McGinness. SUF 36. Witham was further advised that application for a permit to carry a handgun

24  could not be made by individuals residing in Sacramento County for less than 12 months, in the

25  absence of a letter attesting to the applicant's good character from the issuing authority of the

26  applicant's previous gun permit. SUF 37. As Witham had no such letter, he was refused an

27  application form for a handgun carry permit. SUF 38. Witham was advised that as a matter of

28  policy, the Sheriff of Shasta County does not issue such good character letters. SUF 39.

Although Defendant McGinness does not require that handgun carry permit applicants complete the required training prior to making their applications, Witham was certified on December 16, 2008, in 24 hours POST PC 832 Firearms Familiarization at the Sacramento Regional Public Safety Training Center, an approved course for issuance of a handgun carry permit in Sacramento County. SUF 40. Plaintiff Witham seeks to exercise his Second Amendment right to carry a handgun for personal protection. SUF 41. Plaintiff Witham fears victimization, and desires to carry a firearm, but has not previously been victimized by violent crime. Although Witham was previously threatened, the threats subsided after Witham left Shasta County. Witham is unaware of any current, specific threats against him. SUF 42.

Plaintiff Witham has read Defendant McGinness's written policy that "[t]he mere fear of victimization, or desire to carry a firearm, shall be insufficient" "good cause" to issue a gun carry permit and thus understands that he lacks "good cause" to obtain a permit as that term is defined and implemented by Defendants McGinness and Sacramento County. SUF 43. Plaintiff Witham fears arrest, prosecution, fines and imprisonment were he to carry a handgun without a permit. But for the lack of a handgun carry permit and fear of prosecution, Plaintiff Witham would carry a handgun in public for self-defense. SUF 44.

In March, 2009, Plaintiff Adam Richards contacted Defendant Prieto's office to inquire about the process for obtaining a permit to carry a handgun. Defendant Prieto's office advised Plaintiff Richards that the desire to have a gun available for self-defense would not constitute "good cause" for the issuance of the permit, and that he should not apply because doing so would be a futile act. SUF 45. Plaintiff Richards was further advised that as a matter of policy, his application would also not be considered unless he first applied to the Chief of Police in the City of Davis, where he resides. SUF 46.

Richards subsequently applied to Davis Police Chief Lanny Black for a permit to carry a handgun. On April 1, 2009, Police Chief Black denied Plaintiff Richards' application for a permit to carry a handgun, stating that for budgetary reasons his department no longer processes handgun carry permit applications, and suggesting that Richards seek a permit from Prieto. SUF 47.

1    Plaintiff Richards seeks to exercise his Second Amendment right to carry a handgun for

2    personal protection. SUF 48. Plaintiff Richards seeks a handgun carry permit so that he might

3    protect himself and his family. However, Richards has received no threats of violence and is

4    unaware of any specific threat to him or his family. SUF 49. Richards has read Defendant Prieto's

5    written policy declaring that "self-protection and protection of family (without credible threats of

6    violence)" is among "examples of invalid reasons to request a permit," which is perfectly

7    consistent with his experience in unsuccessfully seeking a handgun carry permit. SUF 50.

8    Richards thus understands that he lacks "good cause" to obtain a permit as that term is defined

9    and implemented by Defendants Prieto and Yolo County. SUF 51. Richards fears arrest,

10    prosecution, fines and imprisonment were he to carry a handgun without a permit. But for the

11    lack of a handgun carry permit and fear of prosecution, Richards would carry a handgun in public

12    for self-defense. SUF 52.

13    Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership

14    organization incorporated under the laws of Washington with its principal place of business in

15    Bellevue, Washington. SUF 53. SAF has over 650,000 members and supporters nationwide,

16    including many in California. SUF 54. The purposes of SAF include education, research,

17    publishing and legal action focusing on the Constitutional right to privately own and possess

18    firearms, and the consequences of gun control. SUF 55.

19    Plaintiff The Calguns Foundation, Inc. is a non-profit organization incorporated under the

20    laws of California with its principal place of business in Redwood City, California. SUF 56. The

21    purposes of Calguns include supporting the California firearms community by promoting

22    education for all stakeholders about firearm laws, rights and privileges, and securing the civil

23    rights of California gun owners, who are among its members and supporters. SUF 57.

24    SAF and Calguns expend their resources encouraging exercise of the right to bear arms,

25    and advising and educating their members, supporters, and the general public about the varying

26    policies with respect to the public carrying of handguns in California, including in Sacramento and

27    Yolo Counties. The issues raised by, and consequences of, Defendants' policies, are of great

28    interest to SAF and Calguns' constituencies. Defendants' policies regularly cause the expenditure

1   of resources by SAF and Calguns as people turn to these organizations for advice and

2   information. SUF 58, 59. Defendants' policies bar the members and supporters of SAF and

3   Calguns from obtaining permits to carry handguns. SUF 60.

4                              SUMMARY OF ARGUMENT

5        The Second Amendment plainly guarantees Plaintiffs a fundamental, individual right to

6   carry handguns for self-defense. Although the state may regulate the right to bear arms in the

7   interest of public safety, the fact that such regulations touch upon a fundamental right has long

8   confirmed a distinction between regulation and prohibition.

9        California law expresses a preference that individuals carrying handguns for self-defense

10  do so in a concealed manner, subject to a licensing regime administered by local law enforcement

11  officials. This is a constitutionally permissible legislative choice. Open and concealed carrying of

12  handguns both satisfy the personal interest in self-defense, but precedent confirms that either may

13  be preferred by government officials for various reasons. The government may thus ban the

14  concealed carrying of functional firearms so long as it allows them to be carried openly, or ban the

15  open carrying of firearms so long as it allows them to be carried concealed. But a blanket

16  prohibition on all handgun carrying for self-defense is unconstitutional. Plaintiffs in this case do

17  not contest California's regulation limiting them to concealed carry.

18       Having been charged with the task of implementing California's licensing regime for the

19  carrying of handguns, Defendants may not refuse to do so. *Salute* v. *Pitchess*, 61 Cal. App. 3d.

20  557 (1976). Nor may Defendants exercise that discretion in a manner that deprives individuals of

21  a fundamental constitutional right. And considering that the interest in self-defense lies at the heart

22  of the right to arms, self-defense cannot be rejected as cause for a gun carry permit. Defendants'

23  policies, rejecting the interest in self-defense altogether, are plainly unconstitutional. Considering

24  that Defendants' policies classify individuals arbitrarily in the exercise of a fundamental right,

25  Defendants are also depriving Plaintiffs of the equal protection of the law. Finally, Defendants

26  McGinness and Sacramento County's durational residency requirement for seeking a permit to

27  carry a handgun violates not only the right to bear arms, but the right to travel as well. It, too,

28  must be enjoined.

1

<u>ARGUMENT</u>

2

I.    THE SECOND AMENDMENT PROTECTS THE RIGHT TO CARRY HANDGUNS FOR SELF-DEFENSE.

3

4

The Second Amendment protects the right "to keep and bear arms." U.S. Const. amend.

