Alan Gura (Calif. Bar No. 178221)
Gura & Possessky, PLLC
101 N. Columbus St., Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

Donald E.J. Kilmer, Jr. (Calif. Bar No. 179986)
Law Offices of Donald Kilmer, A.P.C.
1645 Willow Street, Suite 150
San Jose, CA 95125
408.264.8489/Fax 408.264.8487

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Adam Richards, et al., ) | Case No. 2:09-cv-01235-MCE-DAD (TEMP) |
| ) | |
| Plaintiffs, ) | MEMORANDUM OF POINTS |
| ) | AND AUTHORITIES IN OPPOSITION TO |
| v. ) | DEFENDANTS' MOTION FOR |
| ) | SUMMARY JUDGMENT |
| Ed Prieto, et al., ) | |
| ) | Date:    March 10, 2011 |
| Defendants. ) | Time:    2:00 p.m. |
|  ) | Courtroom 7 |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW the Plaintiffs, Adam Richards, Brett Stewart, Second Amendment Foundation, Inc., and The Calguns Foundation, Inc., by and through undersigned counsel, and submit their Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment.

Dated: February 24, 2011                                                      Respectfully submitted,

Donald E.J. Kilmer, Jr. (Calif. Bar No. 179986)         Alan Gura (Calif. Bar No. 178221)
Law Offices of Donald Kilmer, A.P.C.                    Gura & Possessky, PLLC
1645 Willow Street, Suite 150                           101 N. Columbus St., Suite 405
San Jose, CA 95125                                      Alexandria, VA 22314
408.264.8489/Fax 408.264.8487                           703.835.9085/Fax 703.997.7665
E-Mail: Don@DKLawOffice.com

By:  /s/ Donald E.J. Kilmer, Jr.              By:   /s/ Alan Gura
     Donald E.J. Kilmer, Jr.                        Alan Gura

                                                     Attorneys for Plaintiffs

TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I..     THE SECOND AMENDMENT EXTENDS BEYOND THE HOME. . . . . . . . . 2

    II.    THE OPEN CARRYING OF UNLOADED HANDGUNS DOES
          NOT SATISFY THE SECOND AMENDMENT INTEREST IN
          SELF-DEFENSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    III.   TO THE LIMITED EXTENT THAT THE CASE CALLS FOR
          APPLICATION OF A MEANS-ENDS STANDARD OF REVIEW,
          DEFENDANTS CANNOT PREVAIL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.    A Means-Ends Standard of Review Should Control Only
              the Equal Protection Claim, Not the Basic Second Amendment Claim. . . 7

        B.    The Correct Standard of Review In this Case is Strict Scrutiny. . . . . . . . 9

        C.    Defendants Violate Plaintiffs' Right to Equal Protection Under Any
              Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    IV.   OVERBREADTH IS A SECOND AMENDMENT DOCTRINE. . . . . . . . . . . 13

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1 TABLE OF AUTHORITIES

2 Cases

3 *Bd. of Trs. of State Univ. of N.Y.* v. *Fox*,
   492 U.S. 469 (1989)............................................................. 13

*Burdick* v. *Takushi*,
   504 U.S. 428 (1992)............................................................. 9

*Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*,
   447 U.S. 557 (1980)............................................................. 9

*City of Cleburne* v. *Cleburne Living Ctr.*,
   473 U.S. 432 (1985)............................................................. 10

*Crawford* v. *Marion County Election Bd.*,
   553 U.S. 181 (2008)............................................................. 13

*District of Columbia* v. *Heller*,
   128 S. Ct. 2783 (2008)......................................................... passim

*Marbury* v. *Madison*,
   5 U.S. (1 Cranch) 137 (1803) ............................................... 3

*McDonald* v. *City of Chicago*,
   130 S. Ct. 3020 (2010)......................................................... passim

*Parker* v. *District of Columbia*,
   478 F.3d 370 (D.C. Cir. 2007)............................................... 5

*People* v. *Yarbrough*,
   169 Cal. App. 4th 303 (2008)................................................ 4

*Peruta* v. *County of San Diego*,
   2010 U.S. Dist. LEXIS 130878 (S.D. Cal. Dec. 10, 2010)..... 5, 6

*Planned Parenthood of Southeastern Pa.* v. *Casey*,
   505 U.S. 833 (1992)............................................................. 13

