**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| EDWARD PERUTA; MICHELLE LAXSON; JAMES DODD; LESLIE BUNCHER, DR.; MARK CLEARY; CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION, <br>     *Plaintiffs-Appellants*, <br><br> v. <br><br> COUNTY OF SAN DIEGO; WILLIAM D. GORE, individually and in his capacity as Sheriff, <br>     *Defendants-Appellees*, <br><br> STATE OF CALIFORNIA, <br>     *Intervenor.* | No. 10-56971 <br><br> D.C. No. <br> 3:09-cv-02371- <br> IEG-BGS |

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, Senior District Judge, Presiding

2             PERUTA V. CTY. OF SAN DIEGO

| | |
|---|---|
| ADAM RICHARDS; SECOND AMENDMENT FOUNDATION; CALGUNS FOUNDATION, INC.; BRETT STEWART,<br><br>*Plaintiffs-Appellants*,<br><br>v.<br><br>ED PRIETO; COUNTY OF YOLO,<br>*Defendants-Appellees*. | No. 11-16255<br><br>D.C. No.<br>2:09-cv-01235-<br>MCE-DAD<br><br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Chief District Judge, Presiding

Argued and Submitted En Banc June 16, 2015
San Francisco, California

Filed June 9, 2016

Before: Sidney R. Thomas, Chief Judge and Harry
Pregerson, Barry G. Silverman, Susan P. Graber,
M. Margaret McKeown, William A. Fletcher, Richard A.
Paez, Consuelo M. Callahan, Carlos T. Bea, N. Randy
Smith and John B. Owens, Circuit Judges.

Opinion by Judge W. Fletcher;
Concurrence by Judge Graber;
Dissent by Judge Callahan;
Dissent by Judge Silverman;
Dissent by Judge N.R. Smith

# SUMMARY[*]

## Civil Rights

The en banc court affirmed the district courts' judgments and held that there is no Second Amendment right for members of the general public to carry concealed firearms in public.

Appellants, who live in San Diego and Yolo Counties, sought to carry concealed firearms in public for self-defense, but alleged they were denied licenses to do so because they did not satisfy the good cause requirements in their counties. Under California law, an applicant for a license must show, among other things, "good cause" to carry a concealed firearm. California law authorizes county sheriffs to establish and publish policies defining good cause. Appellants contend that San Diego and Yolo Counties' published policies defining good cause violate their Second Amendment right to keep and bear arms.

The en banc court held that the history relevant to both the Second Amendment and its incorporation by the Fourteenth Amendment lead to the same conclusion: The right of a member of the general public to carry a concealed firearm in public is not, and never has been, protected by the Second Amendment. Therefore, because the Second Amendment does not protect in any degree the right to carry concealed firearms in public, any prohibition or restriction a state may choose to impose on concealed carry — including

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a requirement of "good cause," however defined — is necessarily allowed by the Amendment.  The en banc court stated that there may or may not be a Second Amendment right for a member of the general public to carry a firearm openly in public, but the Supreme Court has not answered that question.

The en banc court granted the motion to intervene by the State of California, which sought intervention after the San Diego Sheriff declined to petition for rehearing en banc following the panel's decision.  The en banc court held that under the circumstances presented here, California's motion to intervene was timely.

Concurring, Judge Graber, joined by Chief Judge Thomas and Judge McKeown, wrote separately only to state that, even if the Second Amendment applied to the carrying of concealed weapons in public, the provisions at issue would be constitutional.

Dissenting, Judge Callahan, joined by Judge Silverman as to all parts except section IV, by Judge Bea, and by Judge N.R. Smith as to all parts except section II.B, stated that in the context of present-day California law, the defendant counties' limited licensing of the right to carry concealed firearms is tantamount to a total ban on the right of an ordinary citizen to carry a firearm in public for self-defense. Thus, plaintiffs' Second Amendment rights have been violated.

Dissenting, Judge Silverman, joined by Judge Bea, would hold that the challenged laws are unconstitutional under the Second Amendment because they do not survive any form of heightened scrutiny analysis.

Dissenting, Judge N.R. Smith stated that he joined the dissent of Judge Callahan but wrote separately only to express his opinion that the appropriate remedy is to remand this case to the district courts to allow them to initially determine and apply an appropriate level of scrutiny.

## COUNSEL

In No. 10-56971:

Paul D. Clement (argued), Bancroft PLLC, Washington, D.C.; Paul Henry Neuharth, Jr., Paul Neuharth, Jr., APC, San Diego, California; Carl D. Michel, Glenn S. McRoberts, Sean A. Brady, and Bobbie K. Ross, Michel & Associates, P.C., Long Beach, California, for Plaintiffs-Appellants.

Edward C. DuMont (argued), Solicitor General; Gregory David Brown, Deputy Solicitor General; Douglas J. Woods, Senior Assistant Attorney General; Anthony R. Hakl, Deputy Attorney General; Mark Beckington, Supervising Deputy Attorney General; Kamala D. Harris, Attorney General of California; Office of the California Attorney General, San Francisco, California; for Intervenor.

James Chapin, County Counsel, Office of County Counsel, San Diego, California, for Defendants-Appellees.

In No. 11-16255:

Alan Gura (argued), Gura & Possessky, PLLC, Alexandria, Virginia; Donald Kilmer, Jr., Law Offices of Donald Kilmer, San Jose, California; for Plaintiffs-Appellants.

6           PERUTA V. CTY. OF SAN DIEGO

John A. Whitesides (argued), Peter D. Halloran, and Serena M. Warner, Angelo, Kilday & Kilduff, Sacramento, California, for Defendants-Appellees Ed Prieto and County of Yolo.

* * *

Stefan B. Tahmassebi, Fairfax, Virginia; Stephen Porter Halbrook, Fairfax, Virginia; for Amicus Curiae Congress of Racial Equality, Inc.

John D. Ohlendorf, Peter A. Patterson, David H. Thompson, and Charles J. Cooper, Cooper & Kirk, PLLC, Washington, D.C., for Amicus Curiae National Rifle Association of America, Inc.

Dan M. Peterson, Dan M. Peterson PLLC, Fairfax, Virginia; David B. Kopel, Independence Institute, Denver, Colorado, for Amici Curiae International Law Enforcement Educators and Trainers Association, Law Enforcement Legal Defense Fund, Law Enforcement Action Network, and Law Enforcement Alliance of America.

Simon Frankel, Samantha J. Choe, Steven D. Sassman, and Ryan M. Buschell, Covington & Burling, LLP, San Francisco, California, for Amici Curiae Legal Community Against Violence, Major Cities Chiefs Association, Association of Prosecuting Attorneys, George Gascón, San Francisco District Attorney, and Law Center to Prevent Gun Violence.

Alan Gura, Gura & Possessky, PLLC, Alexandria, Virginia, for Amici Curiae Second Amendment Foundation, Inc., Calguns Foundation, Inc., Adam Richards, and Brett Stewart.

John C. Eastman, Anthony T. Caso, and Karen J. Lugo, Center for Constitutional Jurisprudence, Orange, California, for Amici Curiae Center for Constitutional Jurisprudence, Doctors for Responsible Gun Ownership, and Law Enforcement Alliance of America.

Don Kates, Michel & Associates, P.C., Battle Ground, Washington, for Amici Curiae The Gun Owners of California and H.L. Richardson.

Neil R. O'Hanlon, Hogan Lovells US LLP, Los Angeles, California; Jonathan L. Diesenhaus, Adam K. Levin, James W. Clayton, and Kathryn Linde Marshall, Hogan Lovells US LLP, Washington, D.C., for Amici Curiae Brady Center to Prevent Gun Violence, The International Brotherhood of Police Officers, and The Police Foundation.

John A. Whitesides and Serena M. Warner, Angelo, Kilday & Kilduff, Sacramento, California, for Amici Curiae Edward G. Prieto and County of Yolo.

Girard D. Lau, Solicitor General of Hawaii; Kimberly Tsumoto Guidry, First Deputy Solicitor General; Robert T. Takatsuji, Deputy Solicitor General; Department of the Attorney General, Honolulu, Hawaii; for Amicus Curiae State of Hawaii.

Paul R. Coble, Krista MacNevin Jee, James R. Touchstone, and Martin Joel Mayer, Jones & Mayer, Fullerton, California, for Amici Curiae California Police Chiefs' Association, California Peace Officers' Association, and California Sheriffs' Association.

Stephen M. Duvernay and Bradley A. Benbrook, Benbrook
Law Group, PC, Sacramento, California, for Amici Curiae
Firearms Policy Coalition, Inc., Firearms Policy Foundation,
Inc., California Association of Federal Firearms Licensees,
Inc., Pink Pistols, Gun Rights Across America, Liberal Gun
Owners Association, Madison Society, Inc., Hawaii Defense
Foundation, Florida Carry, Inc., Illinois Carry, Knife Rights
Foundation, Inc., and Second Amendment Plaintiffs.

Charles Nichols, Redondo Beach, California, for Amicus
Curiae California Right to Carry.

Brian S. Koukoutchos, Mandeville, Louisiana, for Amici
Curiae Pink Pistols, Women Against Gun Control, Inc., and
Second Amendment Sisters.

Thomas Peter Pierce and Stephen D. Lee, Richards, Watson
& Gershon, Los Angeles, California, for Amicus Curiae
League of California Cities.

Andrew S. Oldham, Deputy General Counsel; James D.
Blacklock, General Counsel; Office of the Governor, Austin,
Texas; for Amici Curiae Governors of Texas, Louisana,
Maine, Mississippi, Oklahoma, and South Dakota.

Brett J. Talley, Deputy Solicitor General; Andrew L. Brasher,
Solicitor General; Luther Strange, Attorney General; Office
of the Attorney General of Alabama, Montgomery, Alabama;
for Amici Curiae Alabama, Alaska, Arkansas, Florida, Idaho,
Kansas, Kentucky, Louisiana, Michigan, Missouri, Montana,
Nevada, North Dakota, Ohio, Oklahoma, South Carolina,
South Dakota, Texas, Utah, West Virginia, and Wisconsin.

Robert J. Olson, Jeremiah L. Morgan, John S. Miles, William J. Olson, and Herbert W. Titus, William J. Olson, P.C., Vienna, Virginia; for Amici Curiae Gun Owners of America, Inc.; Gun Owners Foundation; U.S. Justice Foundation; The Lincoln Institute for Research and Education; The Abraham Lincoln Foundation for Public Policy Research, Inc.; Policy Analysis Center; Institute on the Constitution; and Conservative Legal Defense and Education Fund.

Michael Connelly, Ramona, California, for Amicus Curiae U.S. Justice Foundation.

Jonathan E. Taylor and Deepak Gupta, Gupta Beck PLLC, Washington, D.C., for Amicus Curiae Everytown for Gun Safety.

David D. Jensen, David Jensen PLLC, New York, New York, for Amici Curiae New York State Rifle & Pistol Association, Association of New Jersey Rifle & Pistol Clubs, Commonwealth Second Amendment, Gun Owners' Action League, and Maryland State Rifle & Pistol Association.

Jonathan S. Goldstein, McNelly & Goldstein, LLC, Hatfield, Pennsylvania, for Amici Curiae Western States Sheriffs' Association, Sheriff Adam Christianson, Sheriff Jon Lopey, Sheriff Margaret Mims, Sheriff Tom Bosenko, David Hencratt, Sheriff Steven Durfor, Sheriff Thomas Allman, Sheriff David Robinson, Sheriff Scott Jones, Sheriff Bruce Haney, Sheriff John D'Agostini, and Retired Sheriff Larry Jones.

10          PERUTA V. CTY. OF SAN DIEGO

Brandon M. Kilian, La Grange, California, for Amicus Curiae The Madison Society, Inc.

Michael John Vogler, Vogler Law Offices, Pasadena, California, pro se Amicus Curiae.

## OPINION

W. FLETCHER, Circuit Judge:

Under California law, a member of the general public may not carry a concealed weapon in public unless he or she has been issued a license.  An applicant for a license must satisfy a number of conditions.  Among other things, the applicant must show "good cause" to carry a concealed firearm.  California law authorizes county sheriffs to establish and publish policies defining good cause.  The sheriffs of San Diego and Yolo Counties published policies defining good cause as requiring a particularized reason why an applicant needs a concealed firearm for self-defense.

Appellants, who live in San Diego and Yolo Counties, allege that they wish to carry concealed firearms in public for self-defense, but that they do not satisfy the good cause requirements in their counties.  They contend that their counties' definitions of good cause violate their Second Amendment right to keep and bear arms.  They particularly rely on the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

We hold that the Second Amendment does not preserve or protect a right of a member of the general public to carry concealed firearms in public.

## I.  Procedural History

Plaintiff Edward Peruta lives in San Diego County.  He applied for a license to carry a concealed firearm in February 2009, but his application was denied because he had not

shown good cause under the policy published in his county. Plaintiff Adam Richards lives in Yolo County.  He sought a license to carry a concealed firearm in May 2009, but was told he could not establish good cause under his county's policy.  Peruta, Richards, and the other plaintiffs — five residents of San Diego and Yolo Counties, as well as several gun-rights organizations — brought two separate suits challenging under the Second Amendment the two counties' interpretation and application of the statutory good cause requirement under California law.