5

II. This syntax is not unique within the Bill of Rights. For example, the Sixth Amendment

6

guarantees the right to a "speedy and public trial," U.S. Const. amend. VI, while the Eighth

7

Amendment secures individuals from "cruel and unusual" punishment. U.S. Const. amend. VIII.

8

Just as the Sixth Amendment does not sanction secret, speedy trials or public, slow trials, and the

9

Eighth Amendment does not allow the usual practice of torture, the Second Amendment's

10

reference to "keep and bear" refers to two distinct concepts.

11

The Supreme Court confirmed as much, rejecting the argument that "keep and bear arms"

12

was a unitary concept referring only to a right to possess weapons in the context of military duty.

13

To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the

14

person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for

15

offensive or defensive action in a case of conflict with another person." *District of Columbia* v.

16

*Heller*, 128 S. Ct. 2783, 2793 (2008) (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143

17

(1998) (Ginsburg, J., dissenting); Black's Law Dictionary 214 (6th Ed. 1998)); *see also Heller*,

18

128 S. Ct. at 2804 ("the Second Amendment right, protecting only individuals' liberty to keep

19

*and carry* arms . . ."), at 2817 ("the right to keep *and carry* arms") (emphasis added).

20

Having defined the Second Amendment's language as including a right to "carry" guns for

21

self-defense, the Supreme Court helpfully noted several exceptions that prove the rule. Explaining

22

that this right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any

23

manner whatsoever and for whatever purpose," *Heller*, 128 S. Ct. at 2816 (citations omitted), the

24

Court confirmed that there is a right to carry at least some weapons, in some manner, for some

25

purpose. The Supreme Court then listed as "presumptively lawful," *Heller*, 128 S. Ct. at 2817

26

n.26, "laws forbidding the carrying of firearms in sensitive places," *id.*, at 2817, confirming both

27

that such "presumptions" may be overcome in appropriate circumstances, and that carrying bans

28

are *not* presumptively lawful in non-sensitive places.

1    In upholding the right to carry a handgun under the Second Amendment, the *Heller* court

2    broke no new ground. As early as 1846, Georgia's Supreme Court, applying the Second

3    Amendment, quashed an indictment for the carrying of a handgun that failed to allege whether the

4    handgun was being carried in a constitutionally-protected manner. *Nunn* v. *State*, 1 Ga. 243, 251

5    (1846); *see also In re Brickey*, 70 P. 609 (Idaho 1902) (Second Amendment right to carry

6    handgun). Numerous state constitutional right to arms provision have likewise been interpreted as

7    securing the right to carry a gun in public, albeit often, to be sure, subject to some regulation. *See*,

8    *e.g. Kellogg* v. *City of Gary*, 562 N.E.2d 685 (Ind. 1990); *State ex rel. City of Princeton* v.

9    *Buckner*, 377 S.E.2d 139 (W. Va. 1988); *City of Las Vegas* v. *Moberg*, 485 P.2d 737 (N.M. Ct.

10   App. 1971); *State* v. *Kerner*, 107 S.E. 222 (N.C. 1921); *State* v. *Rosenthal*, 55 A. 610 (Vt. 1903)

11   (striking down ban on concealed carry); *Andrews* v. *State*, 50 Tenn. 165 (1871); *see also State* v.

12   *Delgado*, 692 P.2d 210 (Or. 1984) (right to carry a switchblade knife).

13   Plaintiffs thus enjoy an individual Second Amendment right to carry a handgun for

14   purposes of self-defense.

15   II.    THE SECOND AMENDMENT IS INCORPORATED AS AGAINST DEFENDANTS
        BY OPERATION OF THE FOURTEENTH AMENDMENT.
16

17   Although at the moment there is no binding Ninth Circuit opinion determining the

     question, post-*Heller*, whether the Second Amendment is incorporated as against the states by the
18
     Fourteenth Amendment, the question is not a difficult one. As recognized by the State of
19
     California's recent brief before the Supreme Court, the Second Amendment should be
20
     incorporated. Br. of Amicus State of California, Supreme Court Nos. 08-1497, 08-1521 (July 6,
21
     2009).[1] Indeed, as discussed below, *Heller* all but commands reaching that result.
22
     A.    The Privileges Or Immunities Clause Incorporates The Second Amendment.
23
     The plain text, legislative history, and original public meaning of the Fourteenth
24
     Amendment's Privileges or Immunities Clause – "No state shall make or enforce any law which
25

26   _____

27   [1]The state's brief speaks of incorporating "*Heller*'s core Second Amendment holding that
     government cannot deny citizens the right to possess handguns in their homes." Cal. Br. at 4. Of
28   course, the incorporation analysis cannot parse different portions of the right, which as shown
     *supra*, includes the right to "bear" arms.

1  shall abridge the privileges or immunities of citizens of the United States," U.S. Const. amend.

2  XIV, sec. 1, cl. 2 – make clear that this language incorporates the Bill of Rights as against the

3  states. Unfortunately, that argument is foreclosed in this Court by *The Slaughter-House Cases*, 83

4  U.S. (16 Wall.) 36 (1873), holding that the Privileges or Immunities Clause guarantees only rights

5  that flow from the existence of United States citizenship, such as the rights to diplomatic

6  protection abroad or to access the navigable waterways of the United States.

7       "Virtually no serious modern scholar – left, right, and center—thinks that [*Slaughter-

8  House*] is a plausible reading of the Amendment." Akhil Reed Amar, *Substance and Method in

9  the Year 2000*, 28 Pepp. L. Rev. 601, 631 n.178 (2001). "'[E]veryone' agrees the Court [has]

10  incorrectly interpreted the Privileges or Immunities Clause." Richard Aynes, *Constricting the Law

11  of Freedom: Justice Miller, the Fourteenth Amendment, and the Slaughter-House Cases*, 70

12  Chi.-Kent L. Rev. 627 (1994).

13       "Legal scholars agree on little beyond the conclusion that the Clause does not mean what

14  the Court said it meant in 1873." *Saenz* v. *Roe*, 526 U.S. 489, 523 n.1 (Thomas, J., dissenting)

15  (citations omitted). Indeed, Justice Thomas, joined by Chief Justice Rehnquist, declared that he

16  "would be open to reevaluating [the Privileges or Immunities Clause's] meaning in an appropriate

17  case." *Saenz*, 526 U.S. at 528.[2] Plaintiffs submit that this is an appropriate such case. But no

18  settled law need be overturned for Plaintiffs to prevail before this Court, because binding Supreme

19  Court precedent commands incorporation of the Second Amendment under the Due Process

20  Clause.

21       B.    The Due Process Clause Incorporates The Second Amendment.

22       It is now well-established that the Due Process Clause has a substantive dimension, and

23  that deprivation of enumerated constitutional rights is thus largely incompatible with due process.

24

25       [2]"Since the adoption of [the Fourteenth] Amendment, ten Justices have felt that it protects
26  from infringement by the States the privileges, protections, and safeguards granted by the Bill of
Rights . . . . Unfortunately it has never commanded a Court. Yet, happily, all constitutional
27  questions are always open." *Gideon* v. *Wainright*, 372 U.S. 335, 345-46 (1963) (Douglas, J.,
28  concurring) (citation omitted).