*Plyler* v. *Doe*,
   457 U.S. 202 (1982)............................................................. 10

*Richmond Med. Ctr. for Women* v. *Herring*,
   570 F.3d 165 (4th Cir. 2009) (en banc)................................. 13

*Romer* v. *Evans*,
   517 U.S. 620 (1996)............................................................. 10

*State* v. *Knight*,
   2010 Kan. LEXIS 701 (Sept. 10, 2010)................................. 4

*State* v. *Knight*,
   42 Kan. App.2d 893 (2009)................................................... 4

*State* v. *Reid*,
    1 Ala. 612 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Staub* v. *City of Baxley*,
    355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Timmons* v. *Twin Cities Area New Party*,
    520 U.S. 351 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States* v. *Carolene Products Co.*,
    304 U.S. 144 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States* v. *Chester*,
    628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Cruikshank*,
    92 U.S. 542 (1875).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States* v. *Miller*,
    307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States* v. *Playboy Entm't Group*,
    529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Williams* v. *State*,
    __ A.3d __, 2011 Md. LEXIS 1 (Jan. 5, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Constitutional Provisions

U.S. CONST. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. CONST. amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Statutes

Cal. Penal Code § 12023(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Cal. Penal Code § 12031(j)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

D.C. Code § 22-4504(a) (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 22-4506 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Penal Code § 12031 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Other Authorities

Br. of the United States, No. 07-290. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

David Kopel & Clayton Cramer, *State Court Standards
    of Review for the Right to Keep and Bear Arms*,
    50 SANTA CLARA L. REV. 1 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PRELIMINARY STATEMENT

Defendants are correct in claiming that the Second Amendment "does not grant" people the right to carry "concealed" firearms in public for self-defense. Def. Br. at 1. The Second Amendment, like the First or Fourth, does not "grant" any rights – it secures rights that the people believe to be inherent and pre-existing their creation of the government. *District of Columbia* v. *Heller*, 128 S. Ct. 2783, 2797 (2008). Accordingly, the Second Amendment right to bear arms is secured against Defendants, regardless of Defendants' opinion about the value of this activity.

It is also true, of course, that "Plaintiffs are not entitled to carry a concealed weapon just because they want to carry one." Def. Br. at 1. Plaintiffs are, however entitled to carry a functional firearm as a constitutional matter, "just because they want to carry one." *See* U.S. Const. amend. II ("the *right* of the people") (emphasis added). The permit to carry a firearm, albeit in a concealed fashion, is the only avenue under California law by which Plaintiffs might engage in this activity. Accordingly, the permit to do so may not be denied arbitrarily.

Defendants are also correct in claiming that the Supreme Court has "made abundantly clear that the extent of rights under the Second Amendment, as it exists today, is to be understood as it was in the eighteenth century when the Second Amendment was adopted." Def. Br. at 8. Accordingly, Defendants carefully avoid arguing that the Second Amendment does not secure a right to carry firearms in public for self-defense, limiting their basic assertion to a claim that there is "no dispositive precedent pertaining to the public carry of concealed weapons." Def Br. at 7.

Although it is easier for Defendants to argue about the meaning of precedent than to conjure a history of the right to arms that does not include the public carrying of handguns for self-defense, this argument ultimately fails as well. *Heller* and the precedent it invoked, in addition to numerous other cases, indicate that there is indeed a right to carry loaded handguns in public for self-defense, and that prohibiting concealed carry is merely an allowable regulation of

that right when the right to carry is otherwise respected. The ability to carry an *unloaded* handgun does not satisfy the Second Amendment interest in self-defense.

Defendants' other arguments fall easily once the Second Amendment is understood to secure the right to carry functional firearms. It is a basic aspect of constitutional analysis that the right protected by the Constitution cannot double as the target of the government's restriction. Defendants have an interest in reducing gun violence, but they cannot have an interest in minimizing the carrying of guns by law abiding people if law abiding people have a fundamental right to carry a gun. There is no doubt that giving the Sheriff arbitrary discretion to ban the carrying of guns will reduce the carrying of guns, at least by law-abiding people such as the Plaintiffs. But the government simply cannot identify and target a constitutional right as an evil to be suppressed.