The district courts granted summary judgment in each case, holding that the counties' policies do not violate the Second Amendment.  *Peruta v. Cty. of San Diego*, 758 F. Supp. 2d 1106 (S.D. Cal. 2010); *Richards v. Cty. of Yolo*, 821 F. Supp. 2d 1169 (E.D. Cal. 2011).  A divided three-judge panel of this court reversed both decisions.  The panel majority held in a published opinion in *Peruta* that San Diego's policy violated the Second Amendment.  *See Peruta v. Cty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014); *see also id.* at 1179 (Thomas, J., dissenting).  Although Plaintiffs challenged only the county's concealed firearms policy, the panel held that their challenge should not be "viewed in isolation."  Rather, in the view of the panel majority, Plaintiffs' suit should be viewed as a challenge to "the constitutionality of [California's] entire [statutory] scheme." *Id.* at 1171.  In the majority's view, the Second Amendment required that "the states permit *some form* of carry for self-defense outside the home." *Id.* at 1172 (emphasis in original). Because California's statutory scheme permits concealed carry only upon a showing of good cause and because open carry is also restricted, the panel held that the county's definition of good cause for a concealed carry license violates the Second Amendment.  *Id* at 1179.  The panel held in

*Richards* that, in light of its holding in *Peruta*, the Yolo County policy also violated the Second Amendment.  *See Richards v. Prieto*, 560 F. App'x 681 (9th Cir. 2014); *see also id.* at 682 (Thomas, J., concurring in the judgment).

Yolo County and its sheriff, Ed Prieto, filed a petition for rehearing en banc in *Richards*.  San Diego County's sheriff, William Gore, announced that he would not petition for rehearing en banc in *Peruta*.  After Sheriff Gore declined to file a petition, the State of California moved to intervene in *Peruta* in order to seek rehearing en banc.  The same divided three-judge panel denied California's motion to intervene. *See Peruta v. Cty. of San Diego*, 771 F.3d 570 (9th Cir. 2014); *see also id.* at 576 (Thomas, J., dissenting).

We granted rehearing en banc in both cases.  *Peruta v. Cty. of San Diego*, 781 F.3d 1106 (9th Cir. 2015); *Richards v. Prieto*, 782 F.3d 417 (9th Cir. 2015).

## II.  Standard of Review

We review a district court's grant of summary judgment de novo.  *Sanchez v. Cty. of San Diego*, 464 F.3d 916, 920 (9th Cir. 2006).  We review constitutional questions de novo. *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1103 (9th Cir. 2004).

## III.  California Firearms Regulation

California has a multifaceted statutory scheme regulating firearms.  State law generally prohibits carrying concealed firearms in public, whether loaded or unloaded.  Cal. Penal Code § 25400.  State law also generally prohibits carrying loaded firearms on the person or in a vehicle in any public

place or on any public street, in either an incorporated city or a "prohibited area" of "unincorporated territory." *Id.* § 25850. Finally, state law generally prohibits carrying unloaded handguns openly on the person in a public place or on a public street, in either an incorporated city or a "prohibited area" of an "unincorporated area of a county." *Id.* § 26350.

However, there are numerous exceptions to these general prohibitions. For example, the prohibitions of §§ 25400 and 25850 do not apply to active and retired "peace officers." *Id.* §§ 25450, 25900. The prohibition of § 25400 does not apply to guards or messengers of common carriers of banks or financial institutions while employed in the shipping of things of value. *Id.* § 25630. The prohibition of § 25850 does not apply to armored vehicle guards, guards or messengers of common carriers, banks or financial institutions, security guards, animal control officers, or zookeepers, provided they have completed an approved course in firearms training. *Id.* §§ 26015, 26025, 26030.

Further, the prohibition of § 25400 does not apply to licensed hunters or fishermen while engaged in hunting or fishing, to members of target shooting clubs while on target ranges, or to the transportation of unloaded firearms while going to or returning from hunting or fishing expeditions or target ranges. *Id.* §§ 25640, 25635. Nor does it apply to the transportation of a firearm to and from a safety or hunting class or a recognized sporting event involving a firearm, to transportation between a person's residence and business or private property owned or possessed by the person, or to transportation between a business or private residence for the purpose of lawful repair, sale, loan, or transfer of the firearm. *Id.* §§ 25520, 25525, 25530. The prohibition of § 25850 does

not apply to a person having a loaded firearm at his or her residence, including a temporary residence or campsite. *Id.* § 26055. Nor does it apply to a person having a loaded firearm at his or her place of business or on his or her private property. *Id.* § 26035. It also does not apply to a person "who reasonably believes that any person or the property of any person is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property." *Id.* § 26045. Nor does it apply to persons using target ranges for practice, or to members of shooting clubs while hunting on the premises of the clubs. *Id.* § 26005. Finally, the prohibitions of §§ 25400, 25850 and 23650 do not apply to transportation of firearms between authorized locations, provided that the firearm is unloaded and in a locked container, and that the course of travel has no unreasonable deviations. *Id.* § 25505.

The case before us concerns the general prohibition of § 25400 against carrying loaded or unloaded concealed weapons, and a license-based exception to that prohibition. The prohibition of § 25400 does not apply to those who have been issued licenses to carry concealed weapons. *Id.* § 25655. The sheriff of a county may issue a concealed carry license to a person upon proof of all of the following:

> (1) The applicant is of good moral character.

> (2) Good cause exists for issuance of the license.

> (3) The applicant is a resident of the county or a city within the county, or the applicant's principal place of employment or business is in the county or a city within the county and

the applicant spends a substantial period of time in that place of employment or business.

(4) The applicant has completed a course of training as described in Section 26165.

*Id.* § 26150(a). The chief of a municipal police department may issue a concealed carry license under comparable criteria; the only difference is that the applicant must be a "resident of that city." *Id.* §§ 26155(a), 26155(a)(3) (residence). Sheriffs and municipal police chiefs are required to "publish and make available a written policy summarizing the provisions" of §§ 26150(a) and 26155(a). *Id.* § 26160.

An affidavit of Blanca Pelowitz, Manager of the San Diego Sheriff's Department License Division, describes the definition of good cause in San Diego County:

Good Cause . . . is defined by this County to be a set of circumstances that distinguish the applicant from the mainstream and causes him or her to be placed in harm's way. Simply fearing for one's personal safety alone is not considered good cause. This criterion can be applied to situations related to personal protection as well as those related to individual businesses or occupations.

Good cause is also evaluated on an individual basis. Reasons applicants request a license will fall into one of . . . four general categories[.]

The only two general categories potentially relevant to this appeal are:

> Category 2 = Personal Protection Only includes: documented threats, restraining orders and other related situations where an applicant can demonstrate they are a specific target at risk.

> Category 4 = Business owners/employees includes a diversity of businesses & occupations, such as doctors, attorneys, CEO's, managers, employees and volunteers whose occupation or business places them at high risk of harm.

The published policy of Yolo County does not define "good cause" but gives examples of where good cause does, or does not, exist.  The policy provides as follows:

> Examples of valid reasons to request a permit include, but are not limited to:

>> Victims of violent crime and/or documented threats of violence.

>> Business owners who carry large sums of cash or valuable items.

>> Business owners who work all hours in remote areas and are likely to encounter dangerous people and situations.

Examples o[f] invalid reasons to request a permit include, but are not limited to:

> Recreation in remote areas.
>
> Hunting or fishing.
>
> Self protection and protection of family (without credible threats of violence).
>
> Employment in the security field, i.e., security guard, body guard, VIP protection.
>
> Personal safety due to job conditions or duties placed on the applicant by their employer.

## IV.  Second Amendment and Concealed Carry

Plaintiffs contend that the good cause requirement for concealed carry, as interpreted in the policies of the sheriffs of San Diego and Yolo Counties, violates the Second Amendment.  Plaintiffs' arguments in the two cases differ in some particulars, but they essentially proceed as follows. First, they contend that the Second Amendment guarantees at least some ability of a member of the general public to carry firearms in public.  Second, they contend that California's restrictions on concealed and open carry of firearms, taken together, violate the Amendment.  Third, they contend that there would be sufficient opportunity for public carry of firearms to satisfy the Amendment if the good cause requirement for concealed carry, as interpreted by the sheriffs of San Diego and Yolo Counties, were eliminated. Therefore,

they contend, the counties' good cause requirements for concealed carry violate the Amendment.  While Plaintiffs base their argument on the entirety of California's statutory scheme, they allege only that they have sought permits to carry concealed weapons, and they seek relief only against the policies requiring good cause for such permits.  Notably, Plaintiffs do *not* contend that there is a free-standing Second Amendment right to carry concealed firearms.

We do not reach the question whether the Second Amendment protects some ability to carry firearms in public, such as open carry.  That question was left open by the Supreme Court in *Heller*, and we have no need to answer it here. Because Plaintiffs challenge only policies governing concealed carry, we reach only the question whether the Second Amendment protects, in any degree, the ability to carry concealed firearms in public.   Based on the overwhelming consensus of historical sources, we conclude that the protection of the Second Amendment — whatever the scope of that protection may be — simply does not extend to the carrying of concealed firearms in public by members of the general public.

The Second Amendment may or may not protect, to some degree, a right of a member of the general public to carry firearms in public.  But the existence *vel non* of such a right, and the scope of such a right, are separate from and independent of the question presented here.  We hold only that there is no Second Amendment right for members of the general public to carry concealed firearms in public.

A. *Heller* and *McDonald*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The watershed case interpreting the Amendment is *District of Columbia v. Heller*, 554 U.S. 570 (2008). The plaintiff in *Heller* challenged a District of Columbia statute that entirely banned the possession of handguns in the home, and required that any lawful firearm in the home be "disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id.* at 628.

Relying on the phrase "shall not be infringed," the Court in *Heller* viewed the Amendment as having "codified a *pre-existing* right." *Id.* at 592 (emphasis in original). The Court focused on the history leading to the adoption of the Amendment, and on the common understanding of the Amendment in the years following its adoption. The Court concluded that the "pre-existing right" to keep and bear arms preserved by the Second Amendment was in part an individual right to personal self-defense, not confined to the purpose of maintaining a well-regulated militia. The Court struck down the challenged statute, concluding that the Amendment preserves the right of members of the general public to keep and bear arms in their homes for the purpose of self-defense: "[W]e hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635.

The Court in *Heller* was careful to limit the scope of its holding. Of particular interest here, the Court noted that the

Second Amendment has not been generally understood to protect the right to carry concealed firearms.   The Court wrote:

> *Like most rights, the right secured by the Second Amendment is not unlimited.*   From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. *For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. See, e.g.*, *State v. Chandler*, 5 La. Ann., at 489–90 [(1850)]; *Nunn v. State*, 1 Ga., at 251 [(1846)]; see generally 2 Kent, [Commentaries on American Law (O. Holmes ed., 12th ed. 1873)] *340, n.2; The American Students' Blackstone 84, n.11 (G. Chase ed. 1884).

*Id.* at 626–27 (emphasis added) (some citations omitted).

At the end of its opinion, the Court again emphasized the limited scope of its holding, and underscored the tools that remained available to the District of Columbia to regulate firearms.   Referring the reader back to the passage just quoted, the Court wrote:

> The Constitution leaves the District of Columbia a variety of tools for combating th[e] problem [of handgun violence],

22          PERUTA V. CTY. OF SAN DIEGO

including some measures regulating handguns, see *supra* at 626–627, and n.26.

*Id.* at 636.

*Heller* left open the question whether the Second Amendment applies to regulation of firearms by states and localities. The Court answered the question two years later, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), holding that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment. In substantial part, the Court based its holding on the understanding of a "clear majority" of the states when the Fourteenth Amendment was adopted. The Court wrote:

> A clear majority of the States in 1868 . . . recognized the right to keep and bear arms as being among the foundational rights necessary to our system of Government.

> In sum, it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.

*Id.* at 777–78.

B.  Second Amendment Right to Keep and Bear Concealed Arms

In analyzing the meaning of the Second Amendment, the Supreme Court in *Heller* and *McDonald* treated its historical analysis as determinative. The Court in *Heller* held that the

Second Amendment, as originally adopted, "codified a pre-existing right," 554 U.S. at 592 (emphasis omitted), a "right inherited from our English ancestors," *id.* at 599 (internal quotation marks omitted).  The Court in *McDonald* held, further, that this "pre-existing right" was incorporated into the Fourteenth Amendment, based in substantial part on the importance attached to the right by a "clear majority" of the states.  In determining whether the Second Amendment protects the right to carry a concealed weapon in public, we engage in the same historical inquiry as *Heller* and *McDonald*.  As will be seen, the history relevant to both the Second Amendment and its incorporation by the Fourteenth Amendment lead to the same conclusion: The right of a member of the general public to carry a concealed firearm in public is not, and never has been, protected by the Second Amendment.

1.  History Relevant to the Second Amendment

a.  Right to Bear Arms in England

The right to bear arms in England has long been subject to substantial regulation.  In 1299, Edward I directed the sheriffs of Safford and Shalop to prohibit anyone from "going armed within the realm without the king's special licence." 4 Calendar Of The Close Rolls, Edward I, 1296–1302, at 318 (Sept. 15, 1299, Canterbury) (H.C. Maxwell-Lyte ed., 1906). Five years later, in 1304, Edward I ordered the sheriff of Leicester to enforce his prohibition on "any knight, esquire or other person from . . . going armed in any way without the king's licence." 5 Calendar Of The Close Rolls, Edward I, 1302–1307, at 210 (June 10, 1304, Stirling) (H.C. Maxwell-Lyte ed., 1908).