1  Almost every provision of the Bill of Rights considered for incorporation in the modern era has

2  been incorporated. The Second Amendment must be among the incorporated rights.

3      The modern incorporation test asks whether a right is "fundamental to the American

4  scheme of justice," *Duncan* v. *Louisiana*, 391 U.S. 145, 149 (1968), or "necessary to an Anglo-

5  American regime of ordered liberty," *id.* at 150 n.14. *Duncan*'s analysis suggests looking to the

6  right's historical acceptance in our nation, its recognition by the states (including any trend

7  regarding state recognition), and the nature of the interest secured by the right. The right to bear

8  arms clearly satisfies all aspects of the selective incorporation standard.

9              1.      *The Right to Arms in Our Legal Tradition*.

10      "By the time of the founding, the right to have arms had become fundamental for English

11  subjects." *Heller*, 128 S. Ct. at 2798 (citations omitted). When the Constitution was written,

12  English law had "settled and determined" that "a man may keep a gun for the defence of his house

13  and family." *Mallock* v. *Eastly*, 87 Eng. Rep. 1370, 1374, 7 Mod. Rep. 482 (C.P. 1744). The

14  violation of that right by George III "provoked polemical reactions by Americans invoking their

15  rights as Englishmen to keep arms." *Heller*, 128 S. Ct. at 2799.

16      There is no need to recite the exhaustive historical evidence considered in *Heller*. The

17  matter is now settled precedent and beyond further dispute: the Second Amendment "codified a

18  right inherited from our English ancestors." *Heller*, 128 S. Ct. at 2802 (citation omitted).

19              2.      *The States' Treatment of the Right to Arms*.

20      All five state constitutional ratifying conventions that demanded a Bill of Rights demanded

21  a right to arms. Forty-four states secure a right to arms in their constitutions. Of these, fifteen are

22  either new or strengthened since 1970. Eugene Volokh, *State Constitutional Rights to Keep and*

23  *Bear Arms*, 11 Tex. Rev. L. & Pol. 191 (2006). In *Heller*, thirty-two states advised that the

24  individual Second Amendment right "is properly subject to incorporation." Br. of Amici States

25  Texas, et al., Supreme Court No. 07-290, at 23 n.6. On July 6, 2009, thirty-four states, including

26  California, reiterated this position. Br. of Amici States Texas, et al., Supreme Court Nos. 08-

27  1497, 08-1521 (thirty-three states); Br. of Amicus State of California, *supra*.

28

3.    *The Interest Secured by the Right to Arms.*

The Second Amendment's purpose confirms its incorporation. "The inherent right of self-defense has been central to the Second Amendment right." *Heller*, 128 S. Ct. at 2818. Blackstone described that right as preserving "'the natural right of resistance and self-preservation,' and 'the right of having and using arms for self-preservation and defence.'" *Heller*, 128 S. Ct. at 2792 (citations omitted).

"[T]he right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." *Youngberg* v. *Romeo*, 457 U.S. 307, 315 (1982) (citation omitted). The Supreme Court binds the states to respect various rights which, like the Second Amendment, are rooted in deference to preserving personal autonomy. Observing that

> no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law,

*Cruzan* v. *Dir., Mo. Dept. of Health*, 497 U.S. 261, 269 (1990) (citation omitted), the Supreme Court recognized a right to refuse life-sustaining medical care. *Id.* at 278; *see also Eisenstadt* v. *Baird*, 405 U.S. 438, 453 (1972) ("the right of the individual . . . to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child"); *Lawrence* v. *Texas*, 539 U.S. 558, 562 (2003) ("liberty of the person both in its spatial and more transcendent dimensions" supports right to consensual intimate relationships); *Rochin* v. *California*, 342 U.S. 165 (1952) (bodily integrity right against searches).

The Supreme Court instructs that "choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment." *Planned Parenthood* v. *Casey*, 505 U.S. 833, 851 (1992). It is unfathomable that the states are constitutionally limited in their regulation of medical decisions or intimate relations, because these matters touch upon personal autonomy, but are unrestrained in their ability to trample upon the enumerated right to arms designed to enable self-preservation. If abortion is protected because "[a]t the heart of liberty is the right to define one's own concept of existence," *id.*, the right of armed self-defense against violent criminal attack is surely deserving of incorporation. Indeed, the right to purchase contraception was discovered as related to the "indefeasible right of personal security." *Griswold*

1  v. *Connecticut*, 381 U.S. 479, 484 n.* (1965) (citation omitted). The right to arms plainly

2  possesses greater nexus to the interest in personal security.

3      *Casey* invoked the second Justice Harlan's celebrated passage describing the liberty

4  protected by the Due Process Clause as broader than "a series of isolated points pricked out in

5  terms of the taking of property; the freedom of speech, press, and religion; *the right to keep and*

6  *bear arms*; the freedom from unreasonable searches and seizures; and so on." *Casey*, 505 U.S. at

7  848 (quoting *Poe* v. *Ullman*, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting)) (emphasis added).

8  Liberty cannot now be defined so narrowly as to exclude one of its more obvious attributes.

9      The Second Amendment also has another purpose, spelled out in the prefatory clause:

10  preservation of the people's ability to act as militia. *Heller*, 128 S. Ct. at 2800-01. The

11  Amendment's framers believed this purpose was "necessary to the security of a free state." U.S.

12  Const. amend. II. By its own terms, the Second Amendment secures a fundamental right.

13      Unfortunately, two courts have recently refused to consider the question of whether the

14  Second Amendment is incorporated. *National Rifle Ass'n* v. *City of Chicago*, 567 F.3d 856 (7th

15  Cir. 2009); *Maloney* v. *Cuomo*, 554 F.3d 56 (2d Cir. 2009). Rather, these courts relied on *pre-*

16  *incorporation era* precedent to hold that the Second Amendment, like the rest of the Bill of

17  Rights, does not bind the states directly.

18      It remains true that the Bill of Rights is not directly applicable to the states. And indeed,

19  the cases relied upon by *Maloney* and *NRA* held that the First and Fourth Amendments do not

20  bind the states, either. *United States* v. *Cruikshank*, 92 U.S. 542, 552 (1875); *Miller* v. *Texas*,

21  153 U.S. 535, 538 (1894). Clearly that is not the operative law today. Far from respecting

22  Supreme Court precedent, *NRA* and *Maloney* ignore the Supreme Court's unmistakable command

23  that incorporation of enumerated rights be considered under its Due Process Clause doctrine. *See,*

24  *e.g. Duncan*, 391 U.S. at 155 (complete non-incorporation "a position long since repudiated").

25      Indeed, the most recent such command was contained in *Heller*. Remarking on one of its

26  ancient pre-incorporation cases failing to apply the Second Amendment to the states, the Court

27  observed: "we note that *Cruikshank* also said that the First Amendment did not apply against the

28  States and did not engage in the sort of Fourteenth Amendment inquiry *required by our later*

1   *cases*." *Heller*, 128 S. Ct. at 2813 n.23 (emphasis added).