Accordingly, Defendants' policy would fail intermediate scrutiny analysis, even were it the correct test (and it is not), because they have failed to identify *any* legitimate governmental interest in depriving law-abiding people of the right to bear arms.

Finally, the notion that the Second Amendment is subject to a "no set of circumstances" test exclusive of overbreadth analysis borders on the specious. There will always be, in our society, at least one individual who may lawfully be barred from accessing firearms. That fact does not negate the entire Second Amendment. The question, in a Second Amendment case, is not whether some theoretical individual could be denied a firearm. The question is whether the law at issue reaches too far by disarming an individual who is entitled to exercise Second Amendment rights.

ARGUMENT

I..    THE SECOND AMENDMENT EXTENDS BEYOND THE HOME.

The notion that there is no "dispositive precedent" regarding the Second Amendment's extension beyond the home is incorrect. As discussed in Plaintiffs' summary judgment brief, the Supreme Court engaged in a long discussion of what it meant, in 1791, to "bear arms," because that question lay at the heart of the District of Columbia's defense in *Heller*, which asserted an alternative definition of "bear arms" as the basis for claiming the right does not attach to

individuals acting in a private capacity. Accordingly, the Court's extended discussion of the concept of "bear arms" was not dicta, but rather essential to the resolution of that case.

In addition to defining "bear" as "carry," the Supreme Court also provided examples of "bearing arms" in various public contexts. *Heller* observed that "Americans valued the ancient right [to keep and bear arms] . . . for self-defense *and hunting*." *Heller*, 128 S. Ct. at 2801 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 3042 n.27 (2010). Hunting does not occur inside the home. And even the *Heller* dissenters acknowledged that the decision protected the public carrying of arms:

> Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.

*Heller*, 128 S. Ct. at 2846 (Stevens, J., dissenting); *see also Heller*, 128 S. Ct. at 2845 n.38 (majority secures right to arms for "self-defense, recreation, and other lawful purposes") (Stevens, J., dissenting); *id.* at 2869 (Breyer, J., dissenting). Recreational firearms use typically occurs outside the home.

The suggestion that the Second Amendment extends no further than the home, because that is the only context in which the Supreme Court has yet to review the Second Amendment, is not rational. Under this reasoning, *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803) would be limited to cases concerning the President's delivery of judicial commissions. That is simply not how the law works.

But the claim is also factually incorrect. The Second Amendment's application outside the home dates back to *United States* v. *Miller*, 307 U.S. 174 (1939), which remanded for further proceedings the question of whether a sawed-off shotgun qualified as a constitutionally-protected arm. The shotgun came within federal purview because it had allegedly been transported from Claremore, Oklahoma to Siloam Springs, Arkansas, *id.* at 175— obviously outside Miller's home, yet potentially within the Second Amendment's protection.

   Defendants correctly point out that several courts, primarily state courts, have resisted recognition of the Second Amendment's application beyond the home. But these cases are of little value. The decision in *State* v. *Knight*, 42 Kan. App.2d 893 (2009), held that the Second Amendment did not apply to the States; it was reversed and remanded for further consideration in light of *McDonald*. *State* v. *Knight*, 2010 Kan. LEXIS 701 (Sept. 10, 2010).

   The California Court of Appeals' decision in *People* v. *Yarbrough*, 169 Cal. App. 4th 303 (2008), believed that *Heller* "left standing the *venerable* holding in *United States* v. *Cruikshank* (1875) 92 U.S. 542 , 553, that the private right to bear arms is not a 'fundamental' right . . ." *Yarbrough*, 169 Cal. App. 4th at 313 n.4 (emphasis added) (parallel citation omitted). Of course, *Cruikshank* contained no such holding; to the contrary, it denied application of the Second Amendment against the States precisely because it described the right to keep and bear arms as too valuable under the circular reasoning of the day. Of course, *Cruikshank* has now been overruled by *McDonald*, at least as to the Second Amendment's application as against the States, and *McDonald* confirms that the right is indeed fundamental. *McDonald*, 130 S. Ct. at 3042 (plurality opinion) & 3059 (Thomas, J., concurring).[1]