In 1308, Edward II ordered the town of Dover to ensure that "no knight, esquire, or other shall . . . go armed at Croydon or elsewhere before the king's coronation." 1 Calendar Of The Close Rolls, Edward II, 1307–1313, at 52 (Feb. 9, 1308, Dover) (H.C. Maxwell-Lyte ed., 1892). In 1310, he issued a similar order to the sheriff of York, demanding that the sheriff prohibit any "earl, baron, knight, or other" from going armed. *Id.* at 257 (Mar. 20, 1310, Berwick-on-Tweed). Two years later, in 1312, Edward II ordered the sheriffs in Warwick and Leicester to seize the weapons of any that "go armed" without special permission from the king. *Id.* at 553 (Oct. 12, 1312, Windsor). These early prohibitions, targeting particular towns and counties, and particular actors, foreshadowed a more general proclamation nearly two decades later, in which Edward II prohibited "throughout [the King's] realm" "any one going armed without [the King's] licence." 4 Calendar Of The Close Rolls, Edward II, 1323–1327, at 560 (Apr. 28, 1326, Kenilworth) (H.C. Maxwell-Lyte ed., 1892).

In 1328, under Edward III, Parliament enacted the Statute of Northampton, an expanded version of Edward II's earlier prohibition. The Statute provided that

> no Man great nor small, of what Condition soever he be, except the King's Servants in his presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them . . . be so hardy to come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs,

> Markets, nor in the presence of the Justices or
> other Ministers, nor in no part elsewhere,
> upon pain to forfeit their Armour to the King,
> and their Bodies to Prison at the King's
> pleasure.

2 Edw. 3, c. 3 (1328). The Statute of Northampton would
become the foundation for firearms regulation in England for
the next several centuries. *See* Patrick J. Charles, *The Faces
of the Second Amendment Outside the Home: History Versus
Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 7–36
(2012) (describing the Statute of Northampton, as well as
English firearms regulation before and after the adoption of
the statute).

The Statute of Northampton was widely enforced. In
1388, for example, Richard II issued to the bailiffs of
Scardburgh an

> [o]rder to arrest and imprison until further
> order for their deliverance all those who shall
> be found going armed within the town,
> leading an armed power, making unlawful
> assemblies, or doing aught else whereby the
> peace may be broken and the people put in
> fear . . . as in the statute lately published at
> Northampton among other things it is
> contained that no man of whatsoever estate or
> condition shall be bold to appear armed before
> justices or king's ministers in performance of
> their office, lead an armed force in breach of
> the peace, ride or go armed by day or night in
> fairs and markets or elsewhere in presence of
> justices etc. . . .

3 Calendar Of The Close Rolls, Richard II, 1385–1389, at 399–400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914).  A half-century later, Henry VI issued a similar order, reminding his subjects of the

> statute published in the parliament holden at Norhampton [*sic*] in 2 Edward III, wherein it is contained that no man of whatsoever estate or condition shall go armed, lead an armed power in breach of the peace, or ride or pass armed by day or night in fairs, markets or elsewhere in the presence of the justices, the king's ministers or others under pain of losing his arms and of imprisonment at the king's will . . . .

4 Calendar Of The Close Rolls, Henry VI, 1441–1447, at 224 (May 12, 1444, Westminster) (A.E. Stamp ed., 1937).

John Carpenter's *The White Book of the City of London* published in 1419 — England's first common law treatise — documented the continuing authority of the Statute of Northampton.  With narrow exceptions, Carpenter wrote, the law mandated that "no one, of whatever condition he be, go armed in the said city or in the suburbs, or carry arms, by day or by night."  *Liber Albus: The White Book Of The City Of London* 335 (Henry Thomas Riley ed., 1861).

In 1541, under the second Tudor king, Henry VIII, Parliament enacted a statute to stop "shamefull murthers roberies felonyes ryotts and routs."  33 Hen. 8, c. 6, § 1 (1541–1542) (Eng.). The statute limited gun ownership to the wealthy — those who "have lands tents rents fees annuityes or Offices, to the yearley value of one hundred Pounds."

33 Hen. 8, c. 6, § 2 (1541–1542) (Eng.).   Of particular importance to the case now before us, the statute expressly forbade everyone, including the wealthy, from owning or carrying concealable (not merely concealed) weapons, such as "little shorte handguns and little hagbutts," and guns "not of the lengthe of one whole Yarde or hagbutt or demyhake beinge not of the lenghe of thre quarters of a Yarde." *Id.*; *see* Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 Chi.-Kent L. Rev. 27, 35–37 (2000–2001) (discussing the 1541 statute of Henry VIII and related laws).

A half-century later, Elizabeth I continued her father's prohibition against concealed weapons.   She issued a proclamation in 1594 emphasizing that the Statute of Northampton prohibited not just the "open carrying" of weapons, but also the carrying of "a device to have secretly small Dagges, commonly called pocket Dags."   By The Quenne Elizabeth I: A Proclamation Against the Carriage of Dags, and for Reformation of Some Other Great Disorders (London, Christopher Barker, 1594).   Six years later, she ordered "all Justices of the Peace" to enforce the Statute "according to the true intent and meaning of the same," which meant a prohibition on the "car[r]ying and use of Gunnes . . . and especially of Pistols, Birding pieces, and other short pieces and small shot" that could be easily concealed.   By The Quenne Elizabeth I: A Proclamation Prohibiting The Use And Cariage Of Dagges, Birding Pieces, And Other Gunnes, Contrary To Law 1 (London, Christopher Barker 1600).

The first Stuart king, James I, issued a proclamation in 1613, forbidding concealed weapons and reciting that the "bearing of Weapons covertly . . . hath ever beene . . . straitly forbidden":

> Whereas the bearing of Weapons *covertly*, and specially of short Dagges, and Pistols, (truly termed of their use, pocket Dagges, that are apparently made to be carried *close*, and *secret*) *hath ever beene*, *and yet is* by the Lawes and policie of this Realme *straitly forbidden* as carying with it inevitable danger in the hands of desperate persons . . . .

By The King James I: A Proclamation Against The Use Of Pocket-Dags 1 (London, Robert Barker, 1613) (emphases added). Three years later, James I issued another proclamation similar to Elizabeth I's, banning the sale, wearing, and carrying of "Steelets, pocket Daggers, pocket Dags and Pistols, which are weapons utterly unserviceable for defence, Militarie practise, or other lawfull use, but odious, and noted Instruments of murther, and mischiefe." By The King James I: A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols, *reprinted in* 1 Stuart Royal Proclamations 359–60 (James F. Larkin & Paul L. Hughes eds., 1973).

In the late 1600s, in *Sir John Knight's Case*, England's Attorney General charged John Knight with violating the Statute of Northampton by "walk[ing] about the streets armed with guns." 87 Eng. Rep. 75 (K.B. 1686). After clarifying that "the meaning of [the Statute of Northampton] was to punish people who go armed to terrify the King's subjects," *id.*, the Chief Justice acquitted Knight, but only because, as a government official, he was exempt from the statute's prohibition.

In 1694, Lord Coke described the Statute of Northampton as providing that a man may neither "goe nor ride armed by night nor by day . . . in any place whatsoever." *The Third*

*Part of the Institutes of the Laws of England* 160, ch. 73 (London, R. Brooke, 1797). Coke recounted the case of Sir Thomas Figett, who was arrested when he "went armed under his garments" before a justice of the King's bench. *Id.* at 161–62. William Hawkins wrote in 1716 that, under the Statute of Northampton, "a Man cannot excuse the wearing [of] such Armour in Publick, by alledging that such a one threatened him, and that he wears it for the Safety of his Person from his Assault." 1 William Hawkins, *A Treatise Of The Pleas Of The Crown* 489, ch. 28, § 8 (London, J. Curwood, 8th ed. 1824). Blackstone, writing in the 1760s, compared the Statute of Northampton to "the laws of Solon, [under which] every Athenian was finable who walked about the city in armour." 5 William Blackstone, *Commentaries on the Laws of England*, edited by St. George Tucker, 149 § 9 (Phila. 1803).

James II, the last of the Stuart kings and England's last Catholic monarch, sought to disarm his Protestant subjects. James II was driven from the throne in 1688 in the Glorious Revolution. In 1689, under his Protestant successors, William of Orange (William III) and Mary II, Parliament enacted the English Bill of Rights, which, as the Court in *Heller* recognized, has "long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. The Bill of Rights provided, with respect to the right to bear arms, "[t]hat the subjects which are Protestants may have arms for their defence suitable to their conditions and *as allowed by law*." 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689) (emphasis added).

To the degree that the English Bill of Rights is an interpretive guide to our Second Amendment, the critical question is the meaning of the phrase "as allowed by law."

More narrowly, with respect to the case now before us, the specific question is whether the arms that are "allowed by law" — that is, the arms Protestants had the right to bear — included concealed firearms.  The history just recounted demonstrates that carrying concealed firearms in public was not "allowed by law."  Not only was it generally prohibited by the Statute of Northampton, but it was specifically forbidden by the statute enacted under Henry VIII, and by the later proclamations of Elizabeth I and James I.

The English writer, Granville Sharp, addressed this precise point in 1782.  Sharp is a particularly important source, given that the Court in *Heller* cited his treatise as an authority supporting its understanding of the English Bill of Rights.  *See Heller*, 554 U.S. at 594.  According to Sharp, the phrase "as allowed by law" referred to pre-existing restrictions, including the statute passed under Henry VIII prohibiting concealed arms.  Sharp wrote:

> [The] latter expression, "*as allowed by law*," respects the limitations in the above-mentioned act of 33 Hen. VIII c. 6, which restrain the use of *some particular sort of arms*, meaning only such arms as were liable to be *concealed*, or otherwise favour the designs of murderers, as "*cross-bows, little short hand-guns, and little hagbuts*," and all guns UNDER CERTAIN LENGTHS, specified in the act . . . .

*Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17–18 (3d ed. 1782) (emphasis in original).

Thus, by the end of the eighteenth century, when our Second Amendment was adopted, English law had for centuries consistently prohibited carrying concealed (and occasionally the even broader category of concealable) arms in public.  The prohibition may be traced back generally to the Statute of Northampton in 1328, and specifically to the Act of Parliament under Henry VIII in 1541.  The prohibition was continued in the English Bill of Rights, adopted in 1689, and was clearly explained by Granville Sharp in 1782, less than a decade before the adoption of the Second Amendment.

### b.  Right to Bear Arms in Colonial America

We have found nothing in the historical record suggesting that the law in the American colonies with respect to concealed weapons differed significantly from the law in England.  In 1686, the New Jersey legislature, concerned about the "great abuses" suffered by "several people in the Province" from persons carrying weapons in public, passed a statute providing that "no person or persons . . . shall presume privately to wear any pocket pistol, skeins, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province."  *An Act Against Wearing Swords, &c.*, N.J. Laws Chap. IX (1689).  Other colonies adopted verbatim, or almost verbatim, English law.  For example, in 1692, the colony and province of Massachusetts Bay authorized the Justice of the Peace to arrest those who "shall ride or go armed Offensively before any of Their Majesties Justices . . . or elsewhere, by Night or by Day, in Fear or Affray of Their Majesties Liege People."  *An Act for the Punishing of Criminal Offenders*, Mass. Laws Chap. XI § 6 (1692).

### c.  Right to Bear Arms in the States

The Supreme Court in *Heller* discussed state court decisions after the adoption of the Second Amendment on the ground that they showed how the Amendment — and the right to bear arms generally — was commonly understood in the years following its adoption.  We recognize that these decisions are helpful in providing an understanding of what the adopters of the Second Amendment intended, but we postpone our discussion to the next section, for they are even more helpful in providing an understanding what the adopters of the Fourteenth Amendment intended.

### 2.  History Relevant to the Fourteenth Amendment

### a.  Pre-amendment History

Following the lead of the Supreme Court in both *Heller* and *McDonald*, we look to decisions of state courts to determine the scope of the right to keep and bear arms as that right was understood by the adopters of the Fourteenth Amendment.  With only one exception — and a short-lived exception at that — state courts before the Civil War unanimously concluded that members of the general public could be prohibited from carrying concealed weapons.

In *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833), the Supreme Court of Indiana, in a one-sentence opinion, upheld a state statute prohibiting the general public from carrying concealed weapons:  "It was *held* in this case, that the statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional."  *Id.* at 229 (emphasis in original).

In *State v. Reid*, 1 Ala. 612 (1840), the defendant had been convicted of violating a statute prohibiting any person from "carry[ing] concealed about his person, any species of fire arms, or any Bowie knife, Arkansaw tooth pick, or any other knife of the like kind, dirk, or any other deadly weapon." *Id.* at 614. The Supreme Court of Alabama upheld the statute against a challenge under the state constitution. It based its analysis in substantial part on its conclusion that the English Bill of Rights did not protect a right to carry concealed weapons. The court wrote:

> The evil which was intended to be remedied [by the English Bill of Rights] was a denial of the right of Protestants to have arms for their defence, and *not an inhibition to wear them secretly*.

*Id.* at 615 (emphasis added). The court defended the Alabama statute on practical as well as legal grounds:

> [A] law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.

*Id.* at 617.

In *Aymette v. State*, 21 Tenn. 154 (1840), a jury convicted the defendant of wearing a bowie knife concealed under his

clothes. The defendant contended that the conviction violated a Tennessee constitutional provision stating that "free white men of this State have a right to keep and bear arms for their common defence." *Id.* at 156. The Tennessee Supreme Court interpreted the English Bill of Rights, as well as the Tennessee constitution, as protecting a group right to engage in military action rather than an individual right to self-defense:

> When, therefore, Parliament says that "subjects which are Protestants may have arms for their defence, suitable to their condition, as allowed by law," it does not mean for private defence, but, being armed, they may as a body rise up to defend their just rights, and compel their rulers to respect the laws.

*Id.* at 157. In the view of the court, concealable weapons did not come within the scope of either the English Bill of Rights or the state constitution:

> The Legislature, therefore, have a right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence.

*Id.* at 159.