2       When the Supreme Court declares a particular analysis is "required," a lower court is not

3   respecting higher authority by foregoing that analysis and resting its decision on the complete

4   state of the law as it existed over a century ago. "[W]hen a lower court perceives a pronounced

5   new doctrinal trend in Supreme Court decisions, it is its duty, cautiously to be sure, to follow not

6   to resist it." *Perkins* v. *Endicott Johnson Corp.*, 128 F.2d 208, 217-18 (2nd Cir. 1942), *aff'd,* 317

7   U.S. 501 (1943) (footnotes omitted).

8       There is nothing new about Due Process Clause incorporation. *Heller*'s command that a

9   modern due process analysis is "required" to determine incorporation question, 128 S. Ct. at

10  hardly restrains the ordinary function of the lower federal courts to develop the law prior to its

11  review by the Supreme Court. To the contrary, the history of incorporation is one of the lower

12  courts taking the lead in addressing incorporation questions, just as all matters not within the

13  Supreme Court's original jurisdiction are presented to the lower courts as a matter of first

14  impression. For example, the Supreme Court did not incorporate the Sixth Amendment right to

15  public trial until long after the Third and Seventh circuits had done so. *See Gannett Co.* v.

16  *DePasquale*, 443 U.S. 368, 379 (1979); *United States ex rel. Latmore* v. *Sielaff*, 561 F.2d 691,

17  693 n.2 (7th Cir. 1977), *cert. denied*, 434 U.S. 1076 (1978); *United States ex rel. Bennett* v.

18  *Rundle*, 419 F.2d 599 (3rd Cir. 1969) (en banc), *cert. denied*, 409 U.S. 916 (1972). Likewise, the

19  Second Circuit incorporated the Fifth Amendment's Double Jeopardy Clause prior to the

20  Supreme Court reaching the same conclusion. *See United States ex rel. Hetenyi* v. *Wilkins*, 348

21  F.2d 844 (2d Cir. 1965), *cert. denied*, 383 U.S. 913 (1966); *Benton* v. *Maryland*, 395 U.S. 794

22  (1969); *see also Price* v. *Georgia*, 398 U.S. 323, 331-32 (1970) (citing *Hetenyi* with approval).

23      The "required" due process analysis is properly before the Court, and leads only to the

24  conclusion that Defendants' actions are restrained by the Second Amendment right to bear arms.

25  III.    CALIFORNIA HAS SELECTED CONCEALED CARRYING AS THE PERMISSIBLE
        MODE OF EXERCISING THE RIGHT TO BEAR ARMS.
26

27      As discussed *supra, Heller* confirms that states enjoy meaningful leeway in proscribing the

28  manner in which guns are carried. Traditionally, "the right of the people to keep and bear arms

1   (Article 2) is not infringed by laws prohibiting the carrying of *concealed* weapons . . . ."

2   *Robertson* v. *Baldwin*, 165 U.S. 275, 281-82 (1897) (emphasis added). But more recently, the

3   Supreme Court has suggested that such bans are only "presumptively" constitutional. *Heller*, 128

4   S. Ct. at 2817 n.26 (emphasis added).

5        Surveying the history of concealed carry prohibitions, it appears time and again that such

6   laws have always been upheld as mere regulations of the manner in which arms are carried – with

7   the understanding that a complete ban on the carrying of handguns is unconstitutional.

8        *Heller* itself discussed, with approval, four state supreme court opinions that referenced

9   this conditional rule. *See Heller*, 128 S. Ct. at 2818 (discussing *Nunn*, *supra*, 1 Ga. 243; *Andrews*,

10  *supra*, 50 Tenn. 165; and *State* v. *Reid*, 1 Ala. 612, 616-17 (1840)) and 128 S. Ct. at 2809 (citing

11  *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850)). In *Reid*, upholding a ban on the carrying of

12  concealed weapons, Alabama's high court explained:

13       We do not desire to be understood as maintaining, that in regulating the manner of bearing
         arms, the authority of the Legislature has no other limit than its own discretion. A statute
14       which, under the pretence of regulating, amounts to a destruction of the right, or which
         requires arms to be so borne as to render them wholly useless for the purpose of defense,
15       would be clearly unconstitutional. But a law which is merely intended to promote personal
         security, and to put down lawless aggression and violence, and to this end prohibits the
16       wearing of certain weapons in such a manner as is calculated to exert an unhappy influence
         upon the moral feelings of the wearer, by making him less regardful of the personal
17       security of others, does not come in collision with the Constitution.

18  *Reid*, 1 Ala. at 616-17.

19       The *Nunn* court followed *Reid*, and quashed an indictment for publicly carrying a pistol

20  for failing to specify how the weapon was carried:

21       so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*,
         that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-
22       defence, or of his constitutional right to keep and bear arms. But that so much of it, as
         contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and
23       *void*.

24  *Nunn*, 1 Ga. at 251 (emphasis original).

25       *Andrews* presaged *Heller* by finding that a revolver was a protected arm under the state

26  constitution's Second Amendment analog. It therefore struck down as unconstitutional the

27  application of a ban on the carrying of weapons to a man carrying a revolver, declaring:

28

If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews*, 165 Tenn. at 187-88.[3]

Finally, in *Chandler,*

the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 128 S. Ct. at 2809 (quoting *Chandler*, 5 La. Ann. at 490).

The legal treatises relied upon by the *Heller* court explained the rule succinctly. For supporting the notion that concealed carrying may be banned, *Heller* further cites to THE AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (G. Chase ed. 1884). *Heller*, 128 S. Ct. at 2816. Here is what that source provides:

[I]t is generally held that statutes prohibiting the carrying of *concealed* weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence. In some States, however, a contrary doctrine is maintained.

Exh. C, AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (emphasis original). This understanding survives today. *See, e.g. In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988) ("'the right to keep and bear arms' does not of necessity require that such arms may be kept concealed").

It is important, then, to recall that (1) the Supreme Court's definition of "bear arms" as that language is used in the Second Amendment includes the concealed carrying of handguns: "wear, bear, or carry . . . *in the clothing or in a pocket* . . ." *Heller*, 128 S. Ct. at 2793 (citations omitted) (emphasis added); (2) the legality of bans on concealed carrying is only "presumptive," *Heller*, 128 S. Ct. at 2817 n.26, and (3) the cases supporting concealed carry prohibition explain that no abrogation of the right to carry arms is effected because open carrying is still permitted.

---

[3]*Andrews* appeared to abrogate in large part *Aymette* v. *State*, 21 Tenn. 154 (1840), upholding the prohibition on the concealed carry of daggers. But even *Aymette*, which found a state right to bear arms limited by a military purpose, deduced from that interpretation that the right to bear arms protected the open carrying of arms. *Aymette*, 21 Tenn. at 160-61.