   Neither *Yarbrough* nor *Williams* v. *State*, __ A.3d __, 2011 Md. LEXIS 1 (Jan. 5, 2011) offered any actual reasoning for limiting the Second Amendment to the home as an interpretive, historical matter. Indeed, the Maryland Court of Appeals' statement that "if the Supreme Court . . . . meant its holding to extend beyond home possession, it will need to say so more plainly," *Williams*, 2011 Md. LEXIS 1 at *30, is practically defiant of the Supreme Court, announcing a policy of out-and-out resistance. The Supreme Court probably does not expect its intervention will be required in each and every Second Amendment case. *Heller* instructs lower courts that the Second Amendment must be interpreted according to the way the Framers would have used its words "in their normal and ordinary as distinguished from their technical meaning." *Heller*, 128

---

[1] *Cruikshank* can hardly be described as a "venerable" case, confirming as it did among the worst massacres in American history and ushering a sad era in which the high court looked the other way at the wholesale deprivation of civil rights by state officials. *See McDonald*, 130 S. Ct. at 3030; *id.*, 130 S. Ct. at 3060 (Thomas, J., concurring) & 3086 (*Cruikshank* "not a precedent entitled to any respect."); Charles Lane, THE DAY FREEDOM DIED (2008).

S. Ct. at 2788. When an activity comes within the plain meaning of the constitutional text, courts must implement, not resist, the constitutional command.

Defendants concede that the Second Amendment must include the rights the Framers believed it to include. Def. Br. at 7. Plaintiffs adopt and advance the Supreme Court's definition of "bear arms" – and Defendants have completely failed to address, let alone rebut, this definition. Neither Defendants, nor any of the resisting cases they cite, offer *any* explanation as to how the people of 1791 believed the Second Amendment right was limited to the home, or what else "bear arms" might mean if it does not mean what the Supreme Court said it means.

Finally with respect to this point, Defendant's amici claim *Heller* limited its holding to the home possession of guns by emphasizing the Supreme Court's command that the District of Columbia issue Heller "a license to carry [his handgun] in the home," Brady Br. at 4 and 6 (quoting *Heller*, 128 S. Ct. at 2822) (footnote omitted). This is at best disingenuous. Heller challenged former D.C. Code § 22-4504(a) (2008), which provided that carrying a gun *in one's home* without a permit constituted a misdemeanor offense, separate and apart from the felony offense of carrying a gun in public. Former D.C. Code § 22-4506 (2008) provided for a license to carry issued at the police chief's discretion, although licenses were never issued. Heller did not seek a permit to carry a handgun in public. *See Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom Heller*.[2]

II. **THE OPEN CARRYING OF UNLOADED HANDGUNS DOES NOT SATISFY THE SECOND AMENDMENT INTEREST IN SELF-DEFENSE.**

There is no need to fully recount the argument that constitutionality of concealed carry restrictions depends upon whether the right to carry a gun is otherwise respected. The case upon which Defendants most heavily rely, *Peruta* v. *County of San Diego*, 2010 U.S. Dist. LEXIS 130878 (S.D. Cal. Dec. 10, 2010), held so directly:

> [I]n its order denying Defendant's motion to dismiss, this Court emphasized that not *all* concealed weapons bans are presumptively lawful. *Heller* and the 19th-century cases it

---

[2] The Brady Center has repeatedly offered this claim in Second Amendment cases litigated by Plaintiffs' counsel, each time necessitating rebuttal with reference to the actual facts of *Heller*. At this point, it is fair to suppose that Brady is aware that its argument is misleading, relying as it does upon an incomplete survey of the facts to distill a legal rule never issued by the Court.

    relied upon instruct that concealed weapons restrictions cannot be viewed in isolation; they must be viewed in the context of the government's overall scheme.

*Peruta*, at *18 (emphasis in original).

  Defendants nonetheless aver that Plaintiffs have no Second Amendment need for a permit to carry a handgun because "[n]othing . . . precludes a person openly carrying an unloaded weapon with ammunition close at hand from lawfully loading it when faced with an emergency situation to act in self-defense or the defense of others." Def. Br. at 12-13.

  Respectfully, the *Peruta* court seriously erred in accepting this rationale. The open carrying of an unloaded handgun is itself a dangerous practice. It is an open invitation to criminals to rob an individual of his or her *unloaded* and thus indefensible handgun. Nor does it seriously afford an individual time to react to a sudden criminal attack. The right to bear arms is, after all, the right to be "*armed and ready* for offensive or defensive action in a case of conflict with another person." *Heller*, 128 S. Ct. at 2793 (citation omitted) (emphasis added). An individual carrying an unloaded gun is neither armed, nor ready for defensive action.