In *State v. Buzzard*, 4 Ark. 18, 19 (1842), the trial court quashed an indictment alleging violation of a state statute providing that "every person who shall wear any pistol, dirk,

butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor." The Arkansas Supreme Court reversed. Even though the Fourteenth Amendment had not yet been adopted, the court believed that the statute was properly challenged under both the Second Amendment and the state constitution. The court held that the statute violated neither the federal nor the state constitution.  In upholding the statute, Justice Dickinson wrote that the purpose of the two constitutional provisions was to provide "adequate means for the preservation and defense of the State and her republican institutions." *Id.* at 27.

> The act in question does not, in my judgment, detract anything from the power of the people to defend their free state and the established institutions of the country.  It inhibits only the wearing of certain arms concealed.

*Id.*

In *Nunn v. State*, 1 Ga. 243 (1846), the defendant was charged with carrying a pistol, but the indictment did not specify that he carried it "secretly." An 1837 state statute criminalized carrying concealed weapons, but allowed open carry.  Like the Arkansas Supreme Court in *Buzzard*, the Georgia Supreme Court addressed the statute under both the Second Amendment and the state constitution.  The court discussed extensively the right to bear arms, writing that the Second Amendment

> assigns as a reason why this right [to keep and bear arms] shall not be interfered with, or in any manner abridged, that the free enjoyment

> of it will prepare and qualify *a well-regulated militia*, which are necessary to the security of a free State.

*Id.* at 250 (emphasis in original). The court concluded that insofar as it prohibited the carrying of concealed weapons, the statute was constitutional:

> We are of the opinion . . . that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defense, or of his constitutional right to keep and bear arms.

*Id.* at 251 (emphasis in original). However, because the indictment failed to allege that the defendant had carried his pistol in a concealed manner, the court dismissed it. *See* Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 Fordham Urb. L.J. 1695, 1716–26 (2011–2012) (discussing *Nunn* and the emergence of public carry regulation outside the south).

In *State v. Chandler*, 5 La. Ann. 489 (1850), the defendant argued that the trial judge should have instructed the jury that it was not a crime in Louisiana to carry a concealed weapon because the Second Amendment guaranteed to citizens the right to bear arms. The Louisiana Supreme Court rejected the argument, holding that a law prohibiting concealed weapons did not violate the Amendment:

> The [Louisiana statute] makes it a misdemeanor to be "found with a concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or any other place about him, that does not appear in full open view." This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's right to carry arms . . . "in full open view," which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.

*Id.* at 489–90.

The only exception to this otherwise uniform line of cases is *Bliss v. Commonwealth*, 12 Ky. 90 (1822), in which the Kentucky Court of Appeals, by a vote of two to one, struck down a state statute prohibiting the wearing of "a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon." *Id.* at 90. The court held that the statute violated Article 10, § 23 of Kentucky's constitution, which provided that "the right of the citizens to bear arms in defense of themselves and the state, shall not be questioned." *Id.* The court wrote:

> [I]n principle, there is no difference between
> a law prohibiting the wearing concealed arms,
> and a law forbidding the wearing such as
> are exposed; and if the former be
> unconstitutional, the latter must be so
> likewise.

*Id.* at 92.

The court's decision in *Bliss* was soon attacked, and was overruled over a decade before the Civil War. In 1837, Governor James Clark, deeply concerned about the "bloodshed and violence" caused by concealed weapons in the wake of *Bliss*, called on the Kentucky legislature to pass a new statute banning the practice. The Kentucky legislative committee that received the Governor's message criticized the court for reading the state constitution too literally. *See* Robert M. Ireland, *The Problem of Concealed Weapons in Nineteenth-Century Kentucky*, 91 Reg. Ky. Hist. Soc'y 370, 373 (1993). In 1849, a Kentucky constitutional convention adopted without debate a provision  authorizing the legislature to "pass laws to prevent persons from carrying concealed arms." Ky. Const. art. XIII, § 25. Then, in 1854, the Kentucky legislature passed a new statute prohibiting the concealed carry of "any deadly weapons other than an ordinary pocket knife." *An Act to prohibit the carrying of concealed weapons*, Mar. 10, 1853, Ky. Acts, Chap. 1020 (1854).

The Supreme Court stated in *Heller* that "*the majority* of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U.S. at 626 (emphasis added). The Court substantially understated

the matter.  As just noted, with the exception of *Bliss*, those pre-Civil War state courts that considered the question *all* upheld prohibitions against concealed weapons.  Four of the six courts upholding prohibitions specifically discussed, and disagreed with, *Bliss*.  *See Reid*, 1 Ala. at 617–20; *Aymette*, 21 Tenn. at 160–61; *Buzzard*, 4 Ark. at 25–26; *Nunn*, 1 Ga. at 247–48.  Moreover, the two-to-one *Bliss* decision did not last. *Bliss* was decided in 1822; a state constitutional amendment was adopted in 1849 to overturn *Bliss*; the legislature then passed a statute in 1854 outlawing concealed weapons.

The Supreme Court wrote in *McDonald* that a "*clear majority* of the States in 1868 . . . recognized the right to keep and bear arms as being among the foundational rights necessary to our system of Government."  561 U.S. at 777 (emphasis added).    Based in substantial part on its understanding of the "clear majority" of states, the Court held that the adopters of the Fourteenth Amendment intended to incorporate the right to bear arms preserved by the Second Amendment.  As just seen, an *overwhelming majority* of the states to address the question — indeed, after 1849, *all* of the states to do so — understood the right to bear arms, under both the Second Amendment and their state constitutions, as not including a right to carry concealed weapons in public.

### b.  Post-Amendment History

The Supreme Court in *Heller* discussed the decisions of early 19th century courts after the adoption of the Second Amendment, on the ground that they were relevant to understanding the intent of the eighteenth century adopters of the Amendment. 554 U.S. at 605–14. We follow the Court's lead with respect to the Fourteenth Amendment and discuss decisions after its adoption.

40                    PERUTA V. CTY. OF SAN DIEGO

The pre-Civil War consensus about the meaning of the right to keep and bear arms continued after the war and the adoption of the Fourteenth Amendment. The post-war constitutions of five states explicitly stated that the right to carry concealed weapons could be prohibited by the legislature. N.C. Const. of 1868, art. I, § 24 (1875) ("A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; . . . Nothing herein contained shall justify the practice of carrying concealed weapons, or prevent the Legislature from enacting penal statutes against said practice."); Colo. Const. art. II, § 13 (1876) ("The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons." ); La. Const. of 1879, art. III ("A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed."); Mont. Const. of 1889, art. II, § 12 ("The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons."); Miss. Const. art. III, § 12 (1890) ("The right of every citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons."). *See generally* David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. Rev. 1359, 1410 n. 190 (1998).

The post-war constitutions of another six states, while not explicitly granting to the legislatures the authority to prohibit concealed weapons, gave state legislatures broad power to regulate the manner in which arms could be carried. *See* Ga. Const. of 1868, art. I, § 14 ("A well-regulated militia being necessary to the security of a free people, the right of the people to keep and bear arms shall not be infringed; but the general assembly shall have power to prescribe by law the manner in which arms may be borne."); Tex. Const. of 1868, art. I, § 13 ("Every person shall have the right to keep and bear arms in the lawful defence of himself or the State, under such regulations as the legislature may prescribe."); Tenn. Const. art. I, § 26 (1870) ("That the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime."); Fla. Const. of 1885, art. I, § 20 ("The right of the people to bear arms in defence of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."); Idaho Const. of 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the Legislature shall regulate the exercise of this right by law."); Utah Const. of 1896, art. I, § 6 ("The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law."). *See generally* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. of L. & Pol. 191, 192–217 (2006) (collecting state constitutional provisions). In these states, the legislatures of Georgia and Tennessee had already passed statutes prohibiting concealed weapons, and the supreme courts of those states, in *Nunn* and *Aymette*, had already upheld the statutes against constitutional challenges. *Aymette*, 21 Tenn. 154; *Nunn*, 1 Ga. 243. As will be seen in a moment, the

Texas legislature would soon pass a statute prohibiting concealed weapons, and that statute, too, would be upheld.

Two state courts and one territorial court upheld prohibitions against carrying concealable (not just concealed) weapons in the years following the adoption of the Fourteenth Amendment. In *English v. State*, 35 Tex. 473 (1871), a Texas statute "regulating, and in certain cases prohibiting, the carrying of deadly weapons," including "pistols, dirks, daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives," *id.* at 474, was challenged under the Second Amendment, as well as under an analogous provision of the Texas constitution. The Texas Supreme Court upheld the statute. The court construed "arms" in the Second Amendment and the Texas constitution as referring only to weapons "used for purposes of war." *Id.* at 475. The court wrote:

> To refer the deadly devices and instruments called in the statute "deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous. No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit.

*Id.* at 476.

In *State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891), a West Virginia statute prohibited carrying, whether openly or concealed, "any revolver or other pistol, dirk, bowie-knife, razor, slung-shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character." The statute exempted from the prohibition a person who is "a quiet and peaceable citizen, of good character and standing in the community in which he lives," and who had "good cause to believe, and did believe, that he was in danger of death or great bodily harm at the hands of another person." *Id.* at 9. Defendant was convicted under the statute because he failed to prove that he was of good character, despite the fact that he had been in clear and immediate danger of death from a particular individual. *Id.* at 10. Defendant contended that the statute violated the Second Amendment. *Id.* at 11. The West Virginia Supreme Court upheld the statute on the ground that the Amendment protected only the right to carry weapons of war:

> [I]n regard to the kind of arms referred to in the amendment, it must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets, — arms to be used in defending the state and civil liberty, — and not to pistols, bowie-knife, brass knuckles, billies, and such other weapons as are usually employed in brawls, street fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the state.

*Id.*

In *Walburn v. Territory*, 59 P. 972 (Okla. 1899), the defendant was convicted of "carrying a revolver on his person."  The Supreme Court of the Territory of Oklahoma sustained the law under which the defendant had been convicted.  "[W]e are of the opinion that the statute violates none of the inhibitions of the constitution of the United States, and that its provisions are within the police power of the territory."  *Id.* at 973.

Finally, and perhaps most importantly, in *Robertson v. Baldwin*, 165 U.S. 275 (1897), the United States Supreme Court made clear that it, too, understood the Second Amendment as not protecting the right to carry a concealed weapon.  The Court wrote:

> [T]he first 10 amendments to the constitution, commonly known as the "Bill of Rights," were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case. In incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed. Thus . . . the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons[.]

*Id.* at 281–82.

### 3. No Second Amendment Right to Carry Concealed Weapons

The historical materials bearing on the adoption of the Second and Fourteenth Amendments are remarkably consistent. Under English law, the carrying of concealed weapons was specifically prohibited since at least 1541. The acknowledged predecessor to the Second Amendment, the 1689 English Bill of Rights, protected the rights of Protestants to have arms, but only those arms that were "allowed by law." Concealed weapons were not "allowed by law," but were, instead, flatly prohibited. In the years after the adoption of the Second Amendment and before the adoption of the Fourteenth Amendment, the state courts that considered the question nearly universally concluded that laws forbidding concealed weapons were consistent with both the Second Amendment and their state constitutions. The only exception was Kentucky, whose court of appeals held to the contrary in a two-to-one decision based on its state constitution. Kentucky thereafter amended its constitution to overturn that result. In the decades immediately after the adoption of the Fourteenth Amendment, all of the state courts that addressed the question upheld the ability of their state legislatures to prohibit concealed weapons. Finally, the United States Supreme Court unambiguously stated in 1897 that the protection of the Second Amendment does not extend to "the carrying of concealed weapons." *Baldwin*, 165 U.S. at 282.

We therefore conclude that the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public. In so holding, we join several of our sister circuits that have upheld the authority of states to prohibit

entirely or to limit substantially the carrying of concealed or concealable firearms.  *See Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013) (right to carry concealed weapons does not fall within the Second Amendment's scope)*; Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) (Maryland requirement that handgun permits be issued only to individuals with "good and substantial reason" to wear, carry, or transport a handgun does not violate Second Amendment); *Drake v. Filko*, 724 F.3d 426, 429–30 (3d Cir. 2013) (New Jersey "justifiable need" restriction on carrying handguns in public "does not burden conduct within the scope of the Second Amendment's guarantee"); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) (New York "proper cause" restriction on concealed carry does not violate Second Amendment).

Our holding that the Second Amendment does not protect the right of a member of the general public to carry concealed firearms in public fully answers the question before us. Because the Second Amendment does not protect in any degree the right to carry concealed firearms in public, any prohibition or restriction a state may choose to impose on concealed carry — including a requirement of "good cause," however defined — is necessarily allowed by the Amendment.  There may or may not be a Second Amendment right for a member of the general public to carry a firearm openly in public.  The Supreme Court has not answered that question, and we do not answer it here.

## V.  Intervention by the State of California

The State of California moved to intervene in *Peruta* after Sheriff Gore of San Diego County declined to petition for rehearing en banc.  Plaintiffs did not oppose intervention by

the State.  As recounted at the beginning of this opinion, however, a divided panel denied the State's motion.  We disagree and grant the motion.

Under Federal Rule of Civil Procedure 24(a)(2), a party may intervene as of right if

> (1) it has a significant protectable interest relating to the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede its ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately represent its interest.

*Day v. Apoliona*, 505 F.3d 963, 965 (9th Cir. 2007) (citation, internal quotation marks, and alterations omitted); *see also* Fed. R. Civ. P. 24(a)(2).