Legislatures might well prefer one form of carrying over another. Precedent relied upon by *Heller* reveals an ancient suspicion of weapons concealment where social norms viewed the wearing of arms as virtuous. But today, the open carrying of a handgun may be mistakenly viewed as provocative or alarming by segments of the population unfamiliar with firearms. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytic Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1523 (2009). California's mode of regulating the carrying of handguns thus makes perfect sense. In rural, sparsely populated areas, Sheriffs are allowed to issue permits to carry handguns openly. But in more populous areas, including Sacramento and Yolo Counties, the state deprives Sheriffs of this ability, and specifies that permits to carry must be limited to concealed handguns. This manner of regulation is not unusual, and has been adopted by some jurisdictions where the public acceptance of gun rights is relatively high. For example, in Texas, where concealed handgun permits are readily available on a "shall issue" basis, Tex. Gov't Code § 411.177(a), a permit holder who "intentionally fails to conceal the handgun" commits a misdemeanor. Tex. Penal Code § 46.035(a).

*Heller*'s recognition of a right to carry a handgun does not force states such as California and Texas to allow the carrying of handguns in a manner they understandably perceive may cause needless public alarm, so long as a more socially-conducive option exists to allow people to exercise the right to bear arms. But *Heller* confirms that once a choice has been made by the legislature as to which manner of carrying will be permitted, that choice must be honored.

Support for this view comes not merely from the plain language of *Heller* and other precedent, but also from the California Legislature's Legislative Analyst. In 1999 and again in 2001, efforts were made to qualify for the California ballot an initiative constitutional amendment securing a "right to keep and bear arms." Pursuant to Cal. Elections Code § 9005, the proposed amendment was submitted for review by the Joint Budget Committee. Each time, the Legislative Analyst concluded that if the state were to adopt a right to keep and bear arms constitutional amendment, existing state law regulating the carrying of guns would not likely be impacted save for limiting discretion in issuing permits:

> While individuals may possess and carry firearms, many of the state's existing systems for . . . weapons permits . . . would likely not change . . . However, local jurisdictions would not be able to limit who obtains concealed weapons permits unless the applicant does not meet federal or state criteria.

Exh. D, Cal. Joint Budget Committee Analysis, SA 2001-RF0041, Dec. 13, 2001, p. 2; Exh. E, Cal. Joint Budget Committee Analysis, SA 1999-RF0053, Dec. 22, 1999, p. 2.

The Legislature did not express the view that adoption of a state right to bear arms would render unconstitutional the general prohibition on open carrying, nor did the Legislature believe that local officials could continue to take a parsimonious approach to the issuance of concealed carry permits. Rather, the view was that which would years later be implicit in *Heller*: the state can continue to prefer concealed to open carry, and regulate the carrying of concealed handguns, so long as the right to carry is not completely abrogated. This is very limited relief, and it is all that Plaintiffs here request.[4]

IV.    DEFENDANTS' CHALLENGED POLICIES ARE UNCONSTITUTIONAL.

Having established that there is a Second Amendment right to carry guns, and that this right can be regulated along the lines adopted by California, specifying that such carrying is to be concealed and subject to a permit, the question turns to Defendants' policies with respect to what constitutes "good cause" for the issuance of carry permits.

Although requiring individuals to demonstrate "good cause" and "moral character" in order to exercise a constitutional right is in and of itself unconstitutional, Plaintiffs acknowledge this case might be resolved on "as applied" grounds, because California's concealed carry law is susceptible of application in a constitutional manner (as, indeed, is the practice in many California jurisdictions). The immediate problem may not be the requirements of good cause and moral character, but the unconstitutional ways in which Defendants, specifically, apply these requirements.

---

[4]Although the Ninth Circuit once held that there is no liberty interest in obtaining a concealed carry permit, *Erdelyi* v. *O'Brien*, 680 F.2d 61 (9th Cir. 1982), the Second Amendment was not considered in that case. *Erdelyi* does not mention, let alone discuss, the Second Amendment, and was decided long before the Second Amendment was clarified to protect a fundamental right.

A.    Defendants' Policies Rejecting Self-Defense As A Basis For Issuing
      <u>Handgun Carry Permits Are Unconstitutional</u>.

Defendants McGinness and Sacramento County have adopted a written policy holding that "[t]he mere fear of victimization, or desire to carry a firearm, shall be insufficient" "good cause" to seek a carry permit. Exh. A. Defendants Prieto and Yolo County have adopted a written policy holding that "self-protection and protection of family (without credible threats of violence)" are "invalid reasons to request a permit." Exh. B. These policies, rejecting self-defense as a valid purpose for carrying handguns, categorically violate the Second Amendment. As the Supreme Court has made clear, self-defense is at the core of the Second Amendment right to bear arms.

"[T]he inherent right of self-defense has been central to the Second Amendment right." *Heller*, 128 S. Ct. at 2817. Self-defense "was the *central component* of the right itself." *Heller*, 128 S. Ct. at 2801 (emphasis original) (citation omitted). The English right to arms "has long been understood to be the predecessor to our Second Amendment . . . . It was, [Blackstone] said, 'the natural right of resistance and self-preservation,'and 'the right of having and using arms for self-preservation and defence.'"*Id.*, at 2798 (citations omitted). "[T]he right secured in 1689 as a result of the Stuarts' abuses was by the time of the founding understood to be an individual right protecting against both public and private violence." *Heller*, 128 S. Ct. at 2798-99.

It bears recalling here that the various cases discussed by *Heller* with respect to carrying guns approved of the practice *for the purpose of self-defense*. *See Heller*, 128 S. Ct. at 2809 ("citizens had a right to carry arms openly [for] 'manly and noble defence of themselves'") (quoting *Chandler*, 5 La. App. at 490); *Heller*, 128 S. Ct. at 2818 ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional.") (quoting *Reid*, 1 Ala. at 616-17); *Nunn*, 1 Ga. at 251 (carrying restriction "valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms") (emphasis original).

B.    <u>Defendants' Challenged Policies Violate The Right To Equal Protection</u>.

The Equal Protection Clause "is essentially a direction that all person similarly situated

1 should be treated alike." *City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432, 439 (1985)

2 (citation omitted). Strict scrutiny applies to government classifications that "impinge on personal

3 rights protected by the Constitution." *Id.*, 473 U.S. at 440 (citations omitted). "Where

4 fundamental rights and liberties are asserted under the Equal Protection Clause, classifications

5 which might invade or restrain them must be closely scrutinized." *Hussey* v. *City of Portland*, 64

6 F.3d 1260, 1265 (9th Cir. 1995) (quoting *Harper* v. *Virginia Board of Elections*, 383 U.S. 663,

7 670 (1966)).

8      The Supreme Court has made clear that the rational basis test "could not be used to

9 evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the

10 freedom of speech, the guarantee against double jeopardy, the right to counsel, *or the right to*

11 *keep and bear arms.*" *Heller*, 128 S. Ct. at 2818 n.27 (citing *United States* v. *Carolene Products*

12 *Co.*, 304 U.S. 144, 152, n. 4 (1938)) (emphasis added). "[I]t remains certain that the federal

13 government may not restrain the freedom to bear arms based on mere whimsy or convenience."