  *Peruta* misread California law, which distinguishes the fundamental character of loaded and unloaded guns. A person is only considered "armed" if carrying a functional handgun. *See, e.g.* Cal. Penal Code § 12023(a) ("[e]very person who carries a *loaded* firearm with the intent to commit a felony is guilty of armed criminal action") (emphasis added). And in *Heller*, the Supreme Court struck down a requirement that firearms in the home be rendered inoperable, as that "makes it impossible for citizens to use [firearms] for the core lawful purpose of self-defense." *Heller*, 128 S. Ct. at 2818.

  While in theory, the California law allows for some exceptions if the person is practically under attack, Defendants do not cite the law's definition of these circumstances—"the brief interval before and after the local law enforcement agency, when reasonably possible, has been notified of the danger and before the arrival of its assistance." Cal. Penal Code § 12031(j)(1).

  This hardly qualifies as permission to be "armed and ready" for defensive action. Criminal attacks are frequently sudden, and by their nature impose a great deal of stress and difficulty on their victims. Violent criminals are not so chivalrous as to afford their prey time to

load their firearms. Defendants' employees do not carry unloaded firearms for a reason. As *Heller* instructs, "[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." *Heller*, 128 S. Ct. at 2818 (quoting *State* v. *Reid*, 1 Ala. 612, 616-17 (1840)).

But Plaintiffs do not claim that simply because Penal Code § 12031 requires that openly-carried firearms be unloaded, that it must be unconstitutional. Regardless of whatever the *Peruta* plaintiffs asserted, precedent clearly allows the State to ban the open carrying of firearms entirely if it so chooses, so long as it does not then ban concealed carrying as well. Section 12031 would only be unconstitutional if state law forbade the concealed carrying of arms, and this the law does not do. Rather, the law, permissibly, bans open carrying of functional firearms for all practical intents and purposes, and subjects the concealed carrying of firearms to a licensing scheme. The only alleged defect in that licensing scheme is that it affords defendants unbridled discretion.

In the absence of a licensing scheme for the concealed carry of handguns, Plaintiffs would have to challenge the constitutionality of Penal Code § 12031, because the law would then simply ban, without more, the practical carrying of handguns. And if California law allowed the open carrying of loaded firearms, Plaintiffs would have greater difficulty challenging the concealed carrying system. But that is not the state of the law.

### III. TO THE LIMITED EXTENT THAT THE CASE CALLS FOR APPLICATION OF A MEANS-ENDS STANDARD OF REVIEW, DEFENDANTS CANNOT PREVAIL.

#### A. A Means-Ends Standard of Review Should Control Only the Equal Protection Claim, Not the Basic Second Amendment Claim.

Defendants do not seriously challenge Plaintiffs' assertion that prior restraint standards most logically apply to this case. They claim that such application should be avoided, but offer no meaningful reasoning for doing so. After all, the right to carry firearms is a "freedom which the Constitution guarantees," and "an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official" is "an unconstitutional censorship *or* prior restraint upon the enjoyment of those freedoms." *Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted) (emphasis added).

As shown previously, at least three circuits hold that First Amendment frameworks are applicable in Second Amendment cases. And indeed, *Heller* demonstrates that it is quite possible to strike down laws that violate the Second Amendment without resort to a means-ends standard of review. Washington, D.C.'s handgun ban failed the common use test for protected arms, while that city's functional firearms ban was in literal conflict with a core guarantee of the right. If a means-ends standard of review were critical to every Second Amendment analysis, *Heller* would have employed one.

Of course, Defendants wish to avoid the question of whether they employ unbridled discretion because they have no answer to the charge. When a licensing official is tasked with determining "good cause" or "moral character," that is the very definition of unbridled discretion. And there is simply no argument for why, or how, the exercise of a fundamental constitutional *right* can be predicated on the whims of a licensing authority.

Defendant's amici's claim that "[c]ourts have always looked with a more wary eye on laws that impose restrictions on broad classes of people than laws that require individual determinations," Brady Br. at 16, could not be more erroneous. It is much easier to sustain a law barring a "broad class of people" that are clearly and objectively defined, i.e., "felons and the mentally ill," *Heller*, 128 S. Ct. at 2817, than a law vesting unbridled discretion to make inherently arbitrary and capricious "individual determinations." Of course, there is nothing quite so broad as a law allowing "individual determinations," because such laws impact *everyone*, as opposed to only those members of a class, however large, described with some precision.