There is no question that California has a significant interest in *Peruta* (and, indeed, in *Richards*).  As the panel majority noted, Plaintiffs "focuse[d] [their] challenge on [the counties'] licensing scheme for concealed carry."  *Peruta*, 742 F. 3d at 1171.  But the panel majority construed the challenge as an attack on "the constitutionality of [California's] entire [statutory] scheme." *Id.* at 1171; *see also id.* at 1169 (assessing whether "*the California scheme* deprives any individual of his constitutional rights" (emphasis added)).  While Plaintiffs' original challenge to the county policies did not appear to implicate the entirety of California's statutory scheme, the panel opinion unmistakably did.

The panel opinion in *Peruta*, if left intact, would have substantially impaired California's ability to regulate firearms. A key premise of the opinion was that the Second Amendment requires the states to "permit *some form* of carry for self-defense outside the home." *Id.* at 1172 (emphasis in original). Though California's statutory scheme permits many residents, in many contexts, to carry a firearm outside the home, it does not permit law-abiding residents of sound mind to do so without a particularized interest in self-defense.

Under the circumstances presented here, we conclude that California's motion to intervene was timely. To determine whether a motion to intervene is timely, we consider "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004) (internal quotation marks omitted). We recognize that California sought to intervene at a relatively late stage in the proceeding. But the timing of California's motion to intervene did not prejudice Plaintiffs; indeed, Plaintiffs did not, and do not, oppose the State's intervention. Equally important, California had no strong incentive to seek intervention in *Peruta* at an earlier stage, for it had little reason to anticipate either the breadth of the panel's holding or the decision of Sheriff Gore not to seek panel rehearing or rehearing en banc.

Our conclusion that California's motion to intervene was timely is consistent with our decision in *Apoliona*, in which the State of Hawai'i had made an argument, as *amicus curiae* before the district court, that the defendants had chosen not to make. 505 F.3d at 964. The district court agreed with Hawai'i's argument, but we reversed, holding that the argument was foreclosed by circuit precedent. *Id.* Hawai'i

moved to intervene as a party in order to file a petition for rehearing en banc. *Id.* Notwithstanding the fact that "the state was aware of the litigation and that the litigation had the potential to affect its interests," we granted the motion. *Id.* at 966. Permitting Hawai'i to intervene, we wrote, "will not create delay by injecting new issues into the litigation, but instead will ensure that our determination of an already existing issue is not insulated from review simply due to the posture of the parties." *Id.* at 965 (citation, internal quotation marks, and alterations omitted).

If we do not permit California to intervene as a party in *Peruta*, there is no party in that case that can fully represent its interests. At trial and on appeal, attorneys representing Sheriff Gore ably defended San Diego County's interpretation of the good cause requirement. But after the panel decision was issued, Sheriff Gore informed the court that he would neither petition for rehearing en banc nor defend the county's position in en banc proceedings. California then appropriately sought to intervene in order to fill the void created by the late and unexpected departure of Sheriff Gore from the litigation.

## VI. Response to Dissents

Our colleagues Judges Callahan, Silverman and N.R. Smith have each written dissenting opinions. We consider Judge Callahan's opinion to be the principal dissent because its argument provides an essential premise for the other two.

None of the dissents contends that there is a free-standing Second Amendment right for a member of the general public to carry a concealed weapon in public. Nor do they make any effort to contradict or undermine any of the historical

evidence showing that the carrying of concealed weapons was consistently forbidden in England beginning in 1541; was consistently forbidden in the American colonies; and was consistently forbidden by the states (with the sole and short-lived exception of Kentucky) both before and after the Civil War. Nor do they dispute that the United States Supreme Court in 1897 clearly stated that carrying concealed weapons was not protected by the Second Amendment. *Robertson v. Baldwin*, 165 U.S. 275, 281–82 (1897) ("[T]he right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons[.]").

The argument of the principal dissent begins with the premise that Plaintiffs, as members of the general public, have a Second Amendment right to carry firearms in public as a means of self-defense. Principal Diss. at 66. The principal dissent characterizes California's restrictions on open carry as effectively prohibiting open carry. It concludes that when California's restrictions on open and concealed carry are considered together, they violate the Second Amendment: "In the context of California's choice to prohibit open carry, the counties' policies regarding the licensing of concealed carry are tantamount to complete bans on the Second Amendment right to bear arms outside the home for self-defense, and are therefore unconstitutional." *Id.* at 69–70. Therefore, according to the principal dissent, California's restrictions on concealed carry violate the Second Amendment. Judge N.R. Smith's dissent agrees with this argument, emphasizing the "context" of Plaintiffs' challenge to California's restrictions on concealed carry.

The argument of the principal dissent is based on a logical fallacy. Even construing the Second Amendment as protecting the right of a member of the general public to carry

a firearm in public (an issue we do not decide), and even assuming that California's restrictions on public open carry violate the Second Amendment so construed (an issue we also do not decide), it does not follow that California's restrictions on public concealed carry violate the Amendment.

As the uncontradicted historical evidence overwhelmingly shows, the Second Amendment does not protect, in any degree, the right of a member of the general public to carry a concealed weapon in public.  The Second Amendment may or may not protect to some degree a right of a member of the general public to carry a firearm in public.  If there is such a right, it is only a right to carry a firearm openly.  But Plaintiffs do not challenge California's restrictions on open carry; they challenge only restrictions on concealed carry.

If there is a Second Amendment right of a member of the general public to carry a firearm openly in public, and if that right is violated, the cure is to apply the Second Amendment to protect that right.  The cure is not to apply the Second Amendment to protect a right that does not exist under the Amendment.

## VII.  Agreement with the Concurrence

Our colleague Judge Graber concurs fully in our opinion, but writes separately "to state that, even if we assume that the Second Amendment applied to the carrying of concealed weapons in public, the provisions at issue would be constitutional."  Graber, J., concurrence at 52.  Even if we assume that the Second Amendment applies, California's regulation of the carrying of concealed weapons in public survives intermediate scrutiny because it "promotes a substantial government interest that would be achieved less

effectively absent the regulation." *Id.* at 58 (internal quotation marks omitted). For the reasons given in our opinion, we do not need to reach the question addressed by the concurrence. But if we were to reach that question, we would entirely agree with the answer the concurrence provides.

Conclusion

We hold that the Second Amendment does not protect, in any degree, the carrying of concealed firearms by members of the general public. This holding resolves the Second Amendment question presented in this case. It also necessarily resolves, adversely to Plaintiffs, their derivative claims of prior restraint, equal protection, privileges and immunities, and due process. In light of our holding, we need not, and do not, answer the question of whether or to what degree the Second Amendment might or might not protect a right of a member of the general public to carry firearms openly in public.

We **AFFIRM** the judgments of the district courts in both cases.

GRABER, Circuit Judge, with whom THOMAS, Chief Judge, and MCKEOWN, Circuit Judge, join, concurring:

I concur fully in the majority opinion. I write separately only to state that, even if we assume that the Second Amendment applied to the carrying of concealed weapons in public, the provisions at issue would be constitutional. Three of our sister circuits have upheld similar restrictions under

intermediate scrutiny. Such restrictions strike a permissible balance between "granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets." *Woollard v. Gallagher*, 712 F.3d 865, 881 (4th Cir. 2013); *see also Drake v. Filko*, 724 F.3d 426, 431–32 (3d Cir. 2013) (assuming that the Second Amendment applies and upholding New Jersey's "justifiable need" restriction on carrying handguns in public); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89, 97 (2d Cir. 2012) (assuming that the Second Amendment applies and upholding New York's "proper cause" restriction on the concealed carrying of firearms). If restrictions on concealed carry of weapons in public are subject to Second Amendment analysis, we should follow the approach adopted by our sister circuits.

Judge Silverman's dissent acknowledges the "significant, substantial, and important interests in promoting public safety and reducing gun violence." (Dissent at 81–82.) He contends, though, that Defendants have failed to demonstrate "a reasonable fit" between the challenged licensing criteria and the government's objectives. (Dissent at 82.) I disagree.

Judge Silverman points to evidence cited by two amici "showing that concealed-carry license holders are disproportionately *less* likely to commit crimes . . . than the general population." (Dissent at 83–84 (citing Amicus Brief for the Governors of Texas, Louisiana, Maine, Mississippi, Oklahoma, and South Dakota at pp. 10–15; and Amicus Brief for International Law Enforcement Educators and Trainers Association, et al., at pp. 22–26.)) There are, however, at least two reasons to question the relevance of those studies.

First, even accepting Judge Silverman's premise, lawmakers are entitled to weigh the severity of the risk as well as the likelihood of its occurrence. Indeed, examples abound of "law-abiding citizens" in the seven states studied who place the public safety in jeopardy. In Florida, a state touted in the second of the cited amicus briefs, a "law-abiding" holder of a concealed-weapons permit shot and killed another person in 2014 in a movie theater after an argument over texting and popcorn. Amicus Brief for the Law Center to Prevent Gun Violence and Marin County Sheriff Robert Doyle In Support of Appellees' Petition for Rehearing En Banc at 13. Two years earlier, another concealed-carry permit holder in Florida fatally shot someone after an argument over loud music in a gas station's parking lot. *Id.* In Arizona, a qualified handgun carrier shot 19 people, including a congresswoman and a federal judge, outside a supermarket in 2011. *Id.* Those shooters all were legally entitled to carry their concealed firearms, which they used to kill others. Sadly, those incidents are not anomalies. Nationwide, since May 2007, concealed-carry permit holders have shot and killed at least 17 law enforcement officers and more than 800 private citizens—including 52 suicides. *Concealed Carry Killers*, Violence Policy Center, www.concealedcarrykillers.org (last visited Apr. 6, 2016). Thus, even if we assume that each and every one of those tragedies was less likely to occur because of the shooter's prior status as a "law-abiding citizen," that does not mean that a state legislature's regulation of concealed carry fails to address the problem in a reasonable way.

Second, to the extent that concealed-carry license holders are, in fact, less likely to commit crimes, their relative peacefulness may result from (and not exist in spite of) the restrictions that are disputed in this case. For example, in

Delaware, five upstanding citizens must swear that carrying a concealed deadly weapon is necessary for the protection of the applicant, the applicant's property, or both.  11 Del. Code Ann. § 1441(a)(2).  In Maryland, the applicant must show that he or she has a "good and substantial reason to wear, carry, or transport a handgun."  Md. Code Ann., Pub. Safety § 5-306(a)(6)(i).  In Hawaii, a concealed-carry permit may be issued only "[i]n an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property."  Haw. Rev. Stat. § 134-9(a).  In New York, a person seeking a license to carry a concealed handgun must show "proper cause," N.Y. Penal Law § 400.00(2)(f); and, in New Jersey, the applicant must demonstrate "that he has a justifiable need to carry a handgun," N.J. Stat. Ann. § 2C:58-4.  Rhode Island and the District of Columbia require the applicant to show that he or she is a "suitable person" and has a "reason," such as "fear[ing] an injury to his or her person or property," for carrying a firearm.  Mass. Gen. Laws ch. 140, § 131(d); 1956 R.I. Gen. Laws § 11-47-11(a); D.C. Code § 22-4506(a).  In other words, it may be the heightened restrictions on concealed-carry permits in many jurisdictions—the very provisions challenged in this case—that cause statistically reduced violence by permit holders.

Of equal importance, the studies to which Judge Silverman alludes are not the only side of the story.  Much respected evidence is to the contrary.  Several studies suggest that "the clear majority of states" that enact laws broadly allowing concealed carrying of firearms in public "experience *increases* in violent crime, murder, and robbery when [those] laws are adopted."  John J. Donohue, *The Impact of Concealed-Carry Laws*, *in* Evaluating Gun Policy Effects on Crime and Violence 287, 320 (2003), *available at*

http://www.brookings.edu/~/media/press/books/2003/evaluatinggunpolicy/evaluatinggunpolicy_chapter.pdf; *see also* Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 Int'l Rev. L. & Econ. 239, 239 (1998) (noting that laws broadly allowing concealed carrying of weapons "have resulted, if anything, in an *increase* in adult homicide rates"), *available at* http://home.uchicago.edu/ludwigj/papers/IJLE-ConcealedGunLaws-1998.pdf; David McDowall et al., *Easing Concealed Firearms Laws:  Effects on Homicide in Three States*, 86 J. Crim. L. & Criminology 193, 202–03 (1995) (noting that, in the aftermath of relaxed concealed-carry laws, "firearms homicides increased" while "homicides without guns remained steady," and concluding that weaker firearms regulation may "raise levels of firearms murders"), *available at* http://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6855&context=jclc.

Similarly, some studies suggest that "policies to *discourage* firearms in public may help prevent violence." McDowall et al., *Easing Concealed Firearms Laws* at 203. A study of prisoners incarcerated for gun offenses, for example, found that two-thirds of those prisoners "reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun." Philip Cook et al., *Gun Control After Heller:  Threats and Sideshows From a Social Welfare Perspective*, 56 U.C.L.A. L. Rev. 1041, 1081 (2009).  The study continues:

> Currently, criminals use guns in only about 25 percent of noncommercial robberies and 4 percent of assaults.  If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become

> quicker to use guns to avert armed self-
> defense, the end result could be that street
> crime becomes more lethal.

*Id.* (footnote omitted).

Clearly, social scientists disagree about the practical effect of modest restrictions on concealed carry of firearms. In the face of that disagreement, and in the face of inconclusive evidence, we must allow the government to select among reasonable alternatives in its policy decisions. As the Second Circuit explained, in upholding a requirement that an applicant show an objective threat to personal safety, or a special need for self-protection, to obtain a concealed-carry license for a handgun:

> To be sure, we recognize the existence of studies and data challenging the relationship between handgun ownership by lawful citizens and violent crime. We also recognize that many violent crimes occur without any warning to the victims. But New York also submitted studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces. It is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments.