14 *United States* v. *Everist*, 368 F.3d 517, 519 n.1 (5th Cir. 2004).[5] However, where a classification

15 plainly fails rational basis review, the Court's analysis need go no further. *Zobel* v. *Williams*, 457

16 U.S. 55, 60-61 (1982). Even absent a Second Amendment right, the Ninth Circuit held that a

17 California Sheriff's policies regarding the issuance of handgun carry permits may be restrained by

18 the Equal Protection Clause. *Guillory* v. *County of Orange*, 731 F.2d 1379 (9th Cir. 1984).

19      That Defendants' policies violate the Equal Protection Clause is obvious from their plain

20 text. The Supreme Court has explained that the interest in self-defense informs the right to bear

21 arms. Presumably, everyone who seeks a permit to carry a handgun does so for the purpose of

22 being able to exercise the right of self-defense. Yet some people who have this plainly sufficient

23 interest (e.g., Plaintiffs) are denied a permit, while others, for whatever reasons, are granted

24 permits. The classification cuts through the very purpose of the right and is therefore irrational. It

25 ───────────────

26      [5]The Fifth Circuit utilizes a version of strict scrutiny to evaluate gun laws under the

27 Second Amendment, permitting regulations that are "limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in

28 this country." *United States* v. *Emerson*, 270 F.3d 203, 261 (5th Cir. 2001).

1    follows that a higher level of scrutiny would also defeat the classification. For example, there can

2    be no important or compelling government interest in denying the interest in self-defense, nor can

3    such a broad denial of the right to bear arms be substantially related to an important interest, to

4    say nothing of being narrowly tailored with respect to an individual right.

5         Defendants McGinness and Sacramento County's durational residence requirement

6    likewise violates the Equal Protection Clause. "[D]urational residence laws must be measured by a

7    strict equal protection test: they are unconstitutional unless the State can demonstrate that such

8    laws are necessary to promote a compelling governmental interest." *Dunn* v. *Blumstein*, 405 U.S.

9    330, 342 (1972) (citations and internal quotation marks omitted). There is no reason to suppose

10   that people who have lived across the county line less than a year ago are less deserving of the

11   right to bear arms, or are categorically too dangerous by that virtue to be entrusted with guns.

12   Sacramento County has well upwards of a million residents, relatively few of whom may be

13   personally known to Sheriff McGinness over the course of a year. And state law already mandates

14   that *all* applicants for handgun carry permits have their backgrounds carefully screened by the

15   California Department of Justice.[6] An unqualified individual might spend a lifetime in the county,

16   and be less deserving than a law abiding relative newcomer. Plaintiff Andrew Witham

17   demonstrates as much: a police officer for many years, already licensed to carry handguns while

18   working, and highly trained in the use of handguns, Witham had his permit revoked and could not

19   apply for a new one based solely on his residence. This is not a legally proper classification.

20        Finally, all Defendants maintain written policies favoring people already victimized or

21   threatened by crime. The McGinness/Sacramento policy states that prima facie "good cause"

22   exists where an applicant is a "specifically targeted victim," Exh. A, at 2, and that non-prima facie

23   "good cause" is held by those who can demonstrate "a history of victimization" or "a history of

24   threats." *Id.* The Prieto/Yolo policy provides that good cause is held by "victims of violent crime

25   and/or documented threats of violence," while good cause does not exist merely because people

26   —————————————

27       [6]Indeed, the residency requirement plainly violates California law. Sheriffs may issue
permits to non-residents who spend a significant amount of time in their counties, Cal. Penal Code

28   § 12050, and cannot refuse to exercise their discretion to do so. *Salute* v. *Pitchess*, *supra*, 61 Cal.
App. 3d 557.

1  undertake "recreation in remote areas" or want to protect themselves and their families "without

2  credible threats of violence." Exh. B, at 2-3.

3      There is something deeply illogical about Defendants' refusal to issue a permit to carry a

4  handgun until *after* a realistic threat to one's life and/or loved ones has materialized. Bearing

5  arms, within the meaning of the Second Amendment, includes carrying handguns "for the purpose

6  . . . of being armed and ready for offensive or defensive action in a case of conflict with another

7  person." *Heller*, 128 S. Ct. at 2793 (citations omitted). The Second Amendment does not exist

8  merely to increase the security of previously victimized individuals. If the conflict has already

9  occurred, the unarmed would-be permit applicant might be dead. And because criminal attacks are

10 often random, there is no particular reason to expect that a person who has previously been

11 victimized might be more likely to need a gun than someone who has yet to be victimized.

12     The point of having a gun available for self-defense is to avoid becoming a victim in the

13 first place. Sheriff McGinness apparently recognized as much when he suggested relaxing his

14 policy with respect to the issuance of gun carry permits to compensate for budget cutbacks in the

15 police force. But of course, the Sheriff owes no general duty of police protection. *Town of Castle*

16 *Rock* v. *Gonzales*, 545 U.S. 748 (2005) (no constitutional right to police protection); *Williams* v.

17 *State of California*, 34 Cal. 3d 18, 22-23 (1983) (public duty doctrine); Cal. Gov't Code §§

18 815.2(b) (general immunity), 818.2 (immunity for failing to enforce law), 820.2 (discretionary

19 immunity), 821.6 (investigative immunity).

20     Everyone who is responsible and law-abiding is entitled to bear arms for self-defense on

21 equal terms. Classifications not designed to weed out incompetent or dangerous individuals, and

22 which plainly deprive individuals of the right to bear arms, violate the Equal Protection Clause.

23      C.    Defendants' Challenged Policies Violate The Right To Travel.

24     Durational residency requirements have repeatedly been struck down as inconsistent with

25 various manifestations of a right to travel. *Saenz*, *supra*, 526 U.S. 489; *Shapiro* v. *Thompson*, 394

26 U.S. 618 (1969); *Dunn*, *supra*, 405 U.S. 330. "Citizens have a fundamental right of free

27 movement, 'historically part of the amenities of life as we have known them.'" *Nunez by Nunez* v.

28 *City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (quoting *Papachristou* v. *City of*

1   *Jacksonville*, 405 U.S. 156, 164 (1972)). Although neither the Supreme Court nor Ninth Circuit

2   have specifically extended the right to travel to *intrastate* travel, *Nunez*, 114 F.3d at 944 n.7

3   (noting circuit split), the existence of such a right follows naturally from the "fundamental right of

4   free movement," *Nunez*, 114 F.3d at 944, and the fact that individuals have the specific right to

5   travel freely across interstate (*Saenz; Shapiro*) and international (*Kent* v. *Dulles*, 357 U.S. 116

6   (1958)) borders.[7]

7        In any event, Defendants McGinness and Sacramento County's durational residence

8   restriction applies equally to all applicants, whether they have arrived from the neighboring

9   county, state, or country. It applied to Plaintiff Witham, and it continues to apply to Calguns and

10  SAF members who exercise their right to travel within a year of seeking to exercise their right to

11  arms.[8] If an interest in receiving welfare payments (*Saenz, Shapiro*) or the right to vote (*Dunn*)

12  cannot be conditioned on durational residency, neither can the right to bear arms be so

13  conditioned. That the right to bear arms is constitutionally enumerated makes the matter more

14  egregious, as the exercise of one right cannot be conditioned upon waiver of another. *See, e.g.*

15  *Apethaker* v. *Secretary of State*, 378 U.S. 500, 507 (1964) (right to travel cannot be conditioned

16  on forfeiture of First Amendment right of association).