Equally strained is Brady's claim that local officials are allegedly "more likely to be familiar with the backgrounds and personalities of the members of their communities than [distant] courts or juries." Brady Br. at 16.[3] In 2011, it is clear that assessments of "personalities"

---

[3] Defendants' contention that Penal Code § 12031(j) is good enough for self-defense is exactly that. A permission given by a judge and jury - though it takes the form of an affirmative defense in a criminal trial for which the Defendant must spend time, money and risk his liberty to persuade a judge/jury that he had good cause to exercise a fundamental right. The notion that any county official could adequately assess the "backgrounds and personalities" of all individuals in Yolo County for any purpose, let alone to determine suitability for exercise of a constitutional right, is not realistic in any event.

1  and "moral character," at least absent further definition, cannot enter a licensing discussion.

2        B.      The Correct Standard of Review In this Case is Strict Scrutiny.

3        To the extent Plaintiffs aver an equal protection challenge, the correct standard is strict
4  scrutiny. Defendants correctly note that some courts have applied intermediate scrutiny in Second
5  Amendment cases, but these courts have done so in contexts where the Second Amendment's
6  core was not implicated—contexts where the right was asserted by lawbreakers, challenging laws
7  that may well be presumptively valid as implicating conduct traditionally believed to be beyond
8  the right.

9        The application of intermediate scrutiny in *other* contexts, however, has been less
10 successful. The notion that the Second Amendment might be subject to intermediate review was
11 first raised, unsuccessfully, by the Solicitor General in *Heller*. In the government's
12 understanding, intermediate review was so toothless that its application might have saved even
13 the District of Columbia's handgun and functional firearms bans—perhaps after trial, no less. Br.
14 of the United States, No. 07-290, at 27-32. That is reason enough to be suspicious of the
15 standard's ability to secure any measure of Second Amendment rights.

16       But intermediate scrutiny's problems are doctrinal as well as practical. In *Heller*, the
17 government drew the intermediate standard from two election-law cases, applying the standard
18 where challenged restrictions were insufficiently "severe" to merit strict scrutiny. *Timmons* v.
19 *Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Burdick* v. *Takushi*, 504 U.S. 428, 434
20 (1992). That dual-level analysis might function in the election context, where some rules are
21 bound to be arbitrary (e.g., voting on Tuesday rather than Wednesday). And indeed, an
22 intermediate standard of review may apply to an enumerated right under circumstances where the
23 right's exercise is "of less constitutional moment." *Cent. Hudson Gas & Elec. Corp.* v. *Public*
24 *Serv. Comm'n*, 447 U.S. 557, 563 n.5 (1980). But intermediate, heightened rational basis review
25 is inapplicable writ-large to fundamental rights.

26       Indeed, intermediate scrutiny is not a reduced form of strict scrutiny; it is an enhanced
27 version of rational basis review. "'[I]ntermediate' scrutiny permits us to evaluate the rationality
28 of the legislative judgment . . . we employ this standard to aid us in determining the rationality of

the legislative choice." *Plyler* v. *Doe*, 457 U.S. 202, 217 n.16 (1982). This aid is invoked in "quasi-suspect" cases, *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985), where the government's classifications do not relate to enumerated rights or suspect classes, and would thus trigger only un-enhanced rational basis review in the absence of intermediate scrutiny's boost. *Romer* v. *Evans*, 517 U.S. 620, 631 (1996).

The Fourth Circuit accurately summed up the situation, applying intermediate rather than strict scrutiny in that case only because the criminal defendant asserting the Second Amendment was not a "*law-abiding, responsible* citizen." *United States* v. *Chester*, 628 F.3d 673, __, 2010 U.S. App. LEXIS 26508 at *26 (4th Cir. 2010). Plaintiffs, however, are law abiding and responsible. Their equal protection claims are entitled to a commensurate level of review.