*Kachalsky*, 701 F.3d at 99; *see also Woollard*, 712 F.3d at 876–82 (detailing the reasons why Maryland's law, requiring a good and substantial reason to carry a concealed firearm in

public, advances the government's important public safety objectives); *Drake*,724 F.3d at 439 (noting that "conflicting empirical evidence . . . does not suggest, let alone compel, a conclusion that the 'fit' between [a state's] individualized, tailored approach and public safety is not 'reasonable'").

Defendants must show only that the regulation "promotes a 'substantial government interest that would be achieved less effectively absent the regulation,'" not that the chosen regulation is the "least restrictive means" of achieving the government's important interest. *Fyock v. City of Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998)); *see also United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) (stating that the fit need only "be reasonable, not perfect"). In examining reasonableness, we "must accord substantial deference to the predictive judgments" of legislative bodies, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994), and the government must be allowed to experiment with solutions to serious problems, *Jackson v. City of San Francisco*, 746 F.3d 953, 966 (9th Cir. 2014) (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).

Finally, despite Judge Silverman's argument to the contrary, California's decision to confer permit discretion on its counties is not an arbitrary one. Localizing the decision allows closer scrutiny of the interests and needs of each community, increasing the "reasonable fit" between the level of restriction and local conditions and decreasing the extent of the restriction that otherwise would apply, statewide, in places that do not require it. Similarly, localizing the decision allows more careful and accurate consideration of each individual's license application. California entrusts the decision-making responsibility to local law enforcement

officials because they are best positioned to evaluate the potential dangers that increasing or decreasing concealed carry would have in their communities. This structure allows for a nuanced assessment of the needs of each locality in processing applications for concealed carry. In short, California's decision to place licensing in local hands is itself reasonable.

In sum, even if the Second Amendment applied to concealed carry of firearms in public, the challenged laws and actions by Defendants survive heightened scrutiny. No constitutional violation occurred.

CALLAHAN, Circuit Judge, dissenting, in which SILVERMAN, Circuit Judge, joins as to all parts except section IV, BEA, Circuit Judge, joins, and N.R. SMITH, Circuit Judge, joins as to all parts except section II.B:

The Second Amendment is not a "second-class" constitutional guarantee. *See McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). In the watershed case *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment codified an existing individual right to keep and bear arms for self-defense. Two years later, the Court reaffirmed *Heller* in *McDonald*, 561 U.S. at 742, and held that the individual right to bear arms for self-defense under the Second Amendment was fundamental and applied to the states. Although these opinions specifically address firearms in the home, any fair reading of *Heller* and *McDonald* compels the conclusion that the right to keep and bear arms extends beyond one's front door. Like the rest of the Bill of Rights, this right is

indisputably constitutional in stature and part of this country's bedrock.

Plaintiffs assert that the counties' concealed weapons licensing schemes, in the context of California's regulations on firearms, obliterate their right to bear arms for self-defense in public.  The Supreme Court in *Heller* addressed concealed-carry restrictions and instructed that those restrictions be evaluated in context with open-carry laws to ensure that the government does not deprive citizens of a constitutional right by imposing incremental burdens.  *Heller*, 554 U.S. at 629.  In the context of present-day California law, the Defendant counties' limited licensing of the right to carry concealed firearms is tantamount to a total ban on the right of an ordinary citizen to carry a firearm in public for self-defense.  Thus, Plaintiffs' Second Amendment rights have been violated.  While states may choose between different manners of bearing arms for self-defense, the right must be accommodated.

The majority sets up and knocks down an elaborate straw argument by answering only a narrow question—whether the Second Amendment protects a right to carry concealed firearms in public.  But this approach is contrary to *Heller*, and contrary to the prescribed method for evaluating and protecting broad constitutional guarantees.  Indeed, the majority's lengthy historical analysis fails to appreciate that many of its cited cases either presumed a right to openly carry a firearm in public or relied on a pre-*Heller* interpretation of the Second Amendment.  Because the majority eviscerates the Second Amendment right of individuals to keep and bear arms as defined by *Heller* and reaffirmed in *McDonald*, I respectfully dissent.

## I.  The Individual Right to Bear Arms Extends Beyond the Home

   A.  *Under Heller and McDonald, the individual right to bear arms for self-defense extends beyond the home*

Our analysis begins with the text of the Second Amendment and the Supreme Court's opinions in *Heller* and *McDonald*, which instruct that the right to bear arms extends beyond the home.

The Second Amendment guarantees "the right of the people to keep and bear Arms."  U.S. Const. amend. II. *Heller* held that the Second Amendment conferred an individual right to keep and bear arms for self-defense. 554 U.S. at 595.  Indeed, *Heller* adopted Justice Ginsburg's definition of "carries a firearm" to mean "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).  *McDonald* affirmed that the constitutional right to keep and bear arms applies to the states.  *McDonald*, 561 U.S. at 778 ("[T]he Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.").

*Heller* and *McDonald* also instruct that the right to bear arms exists outside the home.  Under these cases, the Second Amendment secures "an individual right protecting against both public and private violence," indicating that the right extends in some form to locations where a person might become exposed to public or private violence.  *See Heller*,

554 U.S. at 594.  The Court reinforced this view by noting that the need for the right is "most acute" in the home, *id.* at 628, thus implying that the right exists outside the home.  *See also McDonald*, 561 U.S. at 780 ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."). *Heller* also identifies "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" as presumptively lawful.  554 U.S. at 626.  Were the right to self-defense confined to the home, the validity of such laws would be self-evident.

The history of the Second Amendment also indicates that the right to bear arms applies outside the home.  The common-law "right of having and using arms for self-preservation and defence," according to Blackstone, protected "the natural right of resistance and self-preservation." 1 William Blackstone, *Commentaries* *144.  Blackstone's Commentaries also made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms."  1 William Blackstone & St. George Tucker, *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* 289 (St. George Tucker ed., 1803).  Furthermore, the majority of Nineteenth Century courts agreed that the Second Amendment right extended outside the home and included, at minimum, the right to carry an operable weapon in public for the purpose of lawful self-defense.[1]  Although

---

[1] See Judge O'Scannlain's comprehensive analysis of the historical underpinnings of the Second Amendment's right to some form of carry for self-defense outside the home set forth in *Peruta v. Cty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *vacated* 781 F.3d 1106 (2015).

some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public.

Our sister circuits either have agreed that the Second Amendment right to bear arms extends outside the home or have assumed that the right exists. *See Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) (recognizing that "the Second Amendment's individual right to bear arms *may* have some application beyond the home"); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) (assuming without deciding "that the *Heller* right exists outside the home"); *Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012) ("To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*."); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 & n.10 (2d Cir. 2012) (noting that "[t]he plain text of the Second Amendment does not limit the right to bear arms to the home," and assuming that the Amendment has "some application" in the context of public possession of firearms (emphasis omitted)). Notably, the majority does not refute this analysis, hedging that "[t]he Second Amendment may or may not protect, to some degree, a right of a member of the general public to carry firearms in public." Maj. Op. 19. Thus, pursuant to *Heller* and *McDonald*, an individual's right to self-defense extends outside the home and includes a right to bear arms in public in *some* manner.

B. *States may choose between different manners of bearing arms for self-defense so long as the right to bear arms for self-defense is accommodated*

*Heller* balances the Second Amendment right to bear arms in public with a state's ability to choose between

regulating open carry or concealed carry.  *Heller* first noted that laws prohibiting concealed carry were examples of how the right secured by the Second Amendment was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose:

> Like most rights, the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.  See, *e.g.*, *Sheldon*, in 5 Blume 346; Rawle 123; Pomeroy 152–153; Abbott 333.  For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.  See, *e.g.*, *State v. Chandler*, 5 La. Ann., at 489–490; *Nunn v. State*, 1 Ga., at 251; see generally 2 Kent *340, n. 2; The American Students' Blackstone 84, n. 11 (G. Chase ed. 1884).   Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places

such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626–27.

Importantly, while the Court enumerated four presumptively lawful "longstanding prohibitions," it did not list prohibitions of concealed weapons as one of them. Instead, the Court identified concealed weapons prohibitions as an example of regulating the *manner* in which individuals can exercise their right to keep and carry a firearm for self-defense. The Court further noted that a prohibition on carrying concealed handguns in conjunction with a prohibition of open carry of handguns would destroy the right to bear and carry arms:

> Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. And some of those few have been struck down. In *Nunn v. State*, the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). See 1 Ga., at 251. In *Andrews v. State*, the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," 50 Tenn., at 187, violated the state constitutional provision (which the court equated with the Second Amendment). That was so even though the statute did not restrict the carrying of long guns. *Ibid.* See also

> *State v. Reid*, 1 Ala. 612, 616–617 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional").

*Id.* at 629.

In sum, *Heller* indicates that concealed-weapons prohibitions may be proper as long as individuals retain other means to exercise their Second Amendment right to bear arms for self-defense.   However, where other ways of exercising one's Second Amendment right are foreclosed, a prohibition on carrying concealed handguns constitutes a "severe restriction" on the Second Amendment right, just like the District of Columbia's unconstitutional handgun ban in *Heller*.

## II.  Given California's Choice to Prohibit Open Carry, the Counties' Policies of Not Allowing for Concealed Carry for Self-Defense are Unconstitutional

As the Plaintiffs have some right to carry a firearm in public for self-defense, the next task is to determine whether the counties' policies, in light of the state's open-carry restrictions, are constitutional.   We have held (and the majority does not hold otherwise) that when a law burdens conduct falling within the scope of the Second Amendment's guarantee, a two-step inquiry is appropriate. *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014). "The two-step inquiry we have adopted '(1) asks whether the challenged law burdens conduct protected by the Second

Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny.'" *Id.* at 960 (quoting *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)).

A. *Procedural posture and California's gun control regime*

First, we consider the posture of this case in the context of California's concealed- and open-carry laws. The *Richards* Plaintiffs filed suit in May 2009, and the *Peruta* Plaintiffs filed suit in October 2009. Both plaintiff groups challenged their respective counties' concealed weapons licensing policies under the Second Amendment.

California prohibits an individual from carrying a concealed handgun in public. Cal. Penal Code § 25400 (prohibiting concealed carry of a loaded firearm in public). There are exceptions to this prohibition on concealed carry, including for peace officers, military personnel, and persons in private security. *Id.* §§ 25450, 25620, 25630, 25650. There are also exceptions for persons engaged in particular activities, such as hunting. *Id.* § 25640.

A member of the general public, however, cannot carry a concealed handgun without a concealed-weapons license. The sheriff of a county may issue an applicant a license to lawfully carry a concealed handgun in the city or county in which that applicant works or resides. *Id.* §§ 26150, 26155. However, the applicant must be a resident of (or spend substantial time in) the county in which he or she applies, pass a background check, take a firearms course, demonstrate good moral character, and demonstrate "good cause." *Id.* §§ 26150, 26155, 26165.

The counties' interpretation of "good cause" is a focal point in this case.  Both counties define "good cause" as requiring a particular need.  San Diego County defines "good cause" as "a set of circumstances that distinguish[es] the applicant from the mainstream and causes him or her to be placed in harm's way."  Similarly, Yolo County's written policy requires "valid" reasons for requesting a license. Importantly, under both policies a general desire for self-protection and protection of family does not constitute "good cause."

In upholding the counties' restrictions, the district courts relied on the fact that, at that time, California permitted unloaded open carry of handguns under then Penal Code § 12031(g).  Thus, the district courts found that the counties' licensing schemes did not substantially burden the right to bear arms for self-defense.  *Peruta v. Cty. of San Diego*, 758 F. Supp. 2d 1106, 1114 (S.D. Cal. 2010) ("As a practical matter, should the need for self-defense arise, nothing in section 12031 restricts the open carry of unloaded firearms and ammunition ready for instant loading."); *Richards v. Cty. of Yolo*, 821 F. Supp. 2d 1169, 1175 (E.D. Cal. 2011) ("Under the statutory scheme, even if Plaintiffs are denied a concealed weapon license for self-defense purposes from Yolo County, they are still more than free to keep an unloaded weapon nearby their person, load it, and use it for self-defense in circumstances that may occur in a public setting.").

However, during the pendency of these appeals, California repealed its open-carry law, and enacted broad legislation prohibiting open carry of handguns in public

places.  AB 144, 2011–12 Leg., 2011–12 Sess. (Cal. 2011).[2] Thus, California now generally prohibits individuals from openly carrying a handgun—whether loaded or unloaded—in public locations.  *See* Cal. Penal Code § 25850 (prohibiting carry of a loaded firearm); *id.* § 26350 (prohibiting open carry of an unloaded firearm).[3]

> B.  *In the context of California's ban on open carry, the counties' ban on concealed carry for self-defense is unconstitutional*

In the context of California's choice to prohibit open carry, the counties' policies regarding the licensing of

---

[2] AB 144 provided, among other things, that "[a] person is guilty of openly carrying an unloaded handgun when that person carries upon his or her person an exposed and unloaded handgun outside a vehicle while in or on any of the following: (A) A public place or public street in an incorporated city or city and county. (B) A public street in a prohibited area of an unincorporated area of a county or city and county. (C) A public place in a prohibited area of a county or city and county."  Cal. Penal Code § 26350(a)(1).