17  V.    PLAINTIFFS HAVE BEEN AND CONTINUE TO BE INJURED BY DEFENDANTS'
        UNCONSTITUTIONAL POLICIES.

18
19       Because a permit to carry a concealed handgun is required by state law for Plaintiffs to

20  legally carry a gun, but Defendants' policies render Plaintiffs ineligible for such permits for the

21  specific purpose of self-defense – the core of the Second Amendment right at issue – Plaintiffs are

22  entitled to injunctive and declaratory relief against these policies. Plaintiff Sykes has previously

23  tested the policy, and having now seen the current policy in writing, knows she still fails to qualify

24  _____

25       [7]Sometimes the intrastate right of travel can be gleaned from the operation of other rights.
    *See, e.g. Mills* v. *District of Columbia,* ___ F.3d ___, 2009 U.S. App. LEXIS 15324 at * 20
26  (D.C. Cir. July 10, 2009) ("[i]t cannot be gainsaid that citizens have a right to drive upon the
    public streets of the District of Columbia or any other city absent a constitutionally sound reason
27  for limiting their access") (suspicionless police checkpoints violate Fourth Amendment).

28       [8]Notably, the policy also punishes military personnel returning from overseas deployment.

1    for a permit because her only "good cause" is "fear of victimization and a desire to carry a

2    handgun for self-defense," SUF 26, 28, which according to Defendants, "shall be insufficient."[9]

3    Exh. A. Plaintiff Witham had his permit revoked upon moving to Sacramento County, has been

4    flatly denied an application for lack of sufficient residence (*see discussion infra*), and like Sykes,

5    has no "good cause" other than "fear of victimization and a desire to carry a handgun for self-

6    defense," SUF 42, 43, which according to Defendants, "shall be insufficient." Exh. A. When

7    Richards sought to apply for a permit, he was told not to bother, and faxed a policy statement that

8    "self-protection and protection of family (without credible threats of violence)" – his only "good

9    cause," SUF 45, 49, 50, – are "invalid reasons to request a permit." Exh. B.

10        Because these policies also bar the members and supporters of SAF and Calguns from

11    obtaining permits, SUF 60, it follows that SAF and Calguns have representational standing to

12    vindicate the individual interests here at stake. *United Food & Commercial Workers Union Local*

13    *751* v. *Brown Group, Inc.*, 517 U.S. 544, 553 (1996).

14        SAF and Calguns also suffer organizational injury due to the challenged policies. When an

15    organization is forced to devote its time and energy to dealing with certain conduct, it is injured

16    by that conduct. *See, e.g. Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982). SAF and

17    Calguns educate, research, and publish about gun control and its consequences. They promote the

18    exercise of Second Amendment rights, and seek to enable law-abiding people to responsibly bear

19    arms. In so doing, these organizations have to educate their members, and the public, about the

20    government's enforcement of gun laws. SUF 55-59. When people have questions about firearms

21    policies – including Defendants' policies – they turn to SAF and Calguns. SUF 59. And restrictive

22    policies such as, and including Defendants', frustrate SAF and Calguns' organizational objectives

23    and tax their resources. SUF 53-60.

24        Plaintiffs are mindful that other litigants have made very different arguments attacking

25    Sacramento County's gun carry permit policies. *Mehl* v. *Blanas*, 03-CV-2682; *Rothery* v. *Blanas*,

26    08-CV-2064. Plaintiffs expressly disclaim those efforts, which did not appear to raise their

27    ────────────────

28        [9]Sykes' previous denial is not the basis of her current injury, it merely confirms the on-
going nature of the deprivation.

1    claims.[10] *Cf. Greenlaw* v. *United States*, 128 S. Ct. 2559, 2564 (2008) ("our adversary system is

2    designed around the premise that the parties know what is best for them, and are responsible for

3    advancing the facts and arguments entitling them to relief") (citation omitted).

4            This Court correctly dismissed the earlier cases, which have nothing in common with the

5    instant challenge. The gravamen of *Mehl/Rothery* was a complicated conspiracy theory alleging

6    that Sacramento County's Sheriffs issued carry permits to campaign contributors and cronies,

7    while depriving the plaintiffs of an alleged right to carry concealed weapons. Plaintiffs here do not

8    traffic in conspiracy theories. And as set forth *supra*, Plaintiffs do not claim a right to carry

9    concealed handguns *per se*, only a right to carry handguns subject to proper regulations, of which

10   the specification of the manner of carrying is an historically well-established example.

11           Plaintiffs' only concern is the Defendants' *written* policies, communicated to Plaintiffs and

12   to others, spelling out in no uncertain terms that Plaintiffs are ineligible to apply for handgun carry

13   permits. These policies were not at issue in the earlier cases. Owing to their unambiguous nature,

14   the policies challenged *here* are subject to very different methods of constitutional analysis.

15           Where it is unclear whether a custom, policy, or practice might be implemented in a

16   manner causing a cognizable injury, administrative exhaustion is required to complete a plaintiff's

17   standing. As this Court recognized, this was the proper basis for dismissing *Mehl*, as the alleged

18   unconstitutional policy in that case was nebulous at best, and an application, if submitted, might

19   have been granted – at least, contrary to the theory of that case.[11] Had Plaintiffs here complained

20   that Defendants harbor some *hidden* bias against them, it would be incumbent upon Plaintiffs to

21   test the alleged policy, just as it was incumbent to do so on the peculiar allegations of *Mehl*.

22

23

24           [10]As the Court described in *Rothery*, the complaint in that action was "a mishmash of
     thoughts, legal argument, speculation, with some allegations thrown in," spanning 808 paragraphs
25   across 78 pages, and was subject to a motion to strike. *Rohery*, Tr. of Proceedings, 7/15/09 at 1,
     l. 19 - 2, l. 14.
26

27           [11]One of the *Mehl* plaintiffs was unqualified to have a permit for perfectly valid reasons.
     Here, whether Plaintiffs are otherwise qualified (they are) is irrelevant, because they are
28   automatically ineligible under the challenged policy.

1    However, because the policies at issue in *this* case are expressly declared by the

2    Defendants, all that is necessary to complete the injury here is to read Defendants' written

3    policies. The law recognizes the distinction between the need to allow Defendants to clarify their

4    policies, remedy errors, and compile necessary records, especially when it is unclear if a plaintiff is

5    affected by the purported policy – and the equally important need to dispense with ritualistic and

6    hopeless bureaucratic action advancing no purpose.

7    "[O]ne need not apply for a benefit conditioned by a facially unconstitutional law." *United*

8    *States* v. *Baugh*, 187 F.3d 1037, 1041 (9th Cir. 1999) (citing *Shuttlesworth* v. *City of*

9    *Birmingham*, 394 U.S. 147, 151 (1969)). In a Title VII action, "If an employer should announce

10    his policy of discriminating by a sign reading 'Whites Only' on the hiring-office door, his victims

11    would not be limited to the few who ignored the sign and subjected themselves to personal

12    rebuffs." *Int'l Brotherhood of Teamsters* v. *United States*, 431 U.S. 324, 365-66 (1977).