Vastly exceeding Defendants' position is their amici, the Brady Center, which rejects even intermediate scrutiny in favor of rational basis review, euphemistically re-styled as "reasonableness."  According to Brady, *Heller*'s "reasoning . . . foreclosed any form of heightened scrutiny that would require the government to ensure that firearms legislation has a tight fit between means and ends . . ." Brady Br. at 4, and so the Court is "obligated to uphold [gun] legislation where there is a reasonable basis to do so." *Id.* at 2. Apparently aware that this is not the way in which courts address civil rights generally, Brady offers this unusual approach because it believes "the right to keep and bear arms . . . is unique among constitutional rights in the risks that it presents." *Id.* at 1. "The exercise of Second Amendment rights creates unique risks that threaten the safety of the community." *Id.* at 13.

Each of these positions has been emphatically rejected by the Supreme Court. With respect to the Second Amendment's supposed uniqueness:

> Municipal respondents maintain that the Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a deadly implement and thus has implications for public safety. And they note that there is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries. The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category.

*McDonald*, 130 S. Ct. at 3045 (citations omitted).

Judicial deference to legislative infringement of the right to bear arms is also not contemplated by the Supreme Court. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 128 S. Ct. at 2822. The idea that the Second Amendment must yield to whatever politicians have determined to be in the public interest—that "firearm regulation is best suited for the legislative arena, not the courts," Brady Br. at 18— is simply a nullification of the constitutional guarantee. *Heller* made clear that enforcing the Second Amendment, like the enforcement of other enumerated fundamental rights, is very much the business of the courts, and doing so is incompatible with a deferential posture by the judiciary. *Heller*, 128 S. Ct. at 2818 n.27 (questioning presumption of constitutionality "when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments") (quoting *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152, n. 4 (1938))

Brady's proposition of a "reasonable regulation" test is based on the manner in which state courts have allegedly applied analogous state right to arms provisions. Plaintiffs would disagree with this assessment of how state courts evaluate right to arms provisions. *See, e.g.* David Kopel & Clayton Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms*, 50 SANTA CLARA L. REV. 1 (2010). But having federal courts defer to state authorities on the question of how to best secure a federal constitutional right contradicts the very logic of the Fourteenth Amendment, which was ratified precisely because state courts were not upholding basic civil rights, including particularly the right to keep and bear arms.

Nonetheless, amici advises that its proposed "reasonable regulation" test is distinguished from the rational basis test because the former "does not permit states to prohibit all firearms ownership." Brady Br. at 15. In other words, the test is so deferential as to permit *any* regulation that falls short of a complete prohibition. But the argument does not aid amici. If the Second Amendment protects (as it surely does) the bearing of arms, a licensing system under which virtually any and all applicants may be denied access to the right at the government's whim "eviscerate[s]" the right, "render[s] it nugatory," and "results in the effective 'destruction'" of the right. *Id.* (citations omitted). As the Supreme Court recognized in the First Amendment context,

"[i]t is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree." *United States* v. *Playboy Entm't Group*, 529 U.S. 803, 812 (2000).

C.  Defendants Violate Plaintiffs' Right to Equal Protection Under Any Standard of Review.

Alas, it may not matter much in the final analysis whether the standard is strict or intermediate scrutiny, because Defendants fail to satisfy the threshold burden under either test – they fail to identify any valid interest in their "good cause" and "moral character" requirements. A valid interest can be the reduction of gun violence, and it is easy to see how background checks might serve that interest. Whether the outright banning of guns would reduce gun violence, however, is a debatable point, and the fact that gun ownership is constitutionally secured makes it a moot point as well. Whatever else the government does to reduce gun violence, it lacks an interest in targeting gun ownership, as such, for reduction.

Accordingly, the declaration of Undersheriff Lopez firmly establishes and exposes the absence of a valid governmental interest in the case. Defendants target the right itself, not some manner of its abuse. Lopez identifies the possession and use of guns by law-abiding citizens as the harm Defendants seek to minimize: "[O]nce a weapon is lawfully in the possession of a citizen, the Sheriff has little power to prevent that citizen from selling or giving the weapon away to persons with less moral character;" Lopez Decl. ¶ 9 "the presence of more guns in society at large, and in Yolo County creates many problems for law enforcement officers," Lopez Decl. ¶ 10; and "It is the Sheriff's Office's position that increasing the number of concealed weapons in the community increases the threat of gun violence . . ."  Lopez Decl. ¶ 12.

In other words, the law is valid because it minimizes an activity that it targets, an activity that the Defendants believe is dangerous. But that activity happens to be the exercise of a fundamental constitutional right. And there can be no interest in eliminating the constitutional right as the means to a policy objective.

And there is also no question that Plaintiffs have an equal protection case. Plaintiffs claim that they are being arbitrarily classified with respect to the exercise of a fundamental

constitutional right, because they do not meet Defendants' views of what constitutes good cause to carry a firearm. Defendants might believe that there is no such constitutional right, but there is no question that they are treating people disparately with respect to their particular view of what constitutes good cause to obtain a gun carry permit.

IV.     OVERBREADTH IS A SECOND AMENDMENT DOCTRINE.

Notwithstanding their assertion that this case should be decided on the basis of intermediate scrutiny, Defendants advance a contradictory theory in claiming that the Second Amendment cannot sustain overbreadth-based challenges. Def. Br. at 17.[4]

Contrary to Defendants' suggestion, overbreadth analysis is not limited to the First Amendment. For example, abortion laws are facially invalid where they impose an undue burden on abortion access, not in *all* cases, but "in a large fraction of the cases." *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 895 (1992); *see Richmond Med. Ctr. for Women* v. *Herring*, 570 F.3d 165, 173-74 (4th Cir. 2009) (en banc). The standard for facial invalidity outside areas subject to overbreadth is occasionally, perhaps more accurately described as one exempting statutes having a "plainly legitimate sweep." *Crawford* v. *Marion County Election Bd.*, 553 U.S. 181, 202 (2008) (plurality opinion) (citations omitted).

Overbreadth must apply in the Second Amendment context, because without it, *Heller* and *McDonald* are wrong. *Heller* sustained a facial challenge to three generally-applicable gun laws. The Supreme Court acknowledged that some individuals could be denied handguns and other functional firearms, *Heller*, 128 S. Ct. at 2816-17, and the Court even cautioned that Mr. Heller, specifically, might not be entitled to relief: "*Assuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Heller*, 128 S. Ct. at 2822 (emphasis added). *McDonald* rejected arguments for why a handgun ban might be available to state actors,

---

[4]Defendants' proposed intermediate scrutiny test requires that the government demonstrate "a 'reasonable fit' between the challenged regulation and a 'substantial' government objective." *Chester*, 2010 U.S. App. LEXIS 26508 at *27 (quoting *Bd. of Trs. of State Univ. of N.Y.* v. *Fox*, 492 U.S. 469, 480 (1989)). Under that test, a law that permissibly reaches some valid applications is nonetheless unconstitutional where room remains to narrow its impact.

even were it unavailable to federal actors, but reiterated the notion that at least some individuals could be denied access to handguns.

But under Defendants' formulation, no gun law could ever be declared unconstitutional so long as at least one individual may be identified who is not legally entitled to possess guns under the circumstance described by the provision. This is clearly not the law. Defendant Prieto may deny a carry permit to an armed robber just as the District of Columbia might today deny that same robber a handgun registration permit. But Defendant Prieto can no more deny the right to carry a handgun because he feels that an applicant has no good reason for wanting to do so, than can the District of Columbia deny the right to own a handgun on the same basis.

But even were Plaintiffs' facial claims subject to a "no set of circumstances" test, the fact remains the complaint also asserts an "as applied" challenge. *See* Second Am. Complaint, prayer for relief ¶ 2. There is no question that the challenged policies have been applied as against Plaintiffs.

## CONCLUSION

Defendants' motion for summary judgment should be denied.

Dated: February 24, 2011                          Respectfully submitted,

Donald E.J. Kilmer, Jr. (Calif. Bar No. 179986)   Alan Gura (Calif. Bar No. 178221)
Law Offices of Donald Kilmer, A.P.C.              Gura & Possessky, PLLC
1645 Willow Street, Suite 150                     101 N. Columbus St., Suite 405
San Jose, CA 95125                                Alexandria, VA 22314
408.264.8489/Fax 408.264.8487                     703.835.9085/Fax 703.997.7665
E-Mail: Don@DKLawOffice.com

By:  /s/ Donald E.J. Kilmer, Jr.                  By:  /s/ Alan Gura
     Donald E.J. Kilmer, Jr.                           Alan Gura

                                                  Attorneys for Plaintiffs