[3] There are exceptions.  California law permits (1) possession of a loaded or unloaded firearm at a person's place of residence, temporary residence, campsite, on private property owned or lawfully possessed by the person, or within the person's place of business, Cal. Penal Code §§ 25605, 26035, 26055; (2) the transportation or carrying of any pistol, revolver, or other firearm capable of being concealed upon the person within a motor vehicle, unloaded and locked in the vehicle's trunk or in a locked container in the vehicle, and carrying the firearm directly to or from any motor vehicle within a locked container, *id.* §§ 25505, 25610, 25850; (3) carrying a loaded or unloaded firearm in some unincorporated areas, *id.* §§ 25850(a), 26350(a); and (4) carrying a loaded firearm where the person reasonably believes that any person or the property of any person is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property, *id.* § 26045.

concealed carry are tantamount to complete bans on the Second Amendment right to bear arms outside the home for self-defense, and are therefore unconstitutional.

*Heller* defined the right to bear arms as the right to be "armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello*, 524 U.S. at 143 (Ginsburg, J., dissenting)). Here, California has chosen to ban open carry but grants its citizens the ability to carry firearms in public through county-issued concealed weapons licenses. Thus, in California, the only way that the average law-abiding citizen can carry a firearm in public for the lawful, constitutionally protected purpose of self-defense is with a concealed-carry license. And in San Diego and Yolo Counties that option has been taken off the table. Both policies specify that concern for one's personal safety alone does not satisfy the "good cause" requirement for issuance of a license.

California's exceptions to the general prohibition against public carry do little to protect an individual's right to bear arms in public for self-defense. The exceptions for particular groups of law enforcement officers and military personnel do not protect the average citizen. Bearing arms on private property and at places of business does not allow citizens to protect themselves by bearing arms in public. And the exceptions for "making or attempting to make a lawful arrest" or for situations of "immediate, grave danger" offer no solace to an individual concerned about protecting self and family from unforeseen threats in public.

Here, as in *Heller*, the exceptions are limited and do not adequately allow the ordinary citizen to exercise his or her right to keep and bear arms for self-defense within the

meaning of the Second Amendment, as defined by the Supreme Court. Thus, the counties' concealed-carry policies in the context of California's open-carry ban obliterate the Second Amendment's right to bear a firearm in some manner in public for self-defense. *See also Moore v. Madigan*, 702 F.3d 933, 936–42 (7th Cir. 2012) (striking down the open-and-concealed-carry regulatory regime in Illinois because the state failed to justify "so substantial a curtailment of the right of armed self-defense").

C. *If the counties' policies were not a ban, remand to the district courts would be appropriate*

Even if the counties' policies in light of the California laws prohibiting open carry were not tantamount to complete bans, the proper remedy would be to remand to the district courts. The district courts did not have the benefit of our recent case law applying our Second Amendment framework. *See Jackson*, 746 F.3d at 963; *Chovan*, 735 F.3d at 1130. Additionally, the underlying statutory scheme has changed dramatically since the district courts' decisions. At the time the district courts rendered their decisions, California permitted unloaded open carry, a fact that both district courts relied upon to find that the counties' policies did not substantially burden any Second Amendment rights. *See Peruta*, 758 F. Supp. 2d at 1114–15; *Richards*, 821 F. Supp. 2d at 1175. However, open carry is now effectively prohibited.

Furthermore, reasonable jurists might find triable issues of material fact as to whether the policies substantially burden the right to carry a firearm in public for self-defense, whether there are open alternative channels to bear arms for self-defense, whether there are sufficient governmental interests

that justify some of the restrictions, and whether the restrictions are sufficiently tailored to those interests.  *See Jackson*, 746 F.3d at 963; *Chovan*, 735 F.3d at 1127.  Thus, if the counties' policies are to be upheld, in whole or in part, the parties ought to have the opportunity to present evidence as to these issues, and the district court ought to have the opportunity to consider this evidence under the correct framework.[4]

Instead of remanding, the concurrence would hold that the concealed-weapons restrictions here survive intermediate scrutiny.  The concurrence follows the approach of the Second, Third, and Fourth Circuits, which have held that states may limit the right to bear arms to persons who show good cause or meet a similar elevated standard.  But the analyses in these cases are questionable as they rely on pre-*Heller* interpretations of the Second Amendment.[5]  Even if

---

[4] On a remand, I would apply heightened scrutiny. *Jackson*, 746 F.3d at 964 (noting that a "severe burden" on the Second Amendment right "requires [a] higher level of scrutiny"); *see also Ezell v. City of Chicago*, 651 F.3d 684, 691–92, 708 (7th Cir. 2011) (applying "rigorous" review "if not quite 'strict scrutiny'" to law that required firing range training prior to gun ownership but then banned all firing ranges).

[5] For example, in *Drake*, the Third Circuit upheld New Jersey's requirement that prior to receiving a license to carry a gun, either openly or concealed, an applicant had to show a "justifiable need." 724 F.3d at 428.  The court held that restrictions on concealed weapons are "longstanding regulation[s] that enjoy[] presumptive constitutionality," and thus "regulate[] conduct falling outside the scope of the Second Amendment's guarantee." *Id.* at 434. *Drake* noted that New Jersey courts had upheld the restriction of gun permits in *Siccardi v. State*, 284 A.2d 533, 538 (N.J. 1971), and *Siccardi*, in turn, relied on *Burton v. Sills*, 248 A.2d 521, 525–26 (N.J. 1968). *Drake*, 724 F.3d at 432. *Burton*, however, erroneously held that the Second Amendment referred only to the collective right of the people to keep and bear arms, and not an

*Heller* and *McDonald* are seen as a departure from any prior understanding of the Second Amendment, they are law and remain binding upon us.

### III. The Majority Errs By Ignoring California's Choice to Ban Open Carry and Focusing Myopically on the Counties' Bans on Concealed Carry

The majority's opinion is not in accord with our usual approach to broadly defined constitutional rights, and fails to appreciate the context in which the Plaintiffs' challenges to the counties' policies arise. Moreover, its historical analysis is largely irrelevant because it again fails to appreciate the contexts in which the cited cases arose.

### A. *Courts review a law's constitutionality in that law's larger context, just as the Supreme Court did in Heller*

A holistic approach to evaluating concealed weapons laws in context of the open-carry laws comports with how courts have evaluated other laws that allegedly infringed on

---

individual right to self-defense. *Burton*, 248 A.2d at 526 ("As the language of the [Second] [A]mendment itself indicates it was not framed with individual rights in mind. Thus it refers to the collective right 'of the people' to keep and bear arms in connection with 'a well-regulated militia.'").

Similarly in *Kachalsky*, the Second Circuit noted that New York had long regulated the possession and use of firearms. 701 F.3d at 84–85. However, the Second Circuit acknowledged that "the law was upheld, in part, on what is now the erroneous belief that the Second Amendment does not apply to the states." *Id.* at 85.

constitutional rights.  In the First Amendment context, for example, our precedents inform us that we should not cabin our inquiry to the challenged law before us.  Rather, the preferred course is to examine other, related laws to determine the nature of the asserted constitutional right and the extent of the burden on that right.  *See, e.g.*, *Doe v. Reed*, 561 U.S. 186 (2010) (examining other disclosure laws to determine the constitutionality of a requirement to disclose petition signatories); *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520 (9th Cir. 2015) (en banc) (examining other disclosure laws to determine the constitutionality of a requirement to disclose the identity of a petition proponent).  Similarly here, we must examine the applicable open-carry restrictions to determine the nature of Plaintiffs' asserted right to some carry in public and the extent of the burden of the policies on that right.

B. *Defining the constitutional right to bear arms narrowly is inconsistent with judicial protection of other fundamental freedoms*

Regardless of how a jurist feels about the Second Amendment, there can be no doubt that *Heller* construed the words "keep and bear arms" broadly to encompass an individual's right to self-defense, as opposed to a collective right to keep and bear arms for maintaining a militia.  The Court has defined other constitutional rights broadly as well. *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015) (defining constitutional right as right to marry, not right to same-sex marriage); *Lawrence v. Texas*, 539 U.S. 558, 566–70 (2003) (right to privacy, not right to engage in sodomy); *Griswold v. Connecticut*, 381 U.S. 479, 485–86 (1965) (right to marital privacy, not the right to use birth control devices).  Thus, the question in *Obergefell* was not

whether the plaintiffs have a right to same-sex marriage, the question was whether the states' limitation of marriage to a man and woman violated the right to marry. The question in *Griswold* was not whether there was a constitutional right to use birth control, but rather whether the state's prohibition on birth control violated a person's right to marital privacy.

So too here. The individual constitutional right that Plaintiffs seek to protect is not the right to concealed carry per se, but their individual right to self-defense guaranteed by *Heller*. States may choose how to accommodate this right but they must accommodate it. This distinction may be subtle, but it is critical. Narrowly defining the right may disguise a law's substantive impact on a constitutional freedoms. *See, e.g.*, *Bowers v. Hardwick*, 478 U.S. 186, 190 (1986) (upholding sodomy law, holding that the Constitution does not "confer[] a fundamental right upon homosexuals to engage in sodomy"), *overruled by Lawrence*, 539 U.S. at 569 (striking down sodomy law, holding that "criminal convictions for adult consensual sexual intimacy in the home violate[d] [plaintiffs'] vital interests in liberty and privacy protected by the Due Process Clause of the Fourteenth Amendment").

The majority reasons, however, that "if that right is violated, the cure is to apply the Second Amendment to protect that right. The cure is not to apply the Second Amendment to protect a right that does not exist under the Amendment." Maj. Op. 51. This is an over-simplistic analysis. The counties and California have chipped away at the Plaintiffs' right to bear arms by enacting first a concealed weapons licensing scheme that is tantamount to a complete ban on concealed weapons, and then by enacting an open carry ban. Constitutional rights would become meaningless

if states could obliterate them by enacting incrementally more burdensome restrictions while arguing that a reviewing court must evaluate each restriction by itself when determining its constitutionality. *See Heller*, 554 U.S. at 629 ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional" (quoting *State v. Reid*, 1 Ala. 612, 616–17 (1840))).  Indeed, such an approach was rejected by *Heller* which discussed concealed-carry laws in the context of open-carry prohibitions. *Id.*[6]

By narrowly defining the asserted right as a right to concealed carry, the majority fails to recognize the real impact of the counties' policies on the Second Amendment right to keep and bear arms.

C. *Given the right to bear arms for self-defense extends beyond the home, states must accommodate that right to self-defense*

As explained above, given the right to bear arms for self-defense exists outside the home, it follows then that states must accommodate that right.  While *Heller* prohibits states from completely banning carrying a firearm in public for self-defense, it leaves states room to choose what manner of carry is allowed.  States may choose how to accommodate the right by allowing only open carry, only concealed carry, or some combination of both.  However, states may not disallow both

---

[6] Under the majority's approach, a court reviewing a challenge to California's regulation of the open carrying of firearms could not consider the fact that in some counties an ordinary citizen also cannot carry a concealed weapon.

manners of carry as the counties and California have done here.

The majority concedes that "[t]he Second Amendment may or may not protect to some degree a right of a member of the general public to carry a firearm in public." Maj. Op. 51. However, it claims that "[i]f there is such a right, it is only a right to carry a firearm openly." Maj. Op. 51. The majority's holding—that California *must* accommodate the right to bear arms in public through open carry—is unsupported by Supreme Court precedent and contrary to federalism principles. The Supreme Court has *never* dictated how states must accommodate a right to bear arms. The majority's cited cases, also cited in *Heller*, make this point clear. *See, e.g.*, *Reid*, 1 Ala. at 616–17 ("We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."); *Nunn v. State*, 1 Ga. 243, 243 (1846) ("A law which merely inhibits the wearing of certain weapons in a concealed manner is valid. But so far as it cuts off the exercise of the right of the citizen altogether to bear arms, or, under the color of prescribing the mode, renders the right itself useless-it is in conflict with the Constitution, and

void.").[7]  Thus, the majority errs by suggesting that states must accommodate the right to bear arms through open carry.

Moreover, the majority's requirement that states accommodate the right to bear arms through open carry is unwise.    States may have good reasons for allowing concealed carry but banning open carry.  *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1521 (2009) ("In many places, carrying openly is likely to frighten many people, and to lead to social ostracism as well as confrontations with the

---

[7] Because the majority miscasts the issue in these appeals, its historical analysis is largely irrelevant.  But there are also substantive problems with that analysis.  Some authorities are unpersuasive as they rely on a pre-*Heller* interpretation of the Second Amendment as being limited to a right to bear arms for purposes of maintaining a "well-regulated" militia.  *See, e.g.*, *Aymette v. State*, 21 Tenn. 154, 158 (1840) (limiting "arms" to mean those "such as are usually employed in civilized warfare, and that constitute the ordinary military equipment"); *State v. Buzzard*, 4 Ark. 18, 19 (1842) (rejecting individual Second Amendment right to self-defense; holding that right was tied to well-regulated militia); *English v. State*, 35 Tex. 473, 476 (1871) ("The word 'arms' in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense."); *State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891) (limiting "arms" to mean those "weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets,—arms to be used in defending the state and civil liberty").

Still other authorities, such as *Robertson v. Baldwin*, 165 U.S. 275 (1897), are of limited value because they fail to disclose whether the concealed-weapon law existed in conjunction with laws permitting open carry, or do not indicate whether the court interpreted the Second Amendment to be limited to a collective right related to the militia, instead of an individual right to self-defense.  *See also Walburn v. Territory*, 59 P. 972 (Okla. 1899).

police.").  Different states may have different opinions about whether concealed carry or open carry is preferable.  The point is that, under *Heller*, states cannot prohibit both open and concealed carry, thus eviscerating the right to bear arms in public for self-defense.[8]

## IV.   The Counties' Unfettered Discretion to Grant or Deny Concealed Weapons Licenses is Troubling

Finally, while the majority and I would decide this case on Second Amendment grounds, Plaintiffs have raised non-frivolous concerns as to whether the counties' discretion as to who obtains a license violates the Equal Protection Clause and constitutes an unlawful prior restraint.  The issues are not ripe for review, but I note that a discretionary licensing scheme that grants concealed weapons permits to only privileged individuals would be troubling.[9]   Such discretionary schemes might lead to licenses for a privileged class including high-ranking government officials (like judges), business owners, and former military and police officers, and to the denial of licenses to the vast majority of citizens.  *See, e.g.*, *McDonald*, 561 U.S. at 771 ("After the Civil War, many of the over 180,000 African Americans who served in the Union Army returned to the States of the old

---

[8] Despite California's belated appreciation of the importance of these appeals, the majority grants its motion to intervene.  Hence, now that California is a party, there is no reason to confine our inquiry to the counties' policies.  Rather, California's intervention supports examining Plaintiffs' challenges to the counties' policies in the context of the California open carry ban.

[9] Indeed, a declaration submitted by the County of San Diego indicates that the point of the concealed weapons licensing policy was to make concealed carry "a very rare privilege."

Confederacy, where systematic efforts were made to disarm them and other blacks. The laws of some States formally prohibited African-Americans from possessing firearms." (citations omitted)); Br. for Congress of Racial Equality, Inc. as Amicus Curiae Supporting Appellants 15, 20, 24, ECF No. 249 (arguing that California's gun control history evidences attempts to disarm ethnic minorities including persons of Mexican Heritage, Asian-Americans, and African-Americans); *cf.* Br. for Pink Pistols et al. as Amici Curiae Supporting Appellants 3, ECF No. 240 ("[W]ithout self-defense, there are no gay rights." (alteration and emphasis omitted)). Whatever licensing scheme remains in place in California or in other states, the right to keep and bear arms must not become a right only for a privileged class of individuals.

* * *

The Second Amendment is not a "second-class" Amendment. *See McDonald*, 561 U.S. at 780.

> Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of th[e] [Supreme] Court to pronounce the Second Amendment extinct.

*Heller*, 554 U.S. at 636. Today the majority takes a step toward extinguishing the Second Amendment right recognized by the Supreme Court in *Heller* and *McDonald*.

With no clear guidance from the Court regarding how to evaluate laws that restrict and obliterate the right to keep and bear arms for self-defense, the Second Amendment is becoming "[a] constitutional guarantee subject to future judges' assessments" which is "no constitutional guarantee at all." *Id.* at 634.

Accordingly, I dissent.

---

SILVERMAN, Circuit Judge, with whom BEA, Circuit Judge joins, dissenting:

I dissent from the majority's opinion because the challenged laws do not survive any form of heightened scrutiny – strict or intermediate scrutiny. *See D.C. v. Heller*, 554 U.S. 570, 629 n.27 (2008) (explaining that "rational-basis scrutiny" is inappropriate for reviewing Second Amendment challenges); *see also United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 187 (2014) ("In *Heller*, the Supreme Court did not specify what level of scrutiny courts must apply to a statute challenged under the Second Amendment.   The *Heller* Court did, however, indicate that rational basis review is not appropriate.").   The more lenient of the two standards – intermediate scrutiny – requires "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139.

No one disputes that the County Defendants and California have significant, substantial, and important interests in promoting public safety and reducing gun

violence.  *See Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) ("Sunnyvale's interests in promoting public safety and reducing violent crime are substantial and important government interests.").  However, the County Defendants and California have failed to provide sufficient evidence showing that there is a reasonable fit between the challenged laws and these two objectives.  *See Chovan*, 735 F.3d at 1140–41 (stating that it is the government's burden to establish that the challenged law survives intermediate scrutiny); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (explaining that summary judgment is appropriate if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").

In evaluating the constitutionality of a law under intermediate scrutiny, a reviewing court must assure that, in formulating their judgments, lawmakers have "'drawn reasonable inferences based on *substantial evidence.*'" *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997) (emphasis added) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994)); *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52 (1986) (explaining that the evidence that the lawmakers relied on must be "reasonably believed to be relevant to the problem" the government is addressing).  In evaluating whether California lawmakers have drawn reasonable inferences based on substantial evidence, it is important to note that the constitutional claims at issue in this case do not seek to provide all California citizens with the unrestricted ability to carry concealed firearms in public.  To the contrary, Plaintiffs do not challenge California Penal Code §§ 25655 and 26150's requirements:  (1) that a person desiring to carry a concealed firearm in public first obtain a concealed carry

license; and (2) that in order to obtain that license the person must be a law-abiding citizen of good moral character and complete the necessary course of firearms training.

Thus, Plaintiffs only challenge California's concealed carry licensing scheme as interpreted and implemented by San Diego County and Yolo County to the extent it prohibits certain law-abiding citizens, who have completed the necessary training and applied for the necessary license, from carrying a concealed firearm in public because they cannot satisfy San Diego County and Yolo County's required heightened showing of a particular need to carry a firearm in public for self-defense purposes. This distinction is important because the County Defendants and California have not provided any evidence, let alone substantial evidence, specifically showing that preventing law-abiding citizens, trained in the use of firearms, from carrying concealed firearms helps increase public safety and reduces gun violence. The County Defendants have merely provided evidence detailing the general dangers of gun violence and concealed firearms. This evidence is of questionable relevance to the issues in this case because it does not distinguish between firearm violence committed by people who are either concealed carry license holders or are qualified to obtain such a license and firearm violence committed by people who could not obtain a concealed carry license because of either their criminal record or because they have not completed the necessary course of firearms training.

There is simply no evidence in the record showing that establishing a licensing regime that allows trained law-abiding citizens to carry concealed firearms in public results in an increase in gun violence. Indeed, the only evidence in the record shows the exact opposite. Amici have provided

evidence showing that concealed-carry license holders are disproportionately *less* likely to commit crimes – including violent crimes such as aggravated assault with a deadly weapon – than the general population, and that the adoption of a concealed carry licensing regime such as the one proposed by Plaintiffs in other areas of the country has either had no effect on violent crime or has helped reduce violent crime. *See* Amicus Brief for the Governors of Texas, Louisiana, Maine, Mississippi, Oklahoma, and South Dakota at 10–15; Amicus Brief for International Law Enforcement Educators and Trainers Association, et al. at 22–26. Accordingly, the evidence in the record is insufficient to show that there is a reasonable fit between the challenged laws and the government's stated objectives.

Moreover, the undisputed facts in this case show that there is not a reasonable fit because California law arbitrarily allows its counties to set forth different standards for obtaining a concealed carry license without any reasonable or rational explanation for the differences. For example, in Sacramento County, Fresno County, Stanislaus County, and Ventura County, California Penal Code § 26150(a)'s "good cause" requirement is satisfied by the applicant simply stating that he wishes to carry a firearm in public for self-defense purposes. In contrast, in the two counties at issue in the present appeals – San Diego County and Yolo County – a desire to carry a firearm in public for self-protection purposes by itself is insufficient to satisfy § 26150(a)'s "good cause" requirement. California argues that local officials are best situated to determine what applicants should be required to show in order to satisfy the "good cause" requirement; and, therefore, it is reasonable to confer this discretion to its County sheriffs. However, it does not appear that California's sheriffs are exercising this discretion in a rational

way.  Neither California nor the County Defendants have provided any explanation for why it is reasonable and rational for a desire to carry a firearm in public for self-defense purposes to be insufficient to constitute "good cause" in Yolo County (population 213,016[1]) when right next door in Sacramento County (population 1,501,335[2]) it is sufficient to constitute "good cause."  There cannot be a reasonable fit if the same standard – here, § 26150(a)'s "good cause" requirement – is arbitrarily applied in different ways from county to county without any explanation for the differences.

In sum, I would hold that the challenged laws are unconstitutional under the Second Amendment because they do not survive any form of heightened scrutiny analysis, and therefore, I would reverse.

---

N.R. SMITH, Circuit Judge, dissenting:

I join the dissent of Judge Callahan.  I agree that the majority errs "by answering only a narrow question—whether the Second Amendment protects a right to carry concealed firearms in public."  Dissent 60.  I write separately only to express my opinion that the appropriate remedy is to remand this case to the district courts.

---

[1]  United States Census Bureau, State & County QuickFacts, Yolo County, California, http://www.census.gov/quickfacts/table/PST045215/06113,00 (last visited June 2, 2016).

[2]  United States Census Bureau, State & County QuickFacts, Sacramento County, California, http://www.census.gov/quickfacts/table/PST045215/06067,00 (last visited June 2, 2016).

## I.

This case turns on how the applicable issue is framed. The majority states the issue narrowly—whether the "Second Amendment . . . preserve[s] or protect[s] a right to carry concealed firearms in public." Maj. Op. 11. In contrast, the dissent[1] asks whether "[i]n the *context* of California's choice to prohibit open carry," the counties' restrictions on concealed carry violate the Second Amendment. Dissent 69 (emphasis added).

As a result of this difference in framing the applicable issue, the majority's arguments and the dissent's arguments are often like "two ships passing in the night." For example, the majority engages in a lengthy academic exercise to reach the conclusion that "the carrying of concealed weapons was consistently forbidden in England beginning in 1541; was consistently forbidden in the American colonies; and was consistently forbidden by the states." Maj. Op. 49–50. This historical analysis is relevant to the issue framed by the majority, but it is irrelevant to the issue framed by the dissent "because it again fails to appreciate the *contexts* in which the cited cases arose." Dissent 73 (emphasis added).

The majority's historical analysis is also unnecessary to resolve the issue as framed by the majority opinion. In *District of Columbia v. Heller*, the Supreme Court explicitly recognized that prohibitions on carrying concealed weapons were appropriate for regulating the manner in which

---

[1] All references to the dissent refer to the dissent of Judge Callahan.

individuals could exercise their Second Amendment rights.[2] 554 U.S. 570, 626 (2008).  If the issue before us is truly whether California can, in isolation, prohibit concealed carry, a simple memorandum disposition citing to *Heller* would be sufficient.  A formal opinion, much less the gathering of our en banc panel, would not be necessary to answer the issue framed by the majority.

Accordingly, I agree with the dissent's articulation of the relevant issue in this case.  We should not review the counties' concealed weapons licensing schemes in isolation. Instead, we must review them in the context of the underlying statutory scheme as a whole.  That review is consistent with the Supreme Court's approach in *Heller*.[3]  It is also consistent with our court's two-step Second Amendment inquiry.  *See Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014) (noting that, under the second step of the inquiry, courts should consider whether firearm regulations "leave open alternative channels for self-defense").

---

[2] The Supreme Court also recognized that context was important when reviewing a statute that regulates rights secured by the Second Amendment.  "A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."  *Heller*, 554 U.S. at 629 (quoting *State v. Reid*, 1 Ala. 612, 616–17 (1840)).

[3] *Heller* involved, in part, various prohibitions in the District of Columbia that (i) made it a crime to carry an unregistered firearm, (ii) prohibited the registration of handguns, and (iii) required a license to carry a handgun.  *Heller*, 554 U.S. at 574–75.  The Supreme Court did not review these prohibitions in isolation, but instead concluded that the various prohibitions together "totally ban[ned] handgun possession in the home."  *Id.* at 628.

Accordingly, we cannot ignore the context surrounding the counties' concealed carry prohibitions.

II

During the pendency of these appeals, California's underlying statutory scheme changed. At the time the district courts issued their decisions, California permitted unloaded open carry. However, under the current scheme, open carry (loaded and unloaded) is prohibited. *See* Dissent 68–69. Further, as noted by the dissent, the district courts did not have the benefit of our recent decisions in *Jackson*, 746 F.3d 953 and *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). *See* Dissent 71.

We have consistently concluded that, when confronted with an intervening change in law, the better approach would be to remand for the district court to consider the case under the new legal framework. *See, e.g.*, *Betz v. Trainer Wortham & Co.*, 610 F.3d 1169, 1171 (9th Cir. 2010) (discussing why "remand is the better procedure" when an intervening change in the law required further analysis of the facts of the case); *Baker v. Hazelwood (In re Exxon Valdez)*, 270 F.3d 1215, 1241 (9th Cir. 2001) (noting that, in cases where there is an intervening change in the law, it will often be "the better approach" to remand for the district court to "apply the appropriate standards"); *White Mountain Apache Tribe v. Ariz., Dep't of Game & Fish*, 649 F.2d 1274, 1285–86 (9th Cir. 1981) ("This court may remand a case to the district court for further consideration when new cases or laws that are likely to influence the decision have become effective after the initial consideration.").

Of course, we have discretion to determine "what questions may be taken up and resolved for the first time on appeal." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). We typically feel most comfortable resolving such an issue when it has nonetheless been "extensively litigated in the district court" or "where the proper resolution is beyond any doubt." *Beck v. City of Upland*, 527 F.3d 853, 867 (9th Cir. 2008) (quoting *Golden Gate Hotel Ass'n v. City & Cty. of San Francisco*, 18 F.3d 1482, 1487 (9th Cir. 1994)). However, neither circumstance is present here. The issue at hand—whether the counties' licensing scheme for concealed carry violates the Second Amendment in light of California's restrictions on open carry—was not litigated in the district courts. Further, as is apparent from the various opposing views of my colleagues, proper resolution of this issue is not beyond any doubt.

Indeed, we would benefit greatly from the district courts' expertise in developing the record and applying the appropriate standards in light of California's significant intervening change in its legal framework. I agree that the "challenged law burdens conduct protected by the Second Amendment." *Chovan*, 735 F.3d at 1136. I would therefore remand to allow the district courts to initially determine and "apply an appropriate level of scrutiny." *Id.*

Accordingly, I dissent.