13    Rejecting an exhaustion requirement in a constitutional challenge, the Supreme Court

14    explained exhaustion is only required to let an agency "correct its own errors, to afford the parties

15    and the courts the benefit of its experience and expertise, and to compile a record which is

16    adequate for judicial review." *Weinberger* v. *Salfi*, 422 U.S. 749, 765 (1975) (citation omitted).

17    But when "the only issue is the constitutionality of a statutory requirement, a matter which is

18    beyond [regulatory] jurisdiction to determine," and there are no other issues, exhaustion is not

19    required. *Id.*; *cf. Houghton* v. *Shafer*, 392 U.S. 639, 640 (1968) (per curiam) (citation omitted)

20    (when "rules . . . . were validly and correctly applied to petitioner; these rules are further said to

21    be strictly enforced throughout the entire correctional system . . . . to require petitioner to

22    [administratively] appeal . . . . would be to demand a futile act").

23    The Ninth Circuit explains the distinction between policies that require testing, and those

24    which do not. In *Madsen* v. *Boise State University*, 976 F.2d 1219 (9th Cir. 1992) (per curiam), a

25    *pro se* plaintiff sued a university under the Rehabilitation Act for failing to provide handicapped

26    parking spaces free of charge. However, the *pro se* plaintiff failed to allege what sort of interest

27    he might have had in obtaining a free parking spot by actually applying for one, particularly as the

28    school took remedial measures. The Ninth Circuit was "left somewhat at sea about whether the

1    real dispute now before us concerns a claim that he was entitled to a free permit to park in any

2    handicap space on campus or that there should have been some handicap spaces accessible with a

3    special, no-fee permit." *Madsen*, 976 F.2d at 1221. Because "the dispute between the parties

4    [was] too nebulous for judicial resolution," the failure to apply for a permit proved fatal to the

5    claim. *Id*.

6         The Ninth Circuit acknowledged that there are a class of cases in which "a formal

7    application is unnecessary on grounds of futility." *Id.*, at 1222. But Madsen could not claim

8    futility because it appeared that the school did, in fact, offer a fee waiver for handicapped parking,

9    and at the very least, Madsen was also eligible for a temporary free parking space while the

10   dispute was being resolved. *Id*.

11        Most significantly, *Madsen* lacked any

12       findings or allegations that the University had an impenetrable policy - akin to a "Whites
         Only" sign - which would have rendered it impervious to any efforts to educate it as to
13       defects in its policies. Madsen does not allege similar, futile efforts by others to seek free
         handicap parking, *or anything else that suggests the University administration would have
14       rebuffed his argument out of hand.*

15   *Madsen*, 976 F.2d at 1222 (emphasis added).

16        Yet here, there is indeed "[something] else that suggests the [Defendants] would have

17   rebuffed [Plaintiffs'] argument out of hand," – an "impenetrable policy" instructing Plaintiffs not

18   to apply under their circumstances. *Id.* Defendants' written policies "render[] [them] impervious

19   to any efforts to educate [them] as to defects in [their] policies," *id.*, aside from litigation.

20        Completely on-point is the Second Circuit's decision in *Bach* v. *Pataki*, 408 F.3d 75 (2d

21   Cir. 2005). Bach, a Virginian, challenged New York's ban on the issuance of gun permits to non-

22   residents. Though his Second Amendment claim ultimately failed on incorporation grounds, the

23   court rejected the government's standing challenge:

24       The State Police informed Bach that he was statutorily ineligible for a carry license. Bach
         had nothing to gain thereafter by completing and filing an application . . . . Imposing a
25       filing requirement would force Bach to complete an application for which he is statutorily
         ineligible and to file it with an officer without authority to review it. We will not require
26       such a futile gesture as a prerequisite for adjudication in federal court.

27   *Bach*, 214 F.3d at 82-83 (citation omitted).

28

---

1    This case is identical to *Bach* in terms of the injury-in-fact. Plaintiffs seek handgun carry

2    permits, but were informed by Defendants that they are not eligible because their interest in self-

3    defense does not constitute "good cause." *Bach* is not unique. In recent years, two state Supreme

4    Courts have also declared unconstitutional (under their state Second Amendment analogs)

5    policies making it difficult or impossible to obtain handgun carry permits. *Kellogg*, *supra*, 562

6    N.E.2d 685; *State ex rel. City of Princeton* v. *Buckner*, *supra*, 377 S.E.2d 139.

7    Most instructive is *Kellogg*, where the Indiana Supreme Court found a police chief had

8    violated Section 1983 by refusing to issue handgun carry permit applications, where the state

9    constitution entitled plaintiffs to bear arms. "Without access to the application process, the

10   citizens' underlying substantive right to carry a handgun with a license (provided that all

11   requirements of the Indiana Firearms Act are met), was cut off as well [as the supply of blank

12   forms]." *Kellogg*, 562 N.E.2d at 696.

13   Whether a police chief declares that no applications will be handed out, or hands out

14   applications with a written declaration that an application "shall be insufficient" (McGinness) or

15   have only "invalid reasons to request a permit" (Prieto) makes no difference. In *Kellogg*, the

16   police chief violated Section 1983 for not issuing application forms, and here, Defendants violate

17   Section 1983 for pre-judging applications "insufficient" and "invalid."

18                                    CONCLUSION

19   Plaintiffs accept that the choice of *how* to carry their handguns has been made for them by

20   the Legislature. But question of whether Plaintiffs have a right to carry handguns has been made

21   for Defendants by the Second and Fourteenth Amendments. Defendants' policies rejecting self-

22   defense as a sufficient "good cause" for the issuance of a permit are unconstitutional. Defendants'

23   policies favoring previous crime victims over prospective crime victims and demanding durational

24   residency as a condition of seeking a permit to carry a handgun are also unconstitutional.

25   Defendants still retain the ability to ban the carrying of guns by dangerous individuals and

26   otherwise regulate the carrying of guns in the interest of public safety – consistent with

27   constitutional limitations. But none of these matters are at issue here. The only issues here are

28

1   explicit bans on the right to carry a gun, and impermissible classifications of individuals equally

2   interested in, and entitled to exercise, the right to bear arms.

3        The motion for summary judgment should be granted.

4        Dated: August 6, 2009          Respectfully submitted,

5   Donald E.J. Kilmer, Jr. (Calif. Bar No. 179986)   Alan Gura (Calif. Bar No. 178221)
   Law Offices of Donald Kilmer, A.P.C.         Gura & Possessky, PLLC

6   1645 Willow Street, Suite 150              101 N. Columbus St., Suite 405
   San Jose, CA 95125                   Alexandria, VA 22314

7   408.264.8489/Fax 408.264.8487         703.835.9085/Fax 703.997.7665
   E-Mail: Don@DKLawOffice.com

8

   By:  /s/Donald E.J. Kilmer, Jr./      By:   /s/Alan Gura/

9          Donald E.J. Kilmer, Jr.            Alan Gura

10                                  Